# Marc H. Richman, Inc.

*Consulting Engineers - Forensic Engineers - Metallurgists/Materials Engineers*

One Richmond Square
Suite 107C
Providence, Rhode Island 02906
Telephone: 401-751-9656
Facsimilie: 401-751-9210
mhrichman@aol.com
www.marchrichmanengineering.com

27 June 2005

Andrew J. Tine, Esq.
Haese, LLC
30 Federal Street, 3rd Floor
Boston, MA 02110-2508

In re: **Dossantos and Bunton v Sears**

Ref: 4995

Dear Mr. Tine:

In response to your request, I have investigated the injuries to Jasmine D. Bunton and have examined the refrigerator/freezer associated with those injuries. Due to the delay in production of detailed dimensional drawings of the parts and components of the ice maker/crusher/dispenser as well as factory replacement parts for the instant refrigerator/freezer, a preliminary report dated 30 June 2005 was issued. Since then, Sears has installed factory replacement parts so that the refrigerator/freezer is in essentially the same condition in which it was at the time of the incident. No detailed dimensional drawings have yet been produced by Sears or Whirlpool. My investigation cannot be completed at this time without those detailed dimensional drawings, but I was able to inspect and examine the refrigerator/freezer with the replacement parts installed. The following report, therefore, may be subject to change based upon my review of those detailed dimensional drawings at a subsequent date, but it does represent my report of this investigation as well as my conclusions and opinions in this matter as of this date.

## 1. Introduction:

The following report is based upon my inspection of the instant refrigerator/freezer on 31 March 2005 and again on 19 July 2005, my discussions with Jasmine D. Bunton and Laurenco P. Dossantos, my review of the deposition transcripts of Jasmine D. Bunton, Laurenco P. Dossantos and Stephen G. Boughton, and my review of discovery materials Bates 1-388. It is also based upon my experience of 36 years as a Professor of Engineering at Brown University, Providence, RI and over 48 years as a Forensic Engineer in private practice.

## 2. Background:

The refrigerator/freezer in the Bunton/Dossantos apartment on 16 April 2004 had been purchased from Sears and had been manufactured by Whirlpool. It came with provision for

**EXHIBIT C**

hooking up a water line to the freezer for the icemaker and through the door dispenser of ice (crushed or cubed) and ice water. Mr. Dossantos had decided that he would not have the water line hooked up, but would simply put plastic ice trays into the freezer and make ice cubes manually. He was not aware that the ice crusher was being used by anyone.

According to Jasmine D. Bunton, she put ice cubes made in the individual trays into the hopper on the inside of the door of the freezer. She would then utilize the controls on the outside of the door to deliver ice cubes or crushed ice to a glass.

On 16 April 2004, Jasmine D. Bunton put a glass against the ice dispenser on the exterior of the freezer door and pressed the control for crushed ice. She saw several ice cubes fall into the glass (not crushed ice) and then nothing further. She used her fingers and hand to reach in through the delivery chute to free what she surmised was an ice cube jam. As she was doing this, her arm pressed against the dispenser lever. That activated the ice crusher mechanism while her hand and fingers were still inside the unit.

When she felt something cut into her, she pressed the lock control and the knives stopped moving. She tried to pull her hand out, but was unable to do so. She called for help from her grandmother, and a cousin called 911. The Boston Fire Department managed to take apart the ice crusher mechanism on the inside of the door and free up Jasmine's hand. She was then taken to the hospital for emergency treatment.

Subsequent to that, the ice crusher/hopper was not replaced until recently when a Sears technician delivered and installed the replacement parts which restored the refrigerator/freezer to its original configuration. The water line was still not hooked up to provide automatic ice making.

## 3. Investigation

On 31 March 2005, I met with you at the residence of Jasmine Bunton and Laurenco Dossantos and inspected the instant refrigerator/freezer.

Those parts which had been removed or broken during the rescue attempt had not been replaced.

I also spoke with Jasmine Bunton and Laurenco Dossantos.

The refrigerator/freezer is shown in the photograph presented in Fig. 1. It is a side-by-side refrigerator/freezer equipped with ice (cube or crush) and ice water dispensers on the exterior of the freezer door.

The manufacturer's identification label is shown in Fig. 2. The model number for this Kenmore Coldspot is listed as 106.53634300 and the serial number as SP2535958. This label also indicates that the unit has the Underwriters Laboratory seal.

The ice and ice water dispensers are shown in Fig. 3. The dispenser for the ice is at the left and for the ice water at the right. These are the types of dispensers where a glass is pushed against the grey pad to activate delivery of the desired product. The form of the ice – cube or crushed – is controlled by the pad above the dispensers. These controls are shown in closer detail in Fig. 4. At the left is a LOCK/UNLOCK for the dispenser. The LOCK prevents

**EXHIBIT C**

the dispensers from delivering product until the UNLOCK is depressed. It only requires pressure to go from LOCK to UNLOCK and no parental code is necessary.

The center two controls are for the crushed ice (to the left) and for the ice cubes (to the right). If the crush is selected, the ice crusher in the door will turn on and crush the ice cubes in the hopper until sufficient product has been delivered and pressure is removed from the grey dispenser pad.

At the right are the two controls for a light at this dispenser location. The left control shuts off the light and the right one turns it on.

The ice in cube or crushed form is delivered through a clear plastic delivery chute of 2-1/2 inch inside diameter. There is a flap at the top end of the delivery chute. This flap closes the opening into the freezer. In the photograph in Fig. 5, my finger is pushing that flap into the freezer compartment. The flap in the closed position is shown in Fig. 6.

On the inside of the freezer door (Fig. 7) there is an opening of almost rectangular form and a steel collar and gear which engages the ice crusher and hopper (not present on 31 March 2005). The opening is approximately 4-1/2 inches across and 2-3/4 inches wide as can be seen from the 6-inch ruler placed across the opening in Figs. 8 & 9.

Jasmine is shown standing in front of the refrigerator/freezer with her left hand just below the ice delivery chute in Fig. 10. The size of her hand relative to the diameter of the plastic chute can be seen in Fig. 11.

On my inspection of 19 July 2005, the ice hopper and crusher had already been installed by a Sears technician. This can be seen in Figs. 12 & 13. This is called the spacesaver ice storage system (see Fig. 14) and can be removed from the door by depressing the blue button on the right side. The underside of the ice crusher is shown in Fig. 15. The crushing knives are visible in the center of this photograph and in the closer view in Fig. 16.

With the ice crusher and hopper removed, the flap at the foot of the delivery chute inside the freezer door is shown in Fig. 17 and in closer view in Fig. 18. This flap opens inwards when the grey pad dispenser is pushed by a glass. The diagonal distance from the rim of the rectangular opening to the inside of the flap is 6-3/4 inches and the distance from the corresponding point on the underside of the crusher unit to the lowest knife is 1-1/2 inches. This makes the distance from the flap to the knife as 8-1/4 inches.

There is no warning on the exterior of the freezer door cautioning users about the danger of pushing their fingers or hands up the delivery chute. There is no parental code to prevent youngsters from being allowed to push buttons and activate the ice crusher while they have their hand and fingers up the delivery chute. The only warning contained in the owner's manual is to be careful that a sturdy glass is used so that it does not break when pressing it against the grey dispenser pad and when the ice cubes are falling into that glass.

### 4. Analysis

According to the deposition testimony of Mr. Boughton and the safety audits performed by Whirlpool, a UL articulated probe was used to determine that the point of operation of the ice crusher blades was protected by location, i.e. the probe could not be inserted far enough into

**EXHIBIT C**

the delivery chute for the finger to reach the blades. It was also testified by Mr. Boughton that this was the only probe used by Whirlpool.

The articulated UL probe simulates an anthropomorphic adult hand and fingers. It is shown in the photograph from the web site of Ergonomics, Inc. in Appendix A. The dimensions of this probe taken from an Underwriters Laboratory Product Safety Newsletter is included in Appendix A as is the calibration of an actual articulated finger probe.

The hand dimensions of this UL articulated accessibility probe would prevent that part of the probe from penetrating far enough up the 2-1/2 inch ID chute to allow the finger to reach the rotating knife.

This test probe does not represent a child's fingers, hand, wrist, etc. There are jointed children's finger probes JFP32 (see Appendix B) sold by Ergonomics, Inc. which come in two different sizes – one for simulation of 0 – 36 month old children and the other for 3 to 14 year old children. These are used to test for accessibility by children into dangerous points of operation. These finger probes are manufactured in accordance with IEC 61032 Figs. 12 and 13 which list the dimensions of these probes. These dimensions as well as a calibration for a set of children's finger probes are included in Appendix B. These test probes are also cited in U.S. Federal Regulations, Title 16, Volume 2, Chapter 11, Part 1500 for consumer products.

The children's finger probes have diameters of the hand/wrist which would allow penetration into the 2-1/2 inch ID delivery tube, past the flap, and up to the location of the rotating knives of the crusher mechanism.

There is no question that Jasmine was able to insert her hand and fingers sufficiently far into the chute that she contacted the rotating knives. Had Whirlpool performed a safety audit using the children's finger probes, this danger would have been discovered and corrective action taken - a design change, appropriate and adequate warnings and instructions, and a parental lock code to preclude unauthorized youngsters from being able to turn on the ice crusher mechanism.

Without the detailed dimensional drawings which have not yet been produced by defendants, it can be stated at this time that it would only take an 8-1/4 inch penetration through the 2-1/2 inch diameter ID chute to reach the rotating knives. This distance would be more properly calculated based on detailed dimensional drawings that have not yet been produced.

The injury to Jasmine Bunton would not have occurred unless the refrigerator/freezer were so designed and/or manufactured to allow her fingers to penetrate into the ice dispenser from outside the door sufficiently far as to reach the point of operation of the ice crusher without any interlock shutting off the moving parts of the ice crusher or without a guard blocking her access to that point of operation.

The refrigerator/freezer should have been designed so that the small fingers of a child of this age could not reach in from the outside and encounter the moving parts of the ice crusher mechanism.

There should have been a guard to block access from the outside and/or an interlock switch to deactivate the moving parts of the ice crusher mechanism in the event that a child tried to reach in from the outside. Barrier guards of various types have been stipulated by ANSI and ASME for protecting people from moving parts at points of operation. The dimensions of the

**EXHIBIT C**

necessary barrier guards are dependant on the dimensions of the opening and the distance from the throat of that opening to the point of operation.

While it would be difficult to design a barrier guard or interlock capable of distinguishing between the presence of ice in the chute and a child's hand, the chute could have been made of such geometry that entry up to the point of operation by a child would have been precluded. This could have taken the form of a tortuous chute path, a greater distance to the point of danger, or other similar design changes.

Furthermore, there should have been an emergency button on the ice dispenser panel that would have cut out the functioning of any of the controls on that panel especially the ice crushing controls. Jasmine immediately hit the LOCK button when she felt something had caught or cut her hand. That stopped the blades. An emergency (E-STOP) button would do the same thing, but it would prevent any other control from working until the entire panel were reset. In Jasmine's case, had anyone hit the UNLOCK accidentally while she was caught and her arm was depressing the grey dispenser pad, the knives would have begun to rotate again. This could not happen if there had been an E-STOP.

It is foreseeable that youngsters will use the ice and ice water dispensers on a refrigerator/freezer of this type. Parents should be able to prevent use of these dispensers by having a parental code which would LOCK the ice delivery and ice water delivery until an adult inserted the proper coding to UNLOCK these functions. This would have rendered the ice dispenser more child resistant.

The manual for the refrigerator/freezer should have warned of the danger of using one's fingers to clear a blockage in the ice dispenser and done so with the necessary warning and danger symbols in the manual or by the use of video tape or DVD to illustrate to the purchasers how to use the refrigerator/freezer safely and without risk. It should also have included warnings to parents to instruct them in how to prevent unauthorized use of these functions by youngsters.

The manual does not detail or explain to anyone that with no water line hookup and with no automatic ice maker, the hopper and ice crusher can still be filled with manually frozen ice cubes and the ice crusher and dispenser utilized. A parent who has not hooked up the water line and uses ice cube trays would be unaware, as Mr. Dossantos had been, that individual cubes of ice could be placed in the hopper and that the crushing of ice could still occur with this unit.

## 5. Opinions

Based upon the above-described preliminary investigation, the following are my opinions in this matter:

The instant refrigerator/freezer was defective in its design and/or manufacture and was unfit for its intended purpose in that there was access to the moving parts of the ice crusher mechanism from the exterior of the freezer door by a youngster's fingers and that this point of operation was not guarded by location with respect to children.

The instant refrigerator/freezer was defective in its design and/or manufacture and was unfit for its intended purpose in that the manual did not adequately warn by text, schematics, decals or videos that the ice crusher could be used even though the water line and automatic

**EXHIBIT C**

ice maker were not hooked up and did not adequately warn by text, schematics, decals or videos of the dangers to be encountered by someone (especially a youngster) trying to clear a jam with their fingers from the outside.

It is further my opinion that there should have been an emergency stop button on the door panel as described supra.

It is also my opinion that a parental lock out code should have been available to preclude use of the ice crusher function by unauthorized youngsters.

It is, therefore, my opinion to a reasonable degree of Engineering certainty that the proximate cause of the injuries to Jasmine Bunton was the defective design of the refrigerator/freezer, the inadequate warnings and instructions on the freezer and in the manual, and the lack of a parental lock out code and that these defects rendered the instant refrigerator/freezer model unreasonably dangerous and unfit for its intended purpose.

Sincerely,

Marc H. Richman, Sc.D., P.E.
President

MHR/cp
Datawp\Dossantos Report.doc

**EXHIBIT C**



**Hand Surgical Associates, Inc.**

125 Parker Hill Avenue
Boston, MA 02120-3295
Tel: (617) 738-0857
Fax: (617) 731-3109
www.BostonHand.com

**Paul Feldon, M.D.**
Associate Clinical Professor
Orthopaedic Surgery

**Hervey L. Kimball, III, M.D.**
Clinical Instructor
Orthopaedic Surgery

**Edward A. Nalebuff, M.D.**
Clinical Professor
Orthopaedic Surgery
Chief, Hand Surgery Section NEBH

**Andrew L. Terrono, M.D.**
Associate Clinical Professor
Orthopaedic Surgery

September 27, 2005

Steven Key, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02129

Re: Jasmine Bunton vs. Sears Roebuck
    Date of Birth: July 8, 1996

Dear Mr. Key:

I am writing to you at this time to clarify my previous medical report dated March 15, 2005. At that time, I concluded that although the patient had a serious injury involving the digital nerves of both the index and mid fingers, she had been treated very well with bridge grafts using the sural nerve. I noted that her sensation had recovered quite well to the distal interphalangeal joint crease of both digits. I felt that with additional time, her sensation would probably extend to the tips of the fingers. I felt that she was going to achieve a very good result from her nerve repairs but would probably never have completely normal sensation in these digits.

I estimate that her functional loss in the hand will be less than 10% based upon the amount of future improvement that she achieves during the next six to twelve months.

The patient has regained very good function in the hand but does have some thickened scars which may need revision in the future. She does have some altered sensation on the lateral aspect of the foot as a result of using the sural nerve as a bridge graft. This sensory loss is permanent but of very little functional significance in this location.

Sincerely,

*Edw. A Nalebuff MD*

Edward A. Nalebuff, M.D.

EAN:ba



Care of the Hand, Wrist, & Elbow

New England Baptist Bone
and Joint Institute

Offices in:
• Boston
• Braintree
• Brighton
• Wellesley

**EXHIBIT D**



**Hand Surgical Associates, Inc.**

125 Parker Hill Avenue
Boston, MA 02120-3295
Tel: (617) 738-0857
Fax: (617) 731-3109
www.BostonHand.com

**Paul Feldon, M.D.**
Associate Clinical Professor
Orthopaedic Surgery

**Hervey L. Kimball, III, M.D.**
Clinical Instructor
Orthopaedic Surgery

**Edward A. Nalebuff, M.D.**
Clinical Professor
Orthopaedic Surgery
Chief, Hand Surgery Section NEBH

**Andrew L. Terrono, M.D.**
Associate Clinical Professor
Orthopaedic Surgery

September 30, 2005

Steven Key, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Boston, MA 02129

Re: Jasmine Bunton vs. Sears Roebuck
    Date of Birth: July 8, 1996
    Date of Examination: March 15, 2005

Dear Mr. Key:

I had the opportunity to examine Jasmine Bunton on March 15, 2005 in regard to an injury she sustained to her non dominant left hand in April of 2004 and review the complaint, the patient's initial disclosure and the medical records that I received.

The patient was accompanied by her father who provided some of the medical history. The history indicates that when the patient was 8 years of age, she accidentally had her hand caught in an ice dispenser where it became stuck and required help to free it. She initially was taken to the Boston Medical Center where sutures were applied to lacerations she had on the volar aspect of the palm at the base of the index and middle fingers. According to the patient's father, it was not noted that she had diminished sensation in the index and mid fingers.

She subsequently went to the New England Medical Center where she was seen by her primary care physician, Dr. Johnson, who referred her to Dr. Charles Cassidy, a hand surgeon. His records were reviewed and indicate that she had evidence of diminished sensation on both aspects of the index and mid digits as the digital nerves were divided at the distal palm. The patient was subsequently taken to the operating room and the area explored. The digital nerves were, in fact, divided and it was not possible to bring them together for an end-to-end repair. It was, therefore, elected to make a second incision on the lateral aspect of her left ankle where 7 cm of the sural nerve were taken to be used as nerve grafts. The surgery was carried out microscopically and small sections of the sural nerve were used to bridge the defects in the digital nerves which were then repaired with 10.0 suture material.



Care of the Hand, Wrist, & Elbow

New England Baptist Bone
 and Joint Institute

Offices in:
- Boston
- Braintree
- Brighton
- Wellesley

**EXHIBIT D**

Campbell, Campbell, Edwards & Conroy          Re: Jasmine Bunton
Page 2

The patient had a smooth postoperative course and the wounds healed. However, she developed some thickening on the volar aspect of her thumb and in October of 2004, a small revision was made of the volar scar. The patient has not had any additional treatment although it has been noted that she might need some revision of the palmar scar which spans the area between the index and middle finger and the thumb.

At the present time, the patient's complaints are both in the hand and the ankle. She has tenderness over the area where the sural nerve was taken and finds that this particularly is bothersome when running. She notes some discomfort in the hand when she tries to stretch the thumb away from the other digits and this is related to the palmar scar. She also has diminished sensation in the index and mid fingers.

My examination reveals that the hand has a good appearance and she demonstrates an excellent range of flexion and extension. She is able to oppose her thumb to the other digits without difficulty. There is a healed oblique scar extending from the base of the index finger toward the thumb which is thickened and is tight once the thumb is abducted. She has another oblique scar over the lower aspect of the index finger which is well healed. There is a small scar on the dorsum of the left thumb over the MP joint area. Sensation was carefully tested throughout the hand and she has good two point discrimination to about 6 mm over the major portion of the index and mid fingers but not beyond the distal interphalangeal joint crease. At that point, her sensation is reduced with very little light touch perception. However, the skin itself is intact and there is no evidence that she has burned herself or hurt the skin because of diminished sensation. On examination of her hand, I note that her pinch strength is 4 pounds on the left and 7 pounds on the right. Her grip strength is 15 pounds on the left and 25 pounds on the right. On examination of her ankle, she has a 3" to 4" thick scar along the lateral aspect which demonstrates a keloid formation. She describes altered sensation on the lateral aspect of the foot in the distribution of the sural nerve.

Conclusion: This patient had a serious injury involving the digital nerves of both the index and mid fingers. She was treated very well with bridge grafts using the sural nerve. There is a reasonable degree of medical certainly that the nerve sensation will ultimately extend to the fingertips. Any impairment that she may have will be less than 10% of hand function. At some future date, she could be helped with a Z plasty to modify the volar incision which is somewhat tight and restricts thumb abduction. The scar on the lateral aspect of the ankle may also need to be revised in the future but certainly there is no rush in this regard as keloids often will soften and improve with time. I believe she is going to have a very good result from her nerve repairs.

Sincerely,

Edward A. Nalebuff, M.D.

EAN:ba

**EXHIBIT D**