UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASMINE D. BUNTON, BY HER LEGAL GUARDIAN, LOURENCO P. DOSSANTOS, and LOURENCO P. DOSSANTOS,<br><br>    Plaintiffs,<br><br>v.<br><br>SEARS ROEBUCK and COMPANY and WHIRLPOOL CORPORATION,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) No.: 04-CV-12369-NG<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS SEARS ROEBUCK & CO. AND WHIRLPOOL CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants Sears Roebuck & Co. ("Sears") and Whirlpool Corporation ("Whirlpool") (hereinafter "Defendants"), file this response to Plaintiffs' Motion for Partial Summary Judgment. The Defendants state there are genuine issues of material fact to be determined on Plaintiffs' Motion which prevent summary judgment as a matter of law.

## FACTS

The Plaintiff family purchased a Kenmore brand refrigerator from a Sears store in Braintree, Massachusetts. The refrigerator was manufactured by Whirlpool and contained an "in-door" ice dispensing unit. The ice dispenser panel has control buttons that allow the user to dispense crushed ice or ice cubes, activate or deactivate a light, and lock or unlock the ice dispenser. (Boughton Dep. 16:2-14; Ex. A). Whirlpool conducted a safety audit on the subject model refrigerator (Boughton Dep. 15:1-3, 18-20; Ex. A) and conducted safety tests in conformance with Underwriters Laboratory (Boughton Dep. 43:8-15; Ex. A). The design of the

refrigerator met all Whirlpool safety requirements and passed all Underwriters Laboratory's testing procedures. (Boughton Report, Ex. B).

The Plaintiff family chose not to hook up the water hose to the ice maker, so the refrigerator was incapable of producing ice. Instead, members of the Plaintiff family would place ice cubes (made in trays) into the ice container located inside the refrigerator door and use the in-door unit to dispense ice. Mr. Dossantos, the father of Jasmine Bunton, testified that he was unaware that anyone in the family used the ice dispenser to get crushed ice or that Jasmine knew how to operate the ice dispenser. (Dossantos Dep. 38:11-19; 42:9-18; Ex. C).

Plaintiffs brought the above-captioned matter against Defendants alleging that on or about April 16, 2004, Plaintiff Jasmine Bunton, who was eight years old at the time of this incident, was injured when her hand became stuck in the mechanical workings of the ice crusher when she inserted her hand and arm up into the ice chute in order to reach crushed ice. Jasmine stated that the ice dispenser would only dispense ice cubes and she wanted crushed ice. (Bunton Dep. 24:15-24; Ex D). When the dispenser would not produce any more ice, she stuck her hand in the chute to see if any ice was in the chute. (Bunton Dep. 28:6-16; Ex D). The distance from the opening of the ice chute to the ice crusher mechanism is approximately eight inches. (Boughton Dep. 51:15-22; Ex. A). Jasmine inserted her hand into the chute to a point midway up her arm until she reached the blades of the ice crusher. (Bunton Dep. 30:16-23; Ex D). While her hand was inserted in the chute, the lower portion of her arm pressed against the lever which activated the blades and cut her hand. (Bunton Dep. 31:7-17; Ex D). Once she felt the blades begin to cut, Jasmine immediately hit the "lock" button on the ice dispenser (Bunton Dep. 42:17-24; Ex D), then called for her grandmother and another family member, a cousin. Unable to free

2

her hand, the cousin called the police, however, Jasmine testified that she talked to the police and told them what happened. (Bunton Dep. 44:6-12; Ex D).

The Boston Fire Department arrived at the scene to extricate Jasmine's hand from the icemaker. According to the fire department report, the process took approximately one and a half hours. (Fire Dept. Report, Ex. E). The firemen dismantled the ice dispenser unit in order to disentangle her fingers without further injury. While this process took place, Jasmine, although tearful, remained calm. (Dossantos Dep. 44:14-23; Ex. C). Jasmine was taken to the emergency room where doctors sutured her cuts. A few weeks later additional surgery was performed on her hand which included graft of a nerve section from Jasmine's left ankle into her injured hand.

Plaintiffs seek partial summary judgment on the issue of Defendants' liability under the Breach of Warranty cause of action. This memorandum will demonstrate that genuine issues exist and that Plaintiffs' motion should be denied.

## **LAW**

Summary judgment should not be granted if the Court determines that there are any genuine issues of material fact. Furthermore, in ruling on a motion for summary judgment, the Court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491 (1962); Berard v. General Motors Corp., 493 F. Supp. 1035, 1037 (D. Mass. 1980).

On a breach of warranty claim, the essential elements are: "(1) that the defendant manufactured or sold the product; (2) that a defect or unreasonably dangerous condition existed at the time the product left the defendant's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold; (3) that at the time of his injury, the

3

plaintiff was using the product in a manner that the defendant intended or that could reasonably have been foreseen; and (4) that the defect or unreasonably defective condition . . . was a legal cause of the plaintiff's injury." Lally v. Volkswagen, 698 N.E.2d 28 (Mass. App. Ct. 1998).

Under Massachusetts law, the "merchant seller warrants that his goods are, among other things, 'fit for the ordinary purposes for which such goods are used.'" Back v. Wickes Corp., 378 N.E.2d 964, 969 (Mass. 1978). "Clearly, a defendant is not liable for the consequences of the unforeseeable misuse of a product." Id. (finding that manufacturer is not obliged to design against bizarre, unforeseeable accidents). To prove defective design as a breach of warranty, the plaintiff must prove that the design was not fit for ordinary usage because of a defect making it unreasonably dangerous. Wasylow v. Glock, Inc., 975 F. Supp. 370 (D. Mass. 1996). "[A] product is 'reasonably fit' if the design avoids the 'reasonably foreseeable risks attending the product's use.'" Wasylow at n.12.

"Massachusetts law, which controls this case, requires manufacturers to design and produce products with reasonable care to eliminate avoidable dangers arising from reasonably foreseeable uses of the product." Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 26 (1st Cir. 2004). Ducharme v. Hyundai Motor America, 698 N.E.2d 412, 415 (Mass. 1998); Simmons v. Monarch Mach. Tool Co., Inc., 596 N.E.2d 318, 322 (Mass. 1992); Colter v. Barber-Greene Co., 525 N.E.2d 1305, 1313 (Mass. 988); Uloth v. City Tank Corp., 384 N.E.2d 1188, 1191 (Mass. 1978). In exercising its duty, a manufacturer has duty to design products with reasonable care and is held to the standard of an ordinary reasonably prudent designer in like circumstances. Back v. Wickes Corp., 378 N.E.2d 964, 971 (Mass. 1978); Fahey v. Rockwell Graphic Sys., Inc., 482 N.E.2d 519, 523 (Mass. App. Ct. 1985). A plaintiff asserting a personal injury claim based on a breach of an implied warranty of merchantability must prove that, at the time of the injury,

the plaintiff was using the product in a manner that the defendant seller or manufacturer reasonably could have foreseen. Allen v. Chance Mfg. Co., 494 N.E.2d 1324, 1326 (Mass. 1986). A plaintiff who uses a product in an objectively unreasonable manner may be barred from recovering. Id.; Cigna Insurance Co. v. Oy Saunatec, LTD., 241 F.3d 1, 15 (2001); Colter v. Barber Greene Co., 525 N.E.2d 1305, 1312, (Mass. 1988). "The plaintiff has the burden in design defect cases to show that the manufacturer failed to exercise reasonable care to eliminate avoidable or foreseeable dangers to the user of the product. There is no duty on the part of the manufacturer to design a product that is risk free or risk proof; nor does the manufacturer have a duty to guard against dangers which are only remotely possible or highly speculative." Morrell v. Precise Eng'g, 630 N.E.2d 291, 293 (Mass. App. Ct. 1994). See also Wasylow v. Glock, Inc., 975 F. Supp. 370, 379 (D. Mass. 1996). The mere fact that the plaintiff experienced an unexpected event with the product and suffered injury is not sufficient evidence to establish that a defect existed in the product. Walsh v. Atamian Motors, Inc., 406 N.E.2d 733 (1980)(Rescript); Harrod v. Edward E. Tower Co., 194 N.E.2d 392, (1963) ; Morillo v. Clippard Instrument Laboratories, Inc., 535 N.E.2d 616, (1989).

**ARGUMENT**

A.   **PLAINTIFFS CANNOT ESTABLISH A PRIMA FACIE CASE FOR BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

   1)   **The refrigerator was not defectively designed and was not unreasonably dangerous.**

In breach of warranty actions, Massachusetts has adopted the principles set out in Restatement (Second) of Torts § 402A. Under these principles, Plaintiffs must show that the product was in a defective condition when it left the Defendants' possession. Plaintiffs have no evidence that the subject refrigerator was defectively designed or that a defective condition made

5

the refrigerator unreasonably dangerous. Defendants' expert, Stephen Boughton, who was involved with the design and safety audit on the subject model refrigerator, testified that the refrigerator is not a dangerous product.

> Q. And how were you involved with the design or manufacture of that refrigerator?
> A. I would have been involved with the model approval process, and in particular, the safety audit on this model.

(Boughton Dep. 14:23-24; 15:1-3; Ex. A).

> Q. Is this a product that Whirlpool considers to be dangerous by its nature?
> A. No.
> Q. Is this a product that can become dangerous through normal use?
> A. No.

(Boughton Dep. 49:7-12; Ex. A).

Moreover, the refrigerator was designed to prevent the type of injury that occurred in this case. In addition to several other safety features, the design includes a significant distance from the opening of the ice chute to the crusher mechanism of at least eight inches.

> Q. Do you have knowledge of the dimensions or distances from the chute entranceway to the ice crusher mechanisms?
> A. Approximately, yes.
> Q. Approximately, can you tell me?
> A. I believe it's around 8 inches. It might be a little more than that, but I think that's approximately right.

(Boughton Dep. 51:15-22; Ex. A).

> Q. What features are in place to stop someone from putting their hand up the ice chute?
> A. The diameter of the bottom of the opening.
> Q. Any other features?
> A. Well, that combined with the length between there and the crusher blades.
> Q. Any other features besides the diameter of the opening and the distance between the opening and crusher blades as a safety feature to stop someone from injuring themselves and putting their hand up there?
> A. There is also a trap door that is covering the bottom of the chute.

(Boughton Dep. 55:9-22; Ex. A).

Defendants have no duty to design a "risk free" or "risk proof" product. Morrell v. Precise Eng'g, 630 N.E.2d 291 (Mass. App. Ct. 1994). The design of the subject refrigerator avoids

6

reasonably foreseeable risks of contact with the ice crusher mechanism and thus is not unreasonably dangerous.

    2)    **Plaintiff's actions were not reasonably foreseeable.**

The Plaintiff has the burden of proving that she was using the product in a manner that Defendants could reasonably have foreseen. Allen v. Chance Mfg. Co., 494 N.E.2d 1324 (Mass. 1986). Plaintiffs assert that because it is foreseeable that underage children would have access to the kitchen and refrigerator, the Defendants should have designed the product a broader range of risks arising out of the use of the icemaker and refrigerator. However, while it is reasonably foreseeable that a child would have access to a kitchen and refrigerator and could possibly use the ice dispenser for properly dispensing ice, it is not reasonably foreseeable that a child would stick her entire arm into the ice chute.

Plaintiffs have presented not evidence that this accident was the type that was or should have been reasonably foreseeable to Whirlpool. No witnesses for the Plaintiffs or Defendants were aware of a similar ice chute incident prior to this incident. Mr. Boughton's report stated that the "safety audit and hazard analysis process failed to reveal any incident similar to the Bunton incidence, and therefore this incident and injury was not reasonably foreseeable by Whirlpool Corporation." (Boughton Report, Ex. B). Mr. Boughton also testified in his deposition that in the many years he has worked in refrigerator design, Plaintiff's injury was the first of this kind that he had encountered.

    Q.    Are you aware of any present or past claims against Whirlpool by anyone claiming to have been injured by putting their hand up the ice dispenser chute?
    A.    This is the first one I have heard of. I've been involved in refrigerator design since 1968.

(Boughton Dep. 67:24; 68:1-6; Ex. A).

When questioned regarding the foreseeability of plaintiff's conduct, Mr. Boughton did testify that it was foreseeable that a nine-year old would use the refrigerator and the ice or water dispenser. However, Mr. Boughton also testified that it was <u>not</u> foreseeable that the ice dispenser would be used to crush ice that was not formed in the automatic ice maker.

> Q. Was it foreseeable to Whirlpool that an end user would take ice from an ice tray and put it into the ice bin for dispensing?
> A. I don't know if that was ever considered. As I said, that was not the intent of the design.
> Q. Let me ask you your opinion then, whether you believe that it is foreseeable that an end user would use ice trays to make their own ice and put it in the ice collection bin for dispensing from the automatic dispenser?
> A. Well, this is the first time I have ever heard of anybody doing that. So I suppose I would say no.

(Boughton Dep. 37:6-20; Ex. A).

Mr. Boughton stated that users could attempt to dislodge ice jams in the ice chute by sticking their fingers into the dispensing chute. However, because of the small diameter of the opening and the distance from the opening to the cutting mechanism, Mr. Boughton did <u>not</u> think that it was reasonably foreseeable that a person could be injured in that manner.

> Q. Could you elaborate on that; why you do not believe that to be a safety hazard?
> A. Well, when I clear an ice jam like that in my refrigerator, I reach up there and I dislodge the cubes and they fall out.
> Q. Can you can (sic) reach up with your hand?
> A. As far as I can. That opening, of course, is not very far. But I can reach up far enough. If there are ice cubes jammed in there and if I can free it from underneath, I'll do that and make the ice cubes fall out. If I can't reach the jam, then I open the door and reach in from the inside.
> Q. And in the refrigerator which you are using at home to free ice jams, are you concerned about reaching too far and reaching any working parts?
> A. No.

(Boughton 41:19-24; 42:1-13; Ex. A).

Mr. Boughton also did not believe it reasonably foreseeable that a person would stick their entire hand or arm into the ice chute and cause an injury while trying to dislodge ice. Not only is the

8

diameter of the chute opening and the distance from the opening to the blades designed to avert injury (Boughton Dep. 55:9-22; Ex. A), but the position of the ice would also prevent injury.

> Q. Potentially, if you had this subject model refrigerator and reached up 8 inches and hit the ice crusher mechanism and depressed the lever activating it, potentially you can hurt yourself?
> A. Well, I can't because I can't get my hand up there.
> Q. But if someone could, they could hurt injure themselves that way?
> A. Not if you were dislodging ice cubes, no.
> Q. Why not?
> A. Because the ice cubes would be in the way.

(Boughton Dep. 54: 5-17; Ex. A).

When Jasmine stuck her arm in the ice dispenser she was not trying to free an ice jam, she was trying to get crushed ice instead of ice cubes.

> A. I went to go get some ice, and then it just came out with the cubes. Then I kept on pressing "crush." I went to go put up my hand, and then I pressed my hand against the button, and it just cut me.
> Q. Okay. So you were trying to get—you wanted to get crushed ice?
> A. Yes.

(Bunton Dep. 24:16-24; Ex D).

Plaintiff inserted her arm into the dispenser in an attempt to push ice up and away from the cutter blades.

> Q. When you stuck your arm up in the shoot, what were you trying to do?
> A. I was trying to get that ice cube away from the thing so it could come down. Then it just, like, cut me.
> Q. When you stuck your arm up in there, was there ice blocking the shoot?
> A. Yes.
> Q. How did you get your arm past the ice?
> A. Because I pushed really hard. But then my hand hit the lever, and it just cut me.
> Q. When you say you pushed it really hard, why did you do that?
> A. Because I was trying to get the ice up.

(Bunton Dep. 31:18-24; 32:1-8; Ex D).

9

The fact that Jasmine put her arm in the ice dispenser up to the middle portion of her arm (Bunton Dep. 30:16-23; Ex D) represents an action that was unforeseen by Defendants or by the Plaintiff's family.

### 3) **The refrigerator and ice dispenser at issue were suitable for the ordinary use of goods of that kind.**

Defendants are not liable for Plaintiff's injury due to the unintended use of the product. "The fact that a seller, manufacturer, or distributor is not liable if a plaintiff is injured as a consequence of his unforeseeable misuse of a product is most properly analyzed as an element of the plaintiff's case, since he must prove that his injury was caused by a defect making the product unfit for its ordinary use." Correia v. Firestone Tire & Rubber Co., 446 N.E.2d 1033, 1041, n. 15 (Mass. 1983). The ordinary purpose and intended use of the ice dispenser unit was to crush ice. The refrigerator at issue was designed to dispense crushed ice from the automatic ice maker into a chute. Use of the ice maker and dispenser was not the cause of Plaintiff's injury.

It was not an intended or foreseeable use that a user would stick their hand approximately eight inches (Boughton Dep. 51:15-22; Ex. A) up the chute to reach for ice cubes or crushed ice.

> Q. Potentially, if you had this subject model refrigerator and reached up 8 inches and hit the ice crusher mechanism and depressed the lever activating it, potentially you can hurt yourself?
> A. Well, I can't because I can't get my hand up there.
> Q. But if someone could, they could hurt injure themselves that way?
> A. Not if you were dislodging ice cubes, no.
> Q. Why not?
> A. Because the ice cubes would be in the way.

(Boughton Dep. 54: 5-17; Ex. A).

In fact, Whirlpool performed a safety test on the subject model refrigerator, using a test procedure and probe developed by Underwriter's Laboratory's ("UL") to determine if a user could be injured by putting their hand up the ice chute.

10

> Q. This UL test probe which is put [into] the ice dispenser to see if it makes contact with dangerous pitch points or things of that nature?
> A. Along with any other opening in their product, yes.
>
> &ast;&ast;&ast;
>
> Q. If you go to the bottom item, No. 7, and I'll read this: "Do any openings in the enclosure permit access to moving parts during normal operation." Next to it is says AC. What does AC mean?
> A. Acceptable.

(Boughton Dep. 59:18-22; 61:4-10; Ex. A).

The ice dispenser design used in this refrigerator passed all UL testing procedures and is approved and listed by UL as passing all safety testing requirements. (See Boughton Report, Ex. B). The ice dispenser at issue was suitable for the ordinary purpose of dispensing ice.

### 4) **Defendants have no duty to warn against unforeseeable use of the refrigerator.**

A manufacturer has a duty to warn of the probable results of normal use or of other uses that can be reasonable anticipated. A manufacturer of a dangerous product is "under a duty to give warnings of such dangers to persons who foreseeably will come in contact with that product." Wasylow v. Glock, Inc., 975 F. Supp. 370, 378 (D. Mass. 1996). However, a refrigerator with ice dispenser is not a dangerous product, nor was it normal or reasonably anticipated by Defendants that users would stick their arm eight inches into the ice chute of the ice dispenser unit. Manufacturers are under no duty to warn against uses which were neither intended by the manufacturer nor within the reasonably foreseeable use of the product. Thibault v. Sears, Roebuck & Co., 395 A.2d 843 (N.H. 1978). "[A] manufacturer is not required to warn that placing one's hand into the blades of a potato chopper will cause injury, that permitting a three-year-old child to ride on the running board of a moving tractor risks injury to the child, or that firing a BB gun at another at close range can injure or kill." Laaperi v. Sears, Roebuck & Co., 787 F.2d 726, 731 (1st Cir. 1986). Because it was not reasonably foreseeable that 1)

11

Plaintiff would use the ice dispenser unit when the automatic icemaker was not activated, or 2) Plaintiff would be able to reach the ice crusher mechanism with her fingers, Defendants are not liable on Plaintiffs' failure to warn claim.

### B. THE EXISTENCE OF AN ALTERNATIVE DESIGN DOES NOT PRECLUDE PLAINTIFF'S INJURY

Plaintiffs assert that alternative refrigerator designs existed that could have prevented the Plaintiff's injury. Plaintiffs have no evidence that an alternative design would have prevented the injury in this case and therefore Plaintiffs' claim must fail. See Gillespie v. Sears, Roebuck & Co., 386 F.3d 21 (1st Cir. 2004) (holding that without showing that better design of blade guard would have prevented plaintiff's injury, plaintiff could not prevail on theory of design defect). Plaintiffs misstate Mr. Boughton's testimony regarding the alternative designs. Mr. Boughton testified regarding a previous model refrigerator that had the ice crusher located in the freezer compartment of the refrigerator. Mr. Boughton did not state that the mechanism was "a much greater distance from children's hands" or that the ice maker was "outside of the range of human limbs" or that it would have been "impossible for a child . . . to reach into the cutting tools of the ice crusher through the chute." (Pl.'s Mem. Supp. Summ. J. at 8).

> Q. So was there a previous model or previous design where the ice bucket was located in the back part of the freezer, as opposed to the freezer door?
> A. It was located on a shelf in the freezer compartment before.
> Q. Did that subject model refrigerator have a crusher mechanism, also, the ability to crush ice?
> A. Yes.
> Q. Where was the crusher located in that model refrigerator?
> A. At the front of the ice bucket.
> Q. Not in the freezer door, but in the back of the freezer itself or on one of the shelves?
> A. At the front of the bucket, which is sitting on a shelf in the freezer compartment.

(Boughton Dep. 58:9-24; 59:1; Ex. A).

12

The distance between the opening for the ice and the moving parts of the ice crusher mechanism would have been the same on the earlier model as in the subject model, not less.

Mr. Boughton acknowledged that an activated lock would prevent an ice crusher from working, but he did <u>not</u> state that it "would have made it impossible, without knowing the code, for a child to operate a 'locked' ice/water dispenser." (Pl.'s Mem. Supp. Summ. J. at 8).

> Q. When the lock is on does it prevent the ice crusher from working; when the lock is activated, does it prevent the ice crusher from working?
> A. Yes.

(Boughton Dep. 51:10-14; Ex. A).

The subject refrigerator was subjected to UL testing procedures and passed all safety tests. (See Boughton Report, Ex. B). Despite Plaintiffs' suggested alternative designs, the injury that Plaintiff experienced could still have occurred if Plaintiff used the product in a way Defendants could not have reasonably foreseen as she did in this case.

## **CONCLUSION**

As there are genuine issues of material fact on the issues of liability and defect, summary judgment is not appropriate on Plaintiffs' claims under the breach of warranty theory. Plaintiffs have not shown that the refrigerator and ice dispenser were defectively designed, nor have they shown that the refrigerator and ice dispenser were unsuitable for their ordinary use or that the Defendants should have reasonably foreseen the unintended use of the product by the minor Plaintiff. Accordingly, Plaintiffs cannot prove the requisite elements of their breach of warranty claim and Plaintiffs are not entitled to partial summary judgment. For the reasons set forth above, Defendants respectfully request this Court deny Plaintiffs' Motion for Partial Summary Judgment.

Respectfully submitted
**SEARS, ROEBUCK AND CO., and
WHIRLPOOL CORPORATION**
By their Attorneys,
CAMPBELL CAMPBELL EDWARDS &
CONROY, PROFESSIONAL CORPORATION


/s/ Steven M. Key
Richard L. Edwards (BBO# 151520)
Steven M. Key (BBO# 638145)
One Constitution Plaza
Boston, MA 02129
(617) 241-3000
redwards@campbell-trial-lawyers.com
skey@campbell-trial-lawyers.com

AND

Robert W. Foster, Jr., Esq. (Admitted Pro Hac Vice)
Nelson Mullins Riley & Scarborough LLP
1320 Main Street, 17th Fl.
Columbia, South Carolina  29201
(803) 799-2000

**CERTIFICATE OF SERVICE**

I, Steven M. Key, certify that on November 4, 2005, a true copy of ***Defendants Sears Roebuck & Co and Whirlpool Corporation's Response To Plaintiffs' Motion For Partial Summary Judgment*** was sent by first-class mail, postage prepaid to Andrew J. Tine, Haese, LLC, 70 Franklin St., 9th Floor, Boston, MA  02110

/s/ Steven M. Key
Steven M. Key