UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASMINE D. BUNTON, BY HER LEGAL GUARDIAN, LOURENCO P. DOSSANTOS, and LOURENCO P. DOSSANTOS,<br><br>Plaintiffs,<br><br>v.<br><br>SEARS ROEBUCK and COMPANY and WHIRLPOOL CORPORATION,<br><br>Defendants. | No.: 04-CV-12369-NG<br><br>**DEFENDANTS SEARS ROEBUCK & CO. AND WHIRLPOOL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFFS' EXPERT (MARC H. RICHMAN)** |

## INTRODUCTION

Marc Richman ("Richman") is Plaintiffs' engineering expert who opines that the design of the refrigerator/freezer is defective and unreasonably dangerous for its intended purposes. In addition, Richman goes outside his expertise by offering opinion testimony that the warnings on and accompanying the product were inadequate. Richman conducted no testing to support his opinion, nor did he conduct any peer review research to support his opinion. Richman's alternative design theories are not generally accepted in the industry. To the contrary, Richman states "there's not testing needed" in this case. Furthermore, he concedes he is not aware of any refrigerator manufacturer who uses the alternative designs and warnings he advocates in this case.

The Court should disallow Richman from offering defective design and warning opinions because his expert opinions fail to meet the reliability and relevance requirements established by Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

## FACTUAL BACKGROUND

The Plaintiff family purchased a Kenmore brand refrigerator from a Sears store in Braintree, Massachusetts. The refrigerator was manufactured by Whirlpool and contained an "in-door" ice dispensing unit. Whirlpool conducted an internal safety audit on the subject model refrigerator (Boughton dep., pp. 15, ll.18-20, Ex. A), and conducted all safety tests in conformance with Underwriters Laboratory (Ex. A, p.43, ll.8-15) According to both Defendants' and Plaintiffs' experts, the design of the refrigerator met all Whirlpool safety requirements and passed all Underwriters Laboratory's testing procedures. (Boughton Report, Ex. B; Richman dep., pp. 36-37, 39, 110, 111,116 , Ex. C).

Plaintiffs brought the above-captioned matter against Defendants alleging that Plaintiff Jasmine Bunton, who was eight years old at the time, was injured when her hand became stuck on mechanical parts when she inserted her hand and arm into the ice chute in order to reach crushed ice. Jasmine stated that the ice dispenser would only dispense ice cubes and she wanted crushed ice. When the dispenser would not produce any more ice, Jasmine stuck her hand in the chute to see if any ice was in the chute. (Bunton dep., pp. 24, 28, Ex. D).

The distance from the opening of the ice chute to the ice crusher mechanism is slightly more than eight inches. (Ex. A, p. 51; Ex. C, p. 116-17). Jasmine inserted her hand and arm into the ice chute to a point midway up her arm until she reached the blades of the ice crushing mechanism. (Ex. D, p. 30). While her hand was inserted in the chute, the lower portion of her arm, just below her elbow, pressed against the lever, which activated the blades and cut her hand. (Id. at 31).

Richman testified that he was retained by Plaintiffs' attorney on March 4, 2005. He conducted an initial inspection of the refrigerator at issue on March 31, 2005, for approximately

one hour. (Ex. C, p. 8). At this preliminary inspection, he "basically looked at the refrigerator/freezer and took down the [model and serial] numbers [and] [t]alked to Jasmine and her father and asked them how this happened. . . ." (Id. at 9). Richman looked at the refrigerator/freezer, but noted in his preliminary report that "[t]hose parts which had been removed or broken during the rescue attempt had not been replaced." (Richman 06/30/05 Report, Ex. E; Ex. C, p. 51). The ice maker and ice crushing mechanism were not present during this initial inspection.

Richman prepared a preliminary report based on this visit, even though he did not actually inspect the ice maker system, concluding that the product was "defective in its design and/or manufacture and was unfit for its intended purpose." (Ex. E). Richman was able to reach his opinion before ever actually seeing the ice maker system. (Id.) Richman examined the refrigerator a second time on July 19, 2005, with the ice maker mechanism properly installed, and had basically the same opinions as those stated in his preliminary report. (Richman 07/27/05 Report, Ex. F; Ex. C, p. 44). Richman's opinions are based on two inspections lasting a combined total of two hours, one of which when the ice maker and crusher mechanism were not even installed in the refrigerator. (Ex. C, p. 123).

## LEGAL ARGUMENT

**A. Marc Richman Opinion Testimony Should Be Excluded Because He Is Not Qualified To Render Opinions, and Opinions Are Scientifically Unreliable.**

Pursuant to Rule 104 of the Federal Rules of Evidence, preliminary questions concerning the qualification of a person to be a witness are to be determined by the Court.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, <u>a witness qualified as an expert by knowledge, skill, experience, training, or education</u>, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

3

>sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added).

In Daubert, the United States Supreme Court made clear that trial judges must act as gatekeepers with the duty to actively scrutinize testimony for reliability, relevance and qualifications.  The trial judge must make a preliminary assessment pursuant to Rule 104(a) to determine (1) whether the proposed expert is qualified to testify as an expert by "knowledge, skill, experience, training, or education," and (2) whether the reasoning or methodology underlying the expert's proposed opinions is "reliable" and "relevant."  It is the responsibility of the trial judge to admit only relevant and reliable testimony from qualified expert witnesses.

In the instant case, Richman's proposed testimony should be excluded because Richman is not qualified by "knowledge, skill, experience, training, or education" to render an opinion on refrigerator design, or the warnings and instructions for operation on a refrigerator.  Furthermore, his proposed opinions are unreliable and irrelevant because his purported feasible alternative designs have not been tested, subject to peer review or generally accepted.  Therefore, his proposed testimony should be excluded.

### 1. **Richman's Lack of Qualifications**

Qualifying an expert witness is a matter addressed to the sound discretion of the trial court.  See United States v. Salimonu, 182 F.3d 63, 72 (1st Cir. 1999). The witness must be qualified by "knowledge, skill, experience, training, or education" in order to testify as an expert in the form of opinion.  Fed. R. Evid. 702.

Courts have excluded expert testimony where the witness, although an expert on some subjects, was not qualified with respect to the subject matter of the opinion to be elicited.  See

4

e.g., Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co., 958 F.2d 1169 (1st Cir. 1992).  In Tokio Marine, the court upheld the exclusion of testimony from a mechanical engineer who opined that a crane was defective.  Although the proposed expert witness had construction experience, he had no direct experience with the operation, repair or maintenance of cranes.  Id. at 1174.  The court stated that expert testimony of design defects in such a product required "meaningful cost-benefit analysis," including "considerable familiarity" with the device and its operation, as well as design, manufacturing, marketing and industry standards.  Id.  In addition, the court cited the proposed expert's "hired gun background as an instant expert in an astonishing number of other areas" as yet another reason for exclusion of his testimony.  Id. at 1175.

In this case, Plaintiff proposes to submit Richman's opinions that the Kenmore refrigerator and ice maker system were defectively designed and lacked adequate warnings and instructions.  At his deposition, Richman conceded he had zero experience relating to ice dispensing systems on refrigerators.  (Ex. C, p. 66). He also admitted he had no experience in designing refrigerators, or any part thereof, including ice dispenser systems. (Id. at 66, 75).  This case is the first time he has ever even evaluated an ice dispensing system. (Id. at 80). Richman also testified that he has no experience with warnings or instructions for refrigerators.  (Id.)

Richman is offered as an expert by Plaintiffs, yet he admitted he has no experience in refrigerator design or warnings relating to refrigerators.  If Richman qualifies as an expert witness on the design of a refrigerator ice dispenser system, then any engineer would be capable of qualifying as a design expert in this case.  From Richman's Biographical Sketch and deposition, it is clear that Richman's true expertise, like that of the purported expert in Tokio Marine, lies in acting as a professional witness in product liability and other litigation.  He has been identified as an "expert" in cases involving swimming pools, porch railings, exploding

5

deodorant, placement of utility poles, walk-in refrigerators, circular saws, automobile seatbelts, elevators, pulverizing machines, ladders, lawn furniture, liquid nitrogen, train doors, sailboats, motorcycles, restaurants and parking lots. A list of trials, depositions and hearing at which Richman has testified indicates that since March 1991 he has testified in over 100 cases. (Richman List of Cases, Ex. G). However, this litigation is Richman's first exposure to an ice dispensing system. Therefore, it appears that his only expertise lies, like that of the proposed expert in Tokio Marine, in an "astonishing number of areas," but none that relate to the design issues in this case.

Other courts have appropriately recognized that Richman should be limited in his areas of alleged expertise. Richman's proposed expert testimony has been excluded in prior cases because he was not qualified, and his testimony was not reliable and relevant. In Raimbeault v. Takeuchi Mfg. (U.S.), Ltd., 772 A.2d 1056 (R.I. 2001), Richman's opinion testimony was offered by plaintiff in a product liability case involving a small backhoe. Richman concluded that the design of the product was defective and offered design improvements such as a warning system that would light up to alert the operator of the backhoe as to the direction in which the backhoe was operating. Id. at 1060. Richman also testified that the warnings associated with the operation of the backhoe were inadequate. Id. After Richman testified, the trial judge excluded his testimony. In excluding in the testimony, the judge noted that Richman did not have any experience in tractor machinery and had no experience in designing cabs for track-driven machinery. Id. The trial judge concluded that "Richman's opinions were the product of the instant litigation and not the result of scientific research or experimentation." Id. On review, the Supreme Court held that "Richman did not have 'knowledge, skill, experience, training or

6

education' [under] our Rule 702 nor was his testimony 'relevant, appropriate, or of assistance to the jury,'" 772 A.2d at 1062. In support of its holding, the court held:

> With regard to the "knowledge, skill, experience or education" requirement set forth in Rule 702, we note that Richman had no design experience with regard to track-driven machinery. Specifically, he had no experience with designing cabs for track-driven machinery. Furthermore, Richman had limited experience with warnings and instructions in general, and no experience with warnings and instructions as related to track-driven excavators. Indeed, he had never even designed a warning for a commercially marketed product in connection with the actual marketing of the product. Moreover, Richman was not human factors engineer and he had no training in the area of human factors. Thus, Richman did not have the "knowledge, skill, experience, training, or education" required by Rule 702.

Id. The Raimbeault Court determined that Richman had no experience in the area he was offering his expert opinion and thus was not permitted to testify. (See also Ex. C, p. 67, 68). Similarly, Richman has no experience in designing refrigerators, or any component thereof, including ice dispenser systems (Ex. C, p. 66, 75) and has "no experience as to warnings and instructions as related to" refrigerators. (Raimbeault at 1062; see also Ex. C, p. 80). "Thus, Richman d[oes] not have the 'knowledge, skill, experience, training, or education' required by Rule 702" and his testimony, therefore, should be excluded. Raimbeault at 1062.

The only time Richman was offered as an expert in a consumer refrigerator case[1] he was precluded by the trial judge from offering an opinion regarding refrigerator design. (Ex. C, p. 82). The case of Fletcher v. Whirlpool was dismissed by the trial judge after all of Richman's opinions were excluded as scientifically unreliable.

    Q.   You testified in [Fletcher v. Whirlpool]. Correct?
    A.   Yes, I did.
    Q.   And your testimony was disregarded and thrown out by the trial judge. Correct?

---

[1] Richman has offered opinion testimony regarding refrigerator fire cause and origin, but not basic refrigerator design.

    A.    Yes, you're right there.

(Ex. C, p. 71).

    Q.    [W]ould you agree with me that in the Fletcher v. Whirlpool case your opinions about a defect in a refrigerator were completely disregarded by the trial judge? Would you agree with that?
    A.    Yes, because I did no testing in it.
    Q.    The only other consumer residential refrigerator case you have ever been involved in, your testimony was rejected. Correct?
    A.    That's the Fletcher case.
    Q.    The Fletcher case.
    A.    Yes.

(Id. at 84).

In summary, Richman is a metallurgist who admits that he has no experience in refrigerator design or warning and instructions for refrigerator operation. His only experience with refrigerator and ice dispenser design has been in connection with this litigation. Spending a total of two hours examining the subject refrigerator and ice dispenser system should be insufficient to offer "meaningful cost-benefit analysis" and other design opinion. Just because Richman offers himself as an expert on any type of product should not qualify him as an expert witness in this case. Therefore, pursuant to Rule 702 of the Federal Rules of Evidence, Richman is not qualified as an expert to express any opinions regarding the design of refrigerators and ice dispenser systems, or warning and instructions regarding refrigerator operation.

    **2.**    **Richman's Opinions are Scientifically Unreliable**

Regardless of Richman's qualifications, this Court must exclude an expert's opinion if the methodology he employed to reach an opinion is not scientifically reliable. Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). The United States Supreme Court has emphasized the subject of an expert's testimony must be scientific knowledge. This requirement "establishes a standard of evidentiary

reliability." Daubert, 509 U.S. at 590. Where an expert's opinion is not scientifically based, an expert's knowledge is no more than a "subjective belief of unsupported speculation" and the mandates of Rule 702 of the Federal Rules of Evidence are not met. Id. The First Circuit "accord[s] the trial court broad deference in its determination as to the reliability and relevance of expert testimony, reviewing the determination only for abuse of discretion." Hochen v. Bobst Group, Inc., 290 F.3d 446, 452 (1st Cir. 2002).

The Daubert and Carmichael decisions require this Court to determine whether expert testimony is reliable. The emphasis of such an inquiry should focus solely on the expert's principles and methodologies, not on the conclusions generated. Daubert, 509 U.S. at 594-95.

The Carmichael court expounded on the district court's "gatekeeping" requirement.

> The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

526 U.S. at 152. (emphasis added).

Under the "reliability" prong of the Daubert analysis, the district court must determine whether the expert's testimony reflects "scientific knowledge," whether the expert's findings are "derived by the scientific method," and whether the expert's work product amounts to "good science." Daubert, 509 U.S. at 590, 593. In analyzing this reliability prong, the Supreme Court identified four, non-exclusive factors to be considered by the district court, which are:

(1) Testing - Whether the expert's theory can be and has been tested;
(2) Peer Review and Publication - Whether the theory has been subjected to peer review and publication;
(3) Rate of Error - Whether the technique or methodology has an acceptable known or potential rate of error; and
(4) General Acceptance - Whether the theory is generally accepted in the relevant scientific community.

9

Daubert, 509 U.S. at 593-94.

The most important factor in the Daubert analysis is whether the scientific theory advanced can be and has been tested by scientific method. See Schmaltz v. Norfolk & Western Ry., 878 F. Supp. 1119, 1121 (N.D. Ill. 1995). "Scientific methodology is based on generating hypotheses and testing them." Daubert, 509 U.S. at 593.

Testing one's hypothesis is critical to show that an expert "adhered to the same standards of intellectual rigor that are demanded in their professional work." Cummins v. Lyle Indus., 93 F.3d 362, 369 (7th Cir. 1996). "Adherence to engineering standards of intellectual rigor almost always requires testing of a hypothesis if the expert cannot point to an existing design in the marketplace." Colon v. Bic USA, Inc., 199 F. Supp. 2d 53, 76-77 (S.D.N.Y. 2001). This point is particularly relevant to this case bacause Richman cannot point to any manufacturer who follows his alternative design, and Richman has concluded every manufacturer of ice dispensers have defective designs.

After testing, one of the foremost means of evaluating whether an expert's testimony is based upon reliable scientific principles is to determine whether "the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." Daubert v. Merrill Dow Pharms., Inc., 43 F.3d 1311, 1318 (9th Cir. 1995) (Daubert II) ("[T]he ultimate test of [a scientific expert's] integrity is her readiness to publish and be damned."). Richman did not even bother to do any peer review research to determine if his hypothesis has ever been subject to peer review in the scientific community.

    a.    **Richman's Design Defect Opinions**

Richman's opinions regarding a design defect in the ice dispenser system of the subject refrigerator are unreliable because Richman has done no scientific work to support his opinions.

Richman's opinions regarding the design of the subject refrigerator has never been tested, subjected to peer review, nor is it generally accepted in the relevant scientific community. Basically, Richman's opinions are nothing more than his personal, subjective views of ice dispenser design.

Richman opined the ice maker design is defective simply because Jasmine "was able to get her hand into the ice guide [and] come into contact with the blades," and because a child is able to press the water and/or ice lever. (Ex. C, pp. 54-55, 57-59). Richman's opinion concluded all refrigerators allowing a child to use an automatic ice dispenser are defective, and all automatic ice dispensers presently on the market, by all manufacturers, are defective.

> Q. So any refrigerator/freezer that has an automatic ice dispenser where you can have ice come into your cup or glass without opening the freezer door, if a child can do that, in your opinion, that's a defective design?
>
> A. Yes.
>
> Q. Do you know of any refrigerator manufacturer that has a parental control panel that has a more complicated system, as you're describing, so that a child cannot automatically unlock the ice dispenser?
>
> A. No, I don't.
>
> Q. So any manufacturer of refrigerators in the world that makes a refrigerator/freezer with an automatic ice dispenser that allows a child to stick a glass up to the ice dispenser and allows ice to come right out, those are defective designs?
>
> A. Yeah.

(Ex. C, pp. 60-61).

Richman offers two alternative design theories -- "guarding by location" and adding a parental lock out code on the control panel (Ex. C, pp. 90-91, 99; Ex. F). Other than proclaiming the subject design was defective, Richman performed no testing, no literature review and no standards review to support his "seat-of-the-pants alternative design."

> Q. Now, have you tested the potential hazards that that type of design might create that the existing design does not create?

11

| | | |
|---|---|---|
| A. | Not – I have not built a revised ice crusher mechanism that would have the characteristics I'm talking about. | |
| Q. | So you have not tested yourself this – | |
| A. | This alternative design. | |
| Q. | The alternative design. | |
| A. | No. | |
| Q. | Before you actually recommended to a refrigerator manufacturer that they change to this alternative design, would you agree that you would want to test that to see if it would work or not? | |
| A. | What I'm doing – what I did is offer you a ***seat-of-the-pants alternative design***. | |

(Ex. C, pp. 100-01) (emphasis added).

The Daubert decision was intended to preclude these "seat-of-the-pants" opinions. Daubert requires science. Richman's opinions regarding defect could not be more devoid of science.

| | |
|---|---|
| Q. | Have you actually pulled any standards for your work in this case? |
| A. | No. |

(Ex. C, p. 88).

| | |
|---|---|
| Q. | [H]ave you pulled any literature of any type for your work in this case? |
| A. | No. |

(Id. at 89).

| | |
|---|---|
| Q. | Have you examined any exemplar refrigerator for your work in this case? |
| A. | No, sir. |
| Q. | Have you examined any exemplar ice dispensing system for your work in this case? |
| A. | No, sir. |

(Id. at 86).

| | |
|---|---|
| Q. | Did you do any testing in this case, the case we have before us today? |
| A. | Tried to stick my hand in, the girl stuck her hand in and got it cut. |
| . . . | |
| Q. | -- did you do any other testing in this case? |
| A. | I made measurements. *There's no testing needed here because the girl -- there's no question but that the girl was injured by the ice crusher.* |

(Id. at 72-73) (emphasis added).

| | |
|---|---|
| Q. | And you did not test this product with any probes, correct? |

12

   A. That's correct.

(Id. at 118).

  Richman openly admits he did no testing for this case, and that testing is not needed for him to conclude this product was defective. He opines there is a defect in the ice maker design based solely on the fact that an injury occurred. Richman admits he did not need any science to support his opinions.

> [I]t doesn't take much science to realize that if a child dumps ice water on the floor or ice cubes on the floor, there is a slipping hazard. Every one of us knows you can slip on ice. . . . With kids, they can pick up an ice cube and choke on it or crushed ice and choke on it. So that's how I came to that conclusion. It's common sense. It doesn't have to be a Ph.D. science to know that you slip on ice or slip on water.

(Ex. C, pp. 76-77).

  Additionally, Richman admits that his theory of "guarding by location" has not been subjected to peer review or scrutiny. In Richman's own words, peer review will not work because his alternative designs are only "conceptual."

  Q. There is no study about guarding by --
  A. Location.
  Q. -- location dealing with an ice dispensing system?
  A. Not that I know of, no.

(Ex. C, p 120).

  Q. Have you subjected your alternative design proposals for this refrigerator to any type of peer review or scrutiny?
  A. No. Because if I had made an alternative design and put it together, that's one thing. But without – just conceptually, peer review isn't gonna work.

(Id. at 122).

  Furthermore, Richman is unaware of any manufacturer utilizing the alternative designs he suggests in his expert report. Basically, Richman did not bother to consider what other

13

manufacturer designs entailed. None of Richman's proposed theories are generally accepted or used in the refrigerator manufacturing industry.

> Q. Do you know of any refrigerator manufacturer that incorporates any of your design suggestions that you have written in your preliminary report or your final report?
> A. No.

(Ex. C, p. 77).

> Q. Do you know of any refrigerator manufacturer that has an interlock system that you've described in your preliminary and final report?
> A. No, I don't.

(Id. at 79).

> Q. Do you know of any other manufacturer who has utilized a child-resistant push button lock/unlock panel?
> A. No.

(Id. at 80).

> Q. Are you aware of any manufacturer that has actually implemented an alternative design the same as or similar to the ones you are advocating in this case?
> …
> A. No. Without taking apart their units, I wouldn't know.

(Id. at 103-04).

Even though Richman never did any testing of his alternative designs for this case, he acknowledged that in the real world of manufacturing, testing his alternative designs would be mandatory.

> Q. [W]ould you agree with me that before you would recommend that a manufacturer put [one of your alternative designs] into the marketplace --
> A. They test it.
> Q. -- you'd have to test it first?
> A. You have to test everything before you put it into the marketplace.
> Q. And you have not tested your alternative design theory in this case?
> A. No.
> Q. And in the real worked if you were hired by Whirlpool or Sears, you would test it before you would give them the opinion, This alternative design is safer?

14

> A. Yeah, I would tell them, that, you know, We've gotta get an alternative design and let's try – you know, Let's start with this and, you know, go through several iterations until we get a design that is both safer and works well.

(Id. at 102-03).

In Kumho Tire Co., Ltd. v. Carmichael, supra, the Supreme Court required the expert engineering testimony to have the same level of scientific validity as engineers would employ in the real world when they are making sound judgments and decisions. The courtroom is no place for experts to speculate and give opinions that are not grounded in sound engineering principles. By Richman's own admission, the methodology he employed in this lawsuit is in direct violation of the mandate outlined in Kumho Tire Co. Ltd. v. Carmichael, because he failed to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Carmichael, 526 U.S. at 152. Richman admitted in the "real world", any alternative design would need to be tested before he would recommend such alternative design on a product. Yet, in this case, he has opined the existing design is defective and offered alternatives as safety improvements without any testing whatsoever.

The primary factor of the reliability analysis under Daubert is whether an expert's alternative design or theory can be tested. Saia v. Sears Roebuck & Co., Inc., 47 F. Supp. 2d 141, 144 (D. Mass. 1999) (excluding, as unreliable, Plaintiff's expert "who acknowledge[d] that his theories cannot be tested." Id. at 149). Various courts have expanded the general requirement of testing and refused to allow expert testimony if the expert offers untested alternative design theories.

The Southern District of New York, citing the Second, Seventh, and Eighth Circuits, likewise has rejected expert testimony about alternative designs when it is untested. Colon v. BIC USA, Inc., 199 F. Supp. 2d 53 (S.D.N.Y. 2001).

> While conjecture by a qualified expert is worthy of careful attention, the courtroom is "not the place for scientific guesswork, even of the inspired sort." The axiom that "law lags science [but] does not lead it," applies equally to proposed engineering innovations in a design defect case. "Alternative designs by definition include elements of science, technology and methodology."

Colon, 199 F. Supp. 2d at 76 (citations omitted).

Adherence to engineering standards of intellectual rigor almost always requires testing of a hypothesis if the expert cannot point to an existing design in the marketplace. Colon, 199 F. Supp. 2d at 76-77; see also Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000) (rejecting proposed alternative design of kill switch); Oddi v. Ford Motor Co., 234 F.3d 136, 156-57 (3d Cir. 2000) (excluding proffered alternative designs of biomechanical engineer where engineer had not tested either design for a safer bumper on a truck); Watkins v. Telsmith, Inc., 121 F.3d 984, 988 (5th Cir. 1997) (rejecting proposed alternative design because alleged expert made no design drawings and conducted no tests of proposed alternatives); Pestel v. Vermeer Mfg. Co., 64 F.3d 382, 384 (8th Cir. 1995) (rejecting expert's proposed alternative design because not tested); Stanczyk v. Black & Decker, Inc., 836 F. Supp. 565 (N.D. Ill. 1993) (rejecting expert's proposed alternative design of a guard for allegedly defective saw because no testable design of concept).

Another important reliability factor frequently cited by courts is whether the expert's opinion was generated in a scientific setting or solely for purposes of litigation. Courts have been cautious of the reliability of experts who formed their opinions only within the context of litigation. Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) (Daubert II) ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."); Metabolife Int'l, Inc. v. Wornick, 72 F. Supp. 2d 1160, 1168-69 (S.D. Cal. 1999)

16

(holding expert evidence unreliable and inadmissible after noting that all experts except one formed their opinions after being hired as expert witnesses); Nat'l Bank of Commerce v. Dow Chem. Co., 965 F. Supp. 1490, 1516 (E.D. Ark. 1996) (finding expert unreliable after noting her testimony was tainted by "litigation animus"); Muzzey v. Kerr-McGee Chem. Corp., 921 F. Supp. 511, 518-19 (N.D. Ill. 1996) (holding expert methodology unreliable after noting that the expert witnesses "developed their opinions expressly for purposes of testifying"). Such considerations recognize that a scientific expert's "normal workplace is the lab or the field, not the courtroom or the lawyer's office." Daubert II, 43 F.3d at 1317.

In this case, Richman's opinions were generated solely for litigation purposes. In fact, this case is "the first time [he] has ever evaluated an ice dispensing system. (Richman dep., p. 80). Further, the litigation setting is the only time Richman has ever evaluated consumer refrigerators generally. In his only other consumer refrigerator case, his testimony was rejected as unreliable. In this case, his examination involved two hours, and he was able to determine the design was defective. This Court should require more from an alleged expert witness. (Richman dep., p. 85).

    **b.**    **Richman's Warning Opinions**

In the recent case of Raimbeault v. Takeuchi Mfg. (U.S.) Ltd., 772 A.2d 1056, the Rhode Island Supreme Court fully analyzed Richman's qualifications to testify on product warnings issues. In Raimbeault, Richman testified that the warnings associated with the operation of the backhoe were inadequate. Raimbeault, 772 A.2d at 1060. At the conclusion of Richman's testimony at trial, the trial court excluded Richman's opinions regarding the warnings associated with backhoe. Id. The Rhode Island Supreme Court affirmed the trial court's exclusion of Richman, noting that Richman had "limited experience which warnings and instructions in

17

general" and no experience with warnings and instructions related to the product involved in the case. Id. at 1062. Richman "had never even designed a warning for a commercially marketed product in connection with the actual marketing of the product." Id.

The Raimbeault Court's analysis applies with equal force here as Richman has **no** experience relating to warnings in the refrigerator industry and "limited" experience with warnings in general.

> Q. Do you have any experience with warnings or instructions for refrigerators?
>
> A. No.
> . . .
> Q. Do you have any experience with designing warnings or instructions with any type of ice dispenser system?
>
> A. No.

(Ex. C, p. 80).

Richman opines that there should be affixed to the refrigerator a "warning sticker telling parents about the . . . importance of the locking procedure," (Ex. C, p. 91) and other warnings in the manual against children putting their hands or fingers into the ice chute (Ex. F).  However, Richman admits that no other manufacturers warn against children putting their hands in the ice chute.

> Q. Do you know of **any** manufacturer who puts a warning in their manuals that you might – a child might be able to get their hand or fingers up into the ice chute and get cut?
>
> A. I haven't looked at any other manuals and I don't think it's there.

(Ex. C, pp. 79-80) (emphasis added).  Richman's proposed "expert" testimony on warnings and instructions should be excluded because Richman does not qualify as a warning expert. Furthermore, he has no experience in warnings and instructions for refrigerators. Finally, Richman admitted that no refrigerator manufacturer actually uses the warnings he proposes.

## CONCLUSION

For the reasons stated above, Defendants Whirlpool and Sears respectfully request that this Court enter an Order excluding the testimony of Marc Richman.

                Respectfully submitted
                **SEARS, ROEBUCK AND CO., and**
                **WHIRLPOOL CORPORATION**
                By their Attorneys,
                CAMPBELL CAMPBELL EDWARDS &
                CONROY, PROFESSIONAL CORPORATION

                /s/ Steven M. Key_____
                Richard L. Edwards (BBO# 151520)
                Steven M. Key (BBO# 638145)
                One Constitution Plaza
                Boston, MA 02129
                (617) 241-3000
                redwards@campbell-trial-lawyers.com
                skey@campbell-trial-lawyers.com

                AND

                Robert W. Foster, Jr., Esq. (Admitted Pro Hac Vice)
                Nelson Mullins Riley & Scarborough LLP
                1320 Main Street, 17th Fl.
                Columbia, South Carolina  29201
                (803) 799-2000

## CERTIFICATE OF SERVICE

I, Steven M. Key, certify that on November 14, 2005, a true copy of ***Defendants Sears Roebuck & Co. And Whirlpool Corporation's Memorandum Of Law In Support Of Its Motion To Exclude Plaintiff's Expert (Marc H. Richman)*** was sent by e-mail to Andrew J. Tine, Haese, LLC, 70 Franklin St., 9th Floor, Boston, MA  02110.

                /s/ Steven M. Key_____
                Steven M. Key