Page I

1                          VOLUME I
                          PAGES 1-161
2                          EXHIBITS: Per Index
3
            UNITED STATES DISTRICT COURT
4              DISTRICT OF MASSACHUSETTS
5                          CIVIL ACTION NO.
                          04-CV-12369-NG
6
7   JASMINE D. BUNTON, By Her Legal    )
    Guardian, LOURENCO P. DOSSANTOS,   )
8   and LOURENCO P. DOSSANTOS,         )
          Plaintiffs,                  )
9                                      )
          v.                           )
10                                     )
    SEARS ROEBUCK AND CO. and          )
11  WHIRLPOOL CORP., INC.,             )
          Defendants.                  )
12
13
14          DEPOSITION OF MARC H. RICHMAN, Sc.D.,
15  P.E., a witness called on behalf of the
16  Defendants, pursuant to Rules 30 and 45 of
17  the Federal Rules of Civil Procedure, before
18  Mary E. Rinne, Registered Professional
19  Reporter and Notary Public for the
20  Commonwealth of Massachusetts, at the
21  offices of Winograd, Shine & Zachs, 123 Dyer
22  Street, Providence, Rhode Island, on
23  Tuesday, August 16, 2005, commencing at
24  10:07 a.m.

Page 6

1    depositions, so I'm not going to go through
2    the normal formalities of what a deposition
3    is all about because I know you know what a
4    deposition is all about.
5            How many depositions would you say
6    you have given in your career?
7    A.  I would say about 150 depositions.
8    Q.  So the only thing that you need to do is if
9    you do not understand my question, just feel
10   free to tell me you don't understand it and
11   I'll be glad to rephrase it.  Okay?
12   A.  Okay.
13   Q.  When were you first retained in this case?
14   Did you bring your entire file with you?
15   A.  Everything is here.
16   Q.  All right, fine.
17   A.  The first time I saw the
18   refrigerator/freezer was at the end of
19   March.  I believe it was maybe February that
20   I was contacted initially.  My file's a
21   mess.  That's probably the best I could do.
22   Q.  Do you have an initial retainer letter?
23   A.  I got a check -- let's see.  No, I just -- I
24   didn't get a retainer letter in this one.

Page 7

1    Q.  Who retained you?
2    A.  Mr. Tine.
3    Q.  And what was your retainer fee or fee
4    arrangement at the time you were retained?
5    A.  It was $1,500 up front against which I would
6    bill.
7    Q.  And what do you bill hourly?
8    A.  $200 an hour for investigation, report
9    writing, research, travel.  And for
10   deposition testimony or trial testimony,
11   $350 an hour with a minimum of two hours.
12   Q.  And how soon after you were first retained
13   do you think you first did anything in this
14   case?
15   A.  I think it was probably a month or so after
16   I got the first call that we set up a time
17   to go out and look at the
18   refrigerator/freezer.
19   Q.  And have you been retained by Mr. Tine in
20   the past?
21   A.  No.  This is the first time.
22   Q.  Have you been retained by his firm in the
23   past?
24   A.  No, sir.

Page 8

1    Q.  So the first activity you did in this case
2    other than the initial phone call was to go
3    to the apartment where the subject
4    refrigerator was located?
5    A.  Well, I'm sure he asked me to send him a
6    copy of my CV and fee schedule, which I
7    faxed him.  Then when he said that they were
8    interested in having me work on the case for
9    them, we set up a time.
10           He gave me the background and set
11   up a time, and I met with the young girl
12   Jasmine and her father and looked at the
13   refrigerator.  That was at the end of
14   March.  That was 31 March 2005.
15   Q.  So March the 31st is when you visited the
16   apartment where the refrigerator was
17   located?
18   A.  Yes, sir.
19   Q.  And how long were you there at the apartment
20   that day?
21   A.  I was probably there for about an hour.
22   Q.  And who all was there?
23   A.  Well, the ones that I spoke to was Mr. Tine,
24   Lourenco -- is it Dossantos?

Page 9

1            MR. TINE:  Dossantos.
2    A.  -- and then Jasmine Bunton.
3    Q.  Okay.
4    A.  And there were other people, but we didn't
5    talk to them.
6    Q.  And what did you do while you were there on
7    that visit?
8    A.  I basically looked at the
9    refrigerator/freezer and took down the
10   numbers, the serial number, the model number
11   and so forth.  Talked to Jasmine and her
12   father and asked them how this happened, you
13   know, to talk me through the whole thing --
14   Q.  Mm-hmm.
15   A.  -- which they did.  And then I took some
16   photographs of the refrigerator/freezer and
17   of Jasmine reaching up into that ice chute.
18   And I believe also Mr. Tine asked me since I
19   had the camera there to take some pictures
20   of the scarring on Jasmine.
21   Q.  Do you have the photographs with you?
22   A.  Yes.
23   Q.  And is that the only time you have
24   photographed the refrigerator?

Page 34

1    logically?
2  A.  For the same reason that the UL probe was
3       designed for penetration or contact with
4       electrical components and it's used by
5       Whirlpool in this refrigerator for contact
6       with mechanical components.
7            Same thing you apply -- if probes
8       are made first of all for one purpose, you
9       apply it to anything that the child might
10      get into contact with.  You don't -- you
11      wouldn't apply it, perhaps, to a tractor
12      used on a farm because you wouldn't expect
13      the child of younger years to be exposed to
14      that.
15           But in a house where you have a
16      refrigerator and you have access through the
17      door of the freezer to an ice crusher, then
18      it's foreseeable that a youngster could walk
19      over there and stick his or her fingers up
20      into that chute.
21  Q.  Exhibit No. 3, is that another probe that --
22      dimensions of a probe that you got from a UL
23      standard?
24  A.  Yes.

Page 35

1  Q.  Is that the probe that is specifically
2       mentioned in the UL standard dealing with
3       refrigerators?
4  A.  It's the only probe that UL makes or
5       specifies.  They don't have other probes.
6  Q.  Well, Exhibit No. 3, is that the same
7       dimensions as the probe that is referenced
8       in the UL standard dealing with
9       refrigerators?
10  A.  If they have -- yes.
11  Q.  So if you were asked as an engineer to
12      determine which of these probes to utilize
13      in evaluating a refrigerator, would you find
14      it more logical from an engineering
15      standpoint to go to a refrigerator standard
16      or a toys standard?
17  A.  The first probe I would use would be the
18      refrigerator -- the standard referred to in
19      the refrigerator standard.
20  Q.  Okay.
21  A.  But I would also ask myself, Is this product
22      going to be accessible to children?  In
23      other words, is a child going to approach
24      the refrigerator?  And then if there is an

Page 36

1       opening -- I mean, it's not like the child
2       isn't allowed into the refrigerator and
3       someone puts a tie to hold the doors closed
4       so the kid can't open up the refrigerator or
5       the freezer.  That's one thing.
6            But here you've got a
7       through-the-freezer-door ice dispenser and
8       water dispenser.  All it takes is a kid to
9       come over, press the dispenser bar, water
10      pours out; press the ice bar, crush door,
11      cubed ice comes out.  So it is accessible to
12      a child in that case.
13           As an engineer looking at and
14      analyzing a design, performing what I
15      believe Mr. Boughton referred to as a safety
16      audit, I would ask, using probes, using an
17      adult probe, if a kid can come over there.
18      So I want probes that represent kids.
19  Q.  Now, the probe that's in Exhibit No. 3, the
20      UL probe --
21  A.  Yeah.
22  Q.  -- did the ice dispenser on the subject
23      refrigerator, did it pass the probe test for
24      the probe that is in Exhibit No. 3?

Page 37

1  A.  Yes, according to the documents produced by
2       Sears and Whirlpool in those Bates numbers.
3       It passed that test.  And I couldn't get my
4       hand up there.
5  Q.  Okay.
6  A.  And looking at the dimensions, you couldn't
7       get that in there.
8  Q.  Now, this probe that's in Exhibit No. 3, do
9       you believe this to be representative of
10      only an adult's fingers and hands?
11  A.  It's an anthropomorphical representation of
12      an adult finger and hand.
13  Q.  How do you know it is a representation of an
14      adult finger and hand?  What's the basis of
15      you just stating that?
16  A.  Because if you look at the dimensions, the
17      dimensions are far greater than that for a
18      child.  I mean, as an example, the length of
19      the finger is 100 millimeters.  That's
20      4 inches.  Now, I don't see a child with a
21      4-inch finger length.  I don't know if I got
22      a 4-inch finger length.
23  Q.  Have you done any research in how UL came up
24      with the dimensions of the probe in Exhibit

10 (Pages 34 to 37)

Page 38

1   No. 3?
2   A.  No.  I would have assumed that they would
3       have used anthropomorphical data.  There's
4       standards in SAE that list anthropomorphical
5       data that are used by the automotive
6       industry.  There are tables that show
7       average heights, average weights, average
8       appendages, lengths and widths of every part
9       of the human body, and one can do an
10      averaging.
11          And if you're trying to get
12      something -- one device that will fit, you
13      got men, you got women, you got -- different
14      races have different physical sizes so all
15      of these are taken into account.
16          So somewhere along the line an
17      anthropologist is probably consulted,
18      medical people are consulted and they come
19      up with dimensions which are fed into UL
20      developing this probe.
21  Q.  And my question is, do you know whether in
22      developing the probe in Exhibit No. 3 UL
23      included children's fingers and hands in the
24      development of this probe?  Do you know one

Page 39

1       way or the other?
2   A.  No, I don't.  If they did, if they
3       considered children's hands, they didn't do
4       the job well in designing that probe.
5   Q.  But you don't know what they did and the
6       type of research they utilized to develop
7       this probe.  Is that correct?
8   A.  That's right.
9   Q.  Did the refrigerator in question meet UL
10      standards?
11  A.  I believe so, yes.
12          (Cell phone interruption.)
13  Q.  Other than these dimensions of the probe,
14      what else do you have in your file that
15      assisted you in your conclusions that we
16      haven't already talked about?
17  A.  I think everything else is right in the
18      report.
19  Q.  Let me just take a look at those papers to
20      see if there's anything else I haven't
21      seen.
22  A.  Sure.
23  Q.  I mean, I'll give them back to you.
24  A.  I'll be happy to tell you what each thing

Page 40

1       is.
2           (Attorney Foster reviews documents
3       in file.)
4   Q.  Are these your thoughts that you transcribed
5       and sent to Mr. Tine?
6   A.  Yes, they are.
7   Q.  And what is this correspondence dealing
8       with?
9   A.  Basically, it's a letter from me to Mr. Tine
10      dated 28 May of this year.  I had -- telling
11      him I had reviewed the Bates documents 218
12      to 388 and 123 to 217.
13  Q.  Okay.
14  A.  And about the scheduling of the deposition
15      and just my questions about getting the
16      parts for the refrigerator to put it whole
17      again or to see if we could get ahold of an
18      exemplar refrigerator/freezer or the door.
19  Q.  What is this next correspondence?
20  A.  Mr. Tine asked for a preliminary report
21      which is dated 30 June.  And this is before
22      I was able to go out and look at the
23      refrigerator/freezer with the parts
24      reinstalled or put back in.

Page 41

1   Q.  That was your preliminary report that you
2       signed?
3   A.  This would be the preliminary report, yes.
4   Q.  What is that?
5   A.  Oh, Mr. Tine asked for -- in the 31 March
6       photographs, Mr. Tine had asked me to
7       provide him with two copies of the
8       photographs.  And so I sent that to him.  So
9       that package may have fewer.  It may just
10      have one copy.
11  Q.  All right.  I'll give you that.
12  A.  That was a fax cover sheet dated July 28th
13      in which I sent Mr. Tine a copy of the
14      report that I -- my report dated 27 July
15      2005.
16  Q.  Are these copies of the photographs that are
17      actually in your report?
18  A.  This is the Xerox of the photographs in the
19      report.  Because when I faxed it to
20      Mr. Tine, I couldn't -- I didn't want to run
21      the photographs through the fax machine, I
22      Xerox'd them first.
23  Q.  Is this just another copy of your
24      preliminary report?

Page 42

```
1    A.  Yes, it is.
2    Q.  Is that a letter Mr. Tine sent to you?
3    A.  Yes.
4    Q.  Did Mr. Tine not accompany you on your
5        second visit to the house?
6    A.  No, he didn't.  The young girl was there,
7        Jasmine, and her father on the second visit.
8    Q.  These look like they're just actual
9        photographs?
10   A.  Those are the photographs that I had
11       laser-copied and then put into the report.
12   Q.  What is this Product Safety Newsletter?
13   A.  That's the UL Product Safety Newsletter
14       where I got the dimensions of this page.
15   Q.  Of Exhibit 3?
16   A.  Yeah.
17   Q.  Can you show it to me?
18   A.  That is page 14 of this.
19   Q.  I see.  So page 14 of this Product Safety
20       Newsletter is Exhibit 3?
21   A.  That's right.
22   Q.  And you took it out of this newsletter?
23   A.  Right.
24           MR. FOSTER:  Let's mark this
```

Page 43

```
1        newsletter, exclusive of page 14 because
2        it's already marked as Exhibit 3, as
3        Exhibit 4.
4            (Exhibit 4 marked for
5        identification.)
6    Q.  Now, what I want to do is, looking at your
7        notes, it looks like -- what are the dates
8        of those two pages of notes?
9    A.  This is 7/18/05.
10   Q.  What do those notes indicate?
11   A.  Dossantos.  Freezer never hooked up to water
12       line.  Never intended to give ice water or
13       crushed ice.  Children made ice cubes in
14       trays and put the ice cubes in the hopper
15       for the crusher to crush and deliver at the
16       door front.  Sears to have installed all
17       needed parts on Saturday, 7/16.
18   Q.  So that is your notes when you were
19       reviewing the dad's deposition?
20   A.  The dad and the child's deposition.  Also
21       talking with Mr. Tine because that's how I
22       knew when Sears was coming out.
23           MR. FOSTER:  Let's mark this as
24       Exhibit No. 5.
```

Page 44

```
1            (Exhibit 5 marked for
2        identification.)
3    Q.  What is the date of that next page of notes?
4    A.  7/19.
5    Q.  That's when you would have gone to the
6        apartment the second time?
7    A.  This is -- probably wrote this out in the
8        evening when I got home.
9    Q.  Let's put that aside for a minute.
10           What are these three pages of notes
11       of?
12   A.  Okay.  Page torn out of a notebook.
13   Q.  A page torn out of a notebook?
14   A.  This here page that I tore out from the
15       spiral-bound notebook has the model number,
16       serial number, the manufacturing date of the
17       Kenmore refrigerator.
18   Q.  Okay.
19   A.  These are notes that I took during my first
20       inspection back in March.
21   Q.  All right.
22   A.  So it should be 31 March '05.
23           MR. FOSTER:  Let's just mark that
24       as Exhibit No. 6.
```

Page 45

```
1            (Exhibit 6 marked for
2        identification.)
3    Q.  And what are these next two pages of notes
4        from?
5    A.  The next two pages of notes are during my
6        review of the production, Bates 123 to 217
7        and Bates 218 to 388.
8    Q.  And you have the Bates number in the
9        left-hand column that corresponds with the
10       actual documents?
11   A.  Yes.
12           MR. FOSTER:  Let's just mark these
13       two as Exhibit 7 and Exhibit 8.
14           (Exhibits 7 and 8 marked for
15       identification.)
16   Q.  Are the only notes that you took on your
17       first -- or following your first visit to
18       the house or apartment Exhibit No. 6?
19   A.  Those are the notes I took at the visit on
20       the 31st of March.
21   Q.  And those are the only notes --
22   A.  Yes.
23   Q.  -- following the March 31st visit?
24   A.  Yes.
```

G&M Court Reporters, Ltd.
617-338-0030

Page 50

1    the date of your final report?
2  A.  27 July.
3  Q.  You then prepared your final report, which
4      we'll mark in a minute, and then the next
5      day you were sent the actual dimensional
6      drawings, Bates 390 through 398?
7  A.  Yes.
8  Q.  Now, do you have a copy of your preliminary
9      report?
10  A.  I believe so.
11  Q.  Now, you actually have a copy of this that
12      has your signature on it.  Can I see that
13      one?
14  A.  Oh, yeah.  Here it is.
15  Q.  Let's take a look at that one.
16  A.  Okay.
17  Q.  Now, this seems to represent your
18      preliminary report signed by you with a fax
19      cover sheet dated June 30th where you faxed
20      the report to Mr. Tine.  Is that correct?
21  A.  Yes.
22          MR. FOSTER:  Let's mark that as the
23      next exhibit.
24

Page 51

1          (Exhibit 9 marked for
2      identification.)
3  Q.  You might want to look at that.  I've got
4      some questions about that.  Prior to
5      preparing that first preliminary report, you
6      had not seen the dimensional drawings of the
7      actual ice dispenser.  Correct?
8  A.  Correct.
9  Q.  And by the time you prepared the preliminary
10      report, you had examined the refrigerator
11      and freezer but not the actual physical ice
12      dispenser system?
13  A.  Not the ice crusher system.
14  Q.  You had the plastic chute that was still on
15      the freezer door?
16  A.  Yes, but not the crushing mechanism.
17  Q.  Which is in a box that sits inside the
18      freezer door?
19  A.  Yes, it's got a hopper and then a mechanism
20      and that clips onto part of the inside of
21      the freezer door.
22  Q.  Under your investigation on page 2, you
23      state that these -- at the top of the
24      page -- you say, "Those parts which had been

Page 52

1      removed or broken during the rescue attempt
2      had not been replaced."  What parts were not
3      replaced at the time you did your first
4      inspection?
5  A.  Those parts that were -- which was the
6      hopper and the ice crusher mechanism.  It
7      was whatever had been destroyed by the fire
8      department.
9  Q.  I don't know what was destroyed by the fire
10      department so that's why I was wondering.
11      It was the box and ice crushing mechanism
12      within that box?
13  A.  It's easier to show you with a picture, if
14      you want.
15  Q.  Okay, sure.  Sure.
16  A.  At the time I went out there on the 31st of
17      March, this was what was on the inside of
18      the freezer door.
19  Q.  Now, you're looking at Figure 7 of your
20      final report.  That is what was on the
21      refrigerator/freezer door?
22  A.  Yes.  Then the Whirlpool people or the Sears
23      people went out and they installed the
24      proper part, and that's this gadget that's

Page 53

1      shown in Figure 11 and Figure 12.
2  Q.  Okay.
3  A.  And this has a clear plastic hopper for the
4      ice --
5  Q.  Mm-hmm.
6  A.  -- and a crushing mechanism.  And it clips
7      on -- there's the bottom piece that was
8      shown in the earlier figure.
9  Q.  Okay.
10  A.  This ice caddy and crusher mechanism.
11  Q.  In Figure --
12  A.  Space saver, ice storage system.
13  Q.  So what is pictured in Figures 11 and 12
14      were not in place at the time of your first
15      visit?
16  A.  That's right.
17  Q.  Okay.
18  A.  And the blades on the underside -- this is
19      the underside of that ice crusher storage
20      mechanism.  That's where the blades are.
21  Q.  In Figure 14.  And Figure 14 is within
22      Figures 11 and 12.  Correct?
23  A.  11, 12 and 13.
24  Q.  And 13, okay.  Now, was there a flap or door

14 (Pages 50 to 53)

Page 54

1    that covered the opening of the bottom of
2    the ice chute?
3  A. Yes.
4  Q. Was that in place on your first inspection?
5  A. Yes.
6  Q. Now, in your preliminary report, if you look
7    at your opinion section, did you conclude
8    that the incident refrigerator/freezer was
9    defective?
10  A. Yes.
11  Q. And what was defective about the
12    refrigerator/freezer based on what you had
13    examined by June 30th, 2005?
14  A. Well, even though the parts and the
15    components that contained the knife blades
16    weren't there in March of 2005, I still knew
17    that Jasmine had gotten her hand cut by
18    those blades.
19  Q. Mm-hmm.
20  A. She had to be freed up from the blades by
21    the rescue people.  So that I could conclude
22    that someone Jasmine's age was able to get
23    her hand into the ice guide, the plastic
24    chute at the bottom, reach up far enough to

Page 55

1    come into contact with the blades.  So that
2    told me that it was defective.
3  Q. Well, other than the information that you
4    had that Jasmine Bunton did get her fingers
5    cut by the ice dispensing system, other than
6    that, was there anything else about your
7    opinion that helped you conclude the ice
8    dispenser system was defective?  Other than
9    the fact she did get her fingers cut.
10  A. Well, the fact that she was able to get her
11    fingers cut told me that you could gain
12    access to it -- a child could gain access
13    whereas an adult couldn't.
14        But also just analyzing the type of
15    controls on there told me that a child could
16    go over and activate any of those buttons on
17    the panel.  They're not called buttons
18    anymore.  You just press on the icon and it
19    does something.
20  Q. Mm-hmm.
21  A. Also, push on a lever.  Someone could -- a
22    child could unlock it.  There's a lock
23    button --
24  Q. Mm-hmm.

Page 56

1  A. -- which if a parent doesn't want anyone to
2    access it, they can press the lock button,
3    nothing will work.  The problem is that it's
4    easy for a child to touch the button and
5    unlock it.  There's no difficulty presented,
6    it's just inadvertent contact that just
7    someone looks at all the pictures and
8    pressing buttons and leaving it unlocked.
9        Once it's left unlocked, the child
10    could press against the lever for the ice
11    water, nothing would happen because -- in
12    this case because the water line had never
13    been hooked up.
14  Q. Mm-hmm.
15  A. But from the design point of view of the
16    refrigerator/freezer, let's say it had been
17    hooked up so that all of its capabilities
18    were in play, the water line was brought
19    in.
20        The parents are doing something, a
21    child could come over and just push the
22    lever, dump ice water out and it would
23    continue to flow out as long as the child
24    held the lever.  That's not good for any

Page 57

1    number of reasons.  On the other side, on
2    the left side where there's the ice
3    dispenser, the child could reach their hand
4    up and push the button calling for ice.
5        So my opinion was that the access
6    to the knives of the ice crusher was a
7    defect, the ability of a child to
8    inadvertently touch buttons or levers and
9    get something to happen was a danger.  Or
10    even a child dispensing cube ice and crushed
11    ice could then step on it and fall and bang
12    his head against or her head against the
13    refrigerator/freezer.
14        So that's what I would have decided
15    based on my earlier visit and my review of
16    the literature, the manual, the production
17    records, the depositions and -- not the
18    depositions, but everything in the manual
19    and the production records that said that
20    there was not enough looking by Whirlpool at
21    foreseeable things.  Controls were pretty,
22    they were very nice, they were very easy to use.
23    Too easy.
24  Q. So you were able to determine the ice

15 (Pages 54 to 57)

Page 58

1  dispensing system in this
2  refrigerator/freezer was defective without
3  having seen the actual completed ice
4  dispenser system. Is that correct?
5  A. Yes. For two reasons. One, I knew that
6  Jasmine was able to get her hand up there
7  and get cut. Even had I not known that, if
8  someone had just presented me with the
9  refrigerator/freezer and said, Look at this,
10  Is this okay, I would have looked at that
11  and said a kid can get injured or cause
12  damage by pressing the -- unlocking it and
13  pressing the water dispenser. And a kid can
14  get injured by pressing the ice dispenser
15  and getting cubes come out and then trip on
16  it, injure themselves. Or choke on it.
17  Q. So your opinion is even if a child could not
18  get their hand and arm up into the ice chute
19  where it would have contact moving blades, the
20  fact that a child can press the water lever
21  or the ice lever makes an automatic ice
22  dispensing system defective?
23  A. Yes, unless you have some way to make the
24  unlocking more child-resistant or go for a

Page 59

1  higher height. I know that height was
2  probably selected to make it convenient for
3  children to get their own water or ice. But
4  if you position it higher than the kid could
5  reach or you put a parental code in there so
6  it takes more than hitting an unlock button
7  to release it, you'd have to hit a couple of
8  things simultaneously.
9  Q. Do you have an automatic ice dispenser
10  system on your refrigerator/freezer at home
11  today?
12  A. Not a through-the-door one, no.
13  Q. I'm not talking about a through-the-door
14  one, I'm talking about where you can get ice
15  or water from your refrigerator without
16  having to open the freezer door.
17  A. Well, that's what I mean, through the door.
18  I don't have a through-the-door capability.
19  Q. In other words, on your refrigerator at home
20  you have to open the freezer to get ice?
21  A. Yes.
22  Q. Okay. So you don't have an automatic ice
23  dispensing system?
24  A. No, I got an automatic ice maker if I wanted

Page 60

1  to -- we have a side-by-side in the kitchen.
2  Q. Mm-hmm.
3  A. We've got a full refrigerator and a full
4  freezer downstairs. But that full freezer
5  has an automatic ice maker but my wife chose
6  not to hook it up. She doesn't have that
7  much need for ice.
8  Q. So any refrigerator/freezer that has an
9  automatic ice dispenser where you can put a
10  glass and you can have ice come into your
11  cup or glass without opening the freezer
12  door, if a child can do that, in your
13  opinion that's a defective design?
14  A. Yes.
15  Q. Do you know of any refrigerator manufacturer
16  that has a parental control panel that has a
17  more complicated system, as you're
18  describing, so that a child cannot
19  automatically unlock the ice dispenser?
20  A. No, I don't.
21  Q. So any manufacturer of refrigerators in the
22  world that makes a refrigerator/freezer with
23  an automatic ice dispenser that allows a
24  child to stick a glass up to the ice

Page 61

1  dispenser and allows ice to come right out,
2  those are defective designs?
3  A. Yeah.
4  Q. Have you ever stated such an opinion in any
5  other context other than this lawsuit?
6  A. About refrigerator/freezers?
7  Q. About ice dispenser systems.
8  A. No.
9  Q. When did you come up with the conclusion
10  that all ice dispenser systems from any
11  manufacturer in the world that allows a
12  child to get ice by hitting a knob without
13  having to open the door was a defective
14  design? When did you come up with that?
15  A. When I was analyzing this case. This is the
16  first case I've had with an ice delivery
17  system through the door.
18  Q. What's the basis of you concluding in your
19  report that is was foreseeable or
20  anticipated that a child would stick their
21  arm up into an ice dispenser system and
22  potentially make contact with moving blades?
23  A. Because what you have to do when you design
24  a product is play the "what if" game. What

16 (Pages 58 to 61)

Page 66

1  Q. When they developed the probe, do you know
2     whether UL incorporated into their research
3     a child's finger and hand?
4  A. They couldn't have because the probe was
5     sized wrong for a child.
6  Q. Was Whirlpool unreasonable for following the
7     UL standard when it utilized the probe that
8     you saw in the Whirlpool test documents?
9  A. Whirlpool wasn't unreasonable in using that
10    standard; but Whirlpool should have foreseen
11    this is a consumer product that's going to
12    be used in the home, it's at a level where
13    kids are gonna have access to it. And they
14    should have either gone back to UL and said,
15    Where are the kiddie standards, or they
16    should have looked up test probes for kids.
17 Q. Prior to this case where you were retained
18    by Mr. Tine, have you had any experience
19    dealing with ice dispensing systems on
20    refrigerators?
21 A. No.
22 Q. Have you had any experience in designing an
23    ice dispenser system?
24 A. No.

Page 67

1  Q. Is it true that you have limited experience
2     with warnings and instructions?
3  A. No.
4  Q. That's not true?
5  A. No.
6  Q. Have you read a Court opinion that has
7     concluded you have limited experience with
8     warnings and instructions?
9  A. If you're referring to Takeuchi?
10 Q. Mm-hmm.
11 A. Yes, I've read that opinion.
12 Q. Do you disagree with the Rhode Island
13    Supreme Court?
14 A. I disagree, yes. I disagree with Judge
15    Needham and I disagree with the opinion of
16    the Supreme Court.
17 Q. Have you been disqualified to give testimony
18    in any other cases other than the Raimbeault
19    v. Tak --
20 A. Takeuchi.
21 Q. -- Takeuchi case?
22 A. Yes.
23 Q. Have you been disqualified to give opinions
24    in any other cases?

Page 68

1  A. I'll give you a list of the ones where I've
2     been limited in what I could testify to or
3     my testimony excluded altogether.
4  Q. Let me start with where you've been excluded
5     altogether.
6  A. In Raimbeault v. Takeuchi, Judge Needham's
7     basis for his opinion to exclude my
8     testimony was that other than
9     litigation-related work I had no experience
10    with tracked vehicles, despite the fact that
11    I had testified that in my military service
12    I was in charge of inspecting tracked --
13    2,000 tracked vehicles a week.
14 Q. Before we get into justification, I just
15    really want to know cases where you've been
16    disqualified.
17 A. In a case in Plymouth Superior Court in
18    Massachusetts, I was disqualified for saying
19    how a utility pole should be placed.
20 Q. What was the name of that case?
21 A. I don't -- it's -- it goes back more than
22    four or five years. It was way back. I
23    don't remember the name of it.
24 Q. All right. Other cases where you've been

Page 69

1     disqualified in total.
2  A. I think that's the only ones where I've been
3     disqualified in total. I've been limited in
4     what I could testify to.
5  Q. Well, in addition to being disqualified,
6     have your opinions by any other court just
7     been outright rejected even though you gave
8     testimony, like in the Raimbeault case?
9        MR. FOSTER: That's
10    R-a-i-m-b-e-a-u-l-t.
11       THE COURT REPORTER: Thank you.
12       MR. TINE: If I can object to
13    "rejected by the court," I don't know what
14    you mean by that.
15 Q. Where your opinions were discarded in their
16    entirety.
17       MR. TINE: This is on a judge's
18    ruling from the bench?
19       MR. FOSTER: On or appeal.
20 Q. Judge's ruling or on appeal where your
21    opinions were disregarded as unreliable for
22    one reason or another. Can you think of
23    any?
24       MR. TINE: So this would have to be

18 (Pages 66 to 69)

**Page 70**

1 a bench trial or the judge instructing the
2 jury that they can't rely on the --
3      MR. FOSTER: Bench trial, jury
4 trial or at the appellate level where you do
5 not -- do not rely on Doctor Richman's
6 testimony or completely reject Doctor
7 Richman's testimony.
8 A. The only one I can think of is the Takeuchi
9 case because in most of the others there was
10 a voir dire -- a motion in limine made and a
11 voir dire without the jury being present,
12 and then the judge said, He's limited in
13 what he can say or exclude his testimony
14 altogether. But the jury was never -- the
15 testimony never was read to the jury or the
16 jury didn't hear it.
17 Q. Doctor Richman, do you not recall a case in
18 which I was involved with Jerry DiMaria,
19 Fletcher v. Whirlpool?
20 A. Yes.
21 Q. Wasn't all of your opinions discarded by the
22 trial judge in that case and the case
23 dismissed?
24 A. I know the case. I know what you're talking

**Page 71**

1 about.
2 Q. What did the case involve? A refrigerator.
3 Right?
4 A. This was a case where the refrigerator fell
5 over and pinned the woman and crushed -- and
6 gave her crushing asphyxiation.
7 Q. You testified in that case. Correct?
8 A. Yes, I did.
9 Q. And your testimony was disregarded and
10 thrown out by the trial judge. Correct?
11 A. Yes, you're right there.
12 Q. Okay.
13 A. That was -- but I think that was on a voir
14 dire.
15 Q. I don't -- you were in front of the --
16 A. You asked the question, what cases have I
17 been involved in where I testified before
18 the jury and then the judge told the jury,
19 Disregard what he said, it's no good. And
20 that was a voir dire.
21 Q. I'm not trying to be tricky with any of
22 this. I don't care how us lawyers classify
23 it. My question was in any case, whether
24 it's a Daubert challenge, a voir dire or at

**Page 72**

1 the appellate level where your opinions were
2 simply rejected, for whatever reason.
3 A. That was rejected on the basis of not
4 testing.
5 Q. Wasn't your opinions rejected because they
6 were completely unscientific?
7 A. Because there was no testing.
8 Q. Regardless of the reason, would you agree
9 with me that in the Fletcher v. Whirlpool
10 case your opinions about a defect in a
11 refrigerator were completely disregarded by
12 the trial judge? Would you agree with that?
13 A. Yes, because I did no testing in it.
14 Q. Did you do any testing in this case, the
15 case we have before us today?
16 A. Tried to stick my hand in, the girl stuck
17 her hand in and got it cut.
18 Q. Other than trying to stick your hand into
19 the ice dispenser --
20 A. Yes, sir.
21 Q. -- and I think you told me earlier you were
22 unable to get it into the ice dispenser --
23 A. That's right.
24 Q. -- did you do any other testing in this

**Page 73**

1 case?
2 A. I made measurements. There's no testing
3 needed here because the girl -- there's no
4 question but that the girl was injured by
5 the ice crusher.
6 Q. You're not a warnings expert, are you?
7 A. I don't know what a warnings expert is other
8 than to tell people how to write warnings so
9 that they inform the public or the expected
10 consumer.
11 Q. You don't specialize in warnings. Correct?
12 A. I don't say I'm a human factors person. I
13 don't tend to specialize in warnings. I
14 have advised companies on how to put
15 warnings on and what to put on, but that's
16 not the bulk of my work.
17 Q. You're not a human factors expert. Correct?
18 A. That's what I said.
19 Q. And you have never designed a warning for a
20 commercial product, have you?
21 A. That's not true.
22 Q. Have you done it since 2001?
23 A. Yes.
24 Q. When have you done it?

19 (Pages 70 to 73)

Page 74

1   A.  I've done it for -- I've done it for
2       shredding machines.
3   Q.  When did you do that?
4   A.  Probably two years ago.
5   Q.  What was the name of the company?
6   A.  Security Engineered Machinery.
7   Q.  And what kind of warning did you design for
8       that product?
9   A.  Warning labels to go on their product so
10      that they would be internationally
11      acceptable.  It's a commercial or security
12      type of shredder used by the federal
13      government, Federal Reserve banks to shred
14      documents.
15  Q.  Okay.
16  A.  Even the CIA used it.  Don't wear a loose
17      tie.  Don't have long hair.  Don't let
18      anything get caught.  So I -- that's
19      actually the company for whom I bought these
20      probes, the children's probes and the UL
21      probe.
22  Q.  And what's the name of the company?
23  A.  Security Engineered Machinery.
24  Q.  And you designed a warning that was placed

Page 75

1       onto their machines?
2   A.  Yes.
3   Q.  Were those machines sold commercially?
4   A.  Yes.
5   Q.  What other warnings have you designed for
6       commercially sold products?
7   A.  There was a company called Taggies that
8       makes baby products.
9   Q.  When did you design a warning?
10  A.  Last year.
11  Q.  What other warnings have you designed for
12      products that have been sold commercially?
13  A.  Those are the ones.
14  Q.  You've never designed a refrigerator or any
15      component of a refrigerator.  Is that
16      correct?
17  A.  Correct.
18  Q.  What scientific research or experimentation
19      have you done in this Bunton case to support
20      your conclusion that the refrigerator was a
21      design defect?
22  A.  Measurement of the distance from the bottom
23      of the ice chute to the cutting knives in
24      the crusher.

Page 76

1   Q.  Mm-hmm.
2   A.  That plus the fact that this young lady was
3       able to get her hand up there and get
4       injured.
5   Q.  Okay.
6   A.  Looking at the dimensions of the child's
7       probes versus the Underwriters Lab probes.
8       And that the child's probes could get in
9       there, the UL probes couldn't.  That was the
10      scientific aspect toward getting one's hand
11      caught or fingers caught in the blades.
12          As far as the control panel -- and
13      I said it was a danger even if a kid didn't
14      get his hand up there, that it's -- it
15      doesn't take much science to realize that if
16      a child dumps ice water on the floor or ice
17      cubes on the floor, there is a slipping
18      hazard.  Every one of us knows you can slip
19      on ice, whether it be an ice cube on the
20      carpet or a wet spot.  With kids, they can
21      pick up an ice cube and choke on it or
22      crushed ice and choke on it.
23          So that's how I came to that
24      conclusion.  It's common sense.  It doesn't

Page 77

1       have to be Ph.D. science to know that you
2       slip on ice or you slip on water.  And it
3       doesn't take much to realize that if you
4       have controls that you just touch
5       inadvertently, touching an icon can unlock
6       it and free it up.  And that we have
7       sophisticated logic circuits that are in all
8       of these products that could easily be made
9       so that it required a couple of buttons to
10      be pushed simultaneously or in sequence to
11      avoid -- you know, to unlock it, not just
12      one.
13  Q.  Do you know of any refrigerator manufacturer
14      that incorporates any of your design
15      suggestions that you have written in your
16      preliminary report or your final report?
17  A.  No.
18  Q.  Do you know of any refrigerator manufacturer
19      that has a guard for disallowing a child to
20      get their hand or fingers up into an ice
21      chute?
22  A.  I didn't measure the distances on other
23      refrigerator/freezers.  The guarding could
24      be accomplished simply by distance, by

20 (Pages 74 to 77)

Page 78

1    location, by making the distance further up
2    the chute before you come into contact with
3    the blades or by making a turn in the path
4    so that it wasn't that easily accessible.
5    But I don't know of anyone who has that. I
6    mean, they may have longer chutes.
7  Q. Well, I was gonna ask you that question
8    separately. Have you done any comparison of
9    any other refrigerator manufacturer as to
10   their ice dispensing dimensions?
11 A. No.
12 Q. And do you know whether any refrigerator
13   manufacturer has an ice dispensing opening
14   less than 2-1/2 inches as you measured for
15   this particular refrigerator?
16 A. I would doubt that they would have the
17   opening less than 2-1/2 inches because of
18   the size of the ice cubes that are gonna be
19   produced. If you couldn't deliver cubes,
20   only crushed ice, it's a different story.
21 Q. Do you know of any refrigerator manufacturer
22   that has a distance from the opening to
23   moving blades more than what this particular
24   refrigerator had?

Page 79

1  A. I didn't measure any other -- I didn't check
2    into other people's.
3  Q. What is your understanding of the distance
4    from the opening of the chute to the first
5    time someone could contact moving parts?
6  A. 8-1/4 inches.
7  Q. Have you designed an ice chute that would
8    satisfy your safe design criteria for this
9    case or otherwise?
10 A. No.
11 Q. Have you designed an interlock system that
12   would disallow a child from getting their
13   fingers and hands up into an ice chute
14   system?
15 A. No, I haven't.
16 Q. Do you know of any refrigerator manufacturer
17   that has an interlock system that you've
18   described in your preliminary and your final
19   report?
20 A. No, I don't.
21 Q. Do you know of any manufacturer who puts a
22   warning in their manuals that you might -- a
23   child might be able to get their hand or
24   fingers up into the ice chute and get cut?

Page 80

1  A. I haven't looked at any other manuals and I
2    don't think it's there.
3  Q. Do you know of any other manufacturer who
4    has utilized a child-resistant push button
5    lock/unlock panel?
6  A. No.
7  Q. Do you have any experience with warnings or
8    instructions for refrigerators?
9  A. No.
10 Q. Do you have any experience with --
11 A. You mean designing them?
12 Q. Designing warnings.
13 A. That's what I'm saying. No.
14 Q. Do you have any experience with designing
15   warnings or instructions with any type of
16   ice dispenser system?
17 A. No.
18 Q. This case is the first time you have ever
19   evaluated an ice dispensing system?
20 A. Yes.
21 Q. Other than the Fletcher v. --
22 A. Well, let's say on a consumer product.
23 Q. On a consumer product.
24 A. Yes.

Page 81

1  Q. Have you ever evaluated an ice dispensing
2    system on anything other than a consumer
3    product?
4  A. I have worked with a company that makes
5    frozen lemonade. They crush ice and out of
6    that slush they put some lemon juice in.
7    And they had problems with their ice
8    crushers and the machinery that was doing
9    it, and I consulted for them and helped them
10   out.
11 Q. That was not a consumer product.
12 A. That's why I said, that's a commercial
13   product.
14 Q. And that commercial product, was there an
15   automatic ice dispensing feature where ice
16   would drop into a cup or a glass?
17 A. Yes.
18 Q. Was it ice or was it lemonade, frozen
19   lemonade?
20 A. It was frozen lemonade.
21 Q. Frozen lemonade is what came in --
22 A. Yeah, it was a slush or whatever you call
23   it. You hold it there and throw a lever and
24   it comes out.

21 (Pages 78 to 81)

Page 82

1   Q. Other than the Fletcher v. Whirlpool case,
2       have you ever evaluated any aspect of a
3       refrigerator?
4   A. Yes.
5   Q. What aspects of a refrigerator have you
6       evaluated other than Fletcher v. Whirlpool?
7   A. I've done some fires some of which were
8       initiated in a refrigerator.
9   Q. You did a case against Maytag involving a
10      refrigerator?
11  A. That's right. Hitchner (phonetic).
12  Q. What?
13  A. Hitchner v. Maytag.
14  Q. And in that case, you were essentially the
15      cause and origin expert.
16  A. Yes.
17  Q. Other than being a cause and origin fire
18      expert in a case involving a refrigerator,
19      have you evaluated any other aspects of a
20      refrigerator?
21  A. Not consumer product refrigerators,
22      commercial refrigerators.
23  Q. And what aspects of commercial refrigerators
24      have you evaluated in the past?

Page 83

1   A. It was a walk-in -- it was a freezer
2       actually. It was at a restaurant.
3   Q. Okay.
4   A. It was a big walk-in.
5   Q. Yeah.
6   A. And the designers forgot to put in a
7       condensate drip pan.
8   Q. Mm-hmm.
9   A. And the result was that there were big
10      icicles and puddles on the floor, and one of
11      the chefs came in and slipped and injured
12      themselves. So it was a suit against Bohn,
13      B-o-h-n.
14  Q. And that was a walk-in freezer. Correct?
15  A. Big restaurant-type walk-in.
16      MR. TINE: Could you repeat what
17      case that was?
18      THE WITNESS: Forest v. Bohn,
19      B-o-h-n.
20  Q. Now, that was not a refrigerator. Correct?
21  A. No, it was a freezer.
22  Q. Have you ever been involved in other
23      commercial refrigerator cases?
24  A. I don't know whether you'd call it a

Page 84

1       refrigerator. It's a cold storage vault for
2       furs and they have to cool it for the pelts.
3   Q. Okay.
4   A. And they hired a plumber to replace a valve
5       for the cooling water on a Friday. And he
6       replaced the valve and they locked up the
7       vault over the Labor Day weekend, and then
8       there was a claim for $3 million of damages
9       because of water leakage that the valve
10      wasn't put in right.
11  Q. Okay.
12  A. And I was there on behalf of the plumbing --
13      plumber's insurance company. That was sort
14      of a refrigerator, commercial type.
15  Q. Any other commercial refrigerators you can
16      think of you've been involved with?
17  A. No, that's probably it.
18  Q. The only other consumer residential
19      refrigerator case you have ever been
20      involved in, your testimony was rejected.
21      Correct?
22  A. That's the Fletcher case.
23  Q. The Fletcher case.
24  A. Yes.

Page 85

1   Q. When did you retire from Brown University?
2   A. '98.
3   Q. Since you retired from Brown University,
4       what percentage of your work has been for
5       what I'm going to start out classifying as
6       plaintiffs' work versus defense work?
7   A. About 40 percent, plaintiff; 60 percent,
8       defense on the civil side.
9   Q. Now, I'm talking about since you retired.
10      Correct?
11  A. Yeah.
12  Q. Okay. Now, since the year 2000, what
13      percent of your work on the civil side has
14      been for a plaintiff versus defendant?
15  A. 40 percent, plaintiff; 60 percent,
16      defendant.
17  Q. The same ratio --
18  A. If you go back five or six years, it was
19      more 60 percent, plaintiff; 40 percent,
20      defense. Now it's shifted to the defense
21      side.
22  Q. You're saying in the two, three, four years?
23  A. Probably five years or so.
24  Q. Five years, it's more for the defense?

22 (Pages 82 to 85)

## Page 86

1 A. Yes.
2 Q. Defending products than for the plaintiff?
3 A. Yes.
4 Q. Other than the depositions we talked about
5  earlier in your stack of materials, have you
6  seen any other depositions in this case?
7 A. No, sir.
8 Q. Have you examined any exemplar refrigerator
9  for your work in this case?
10 A. No, sir.
11 Q. Have you examined any exemplar ice
12  dispensing system for your work in this
13  case?
14 A. No, sir.
15 Q. Have you taken any videotapes in this case?
16 A. No.
17 Q. Are these copies of all the photographs
18  you've taken in total in this case?
19 A. I would say so except the ones I may have
20  used in the report.
21 Q. Basically, the photographs you took in this
22  case were on both of your visits to the
23  house or apartment of the condition of the
24  refrigerator, the freezer and the ice

## Page 87

1  dispenser system?
2 A. Yes, sir.
3 Q. And pictures of Jasmine's hand?
4 A. Yes. I think her ankle, too.
5 Q. And her ankle? Okay. But there's no other
6  pictures other than of Jasmine or the
7  subject refrigerator in this lawsuit that
8  you've taken in this case?
9 A. That's right.
10 Q. And you have photographs of the
11  refrigerator/freezer compartment both before
12  the ice dispenser system was reinstalled and
13  after the ice dispenser system was
14  reinstalled?
15 A. Yes. You just looked at 31 March
16  photographs. These are the July
17  photographs.
18 Q. It looked like in these, didn't I see some
19  ice dispenser?
20 A. Unless they got mixed up.
21 Q. I think they did.
22 A. It may be the reverse. Yeah, that's the ice
23  dispenser.
24 Q. Okay.

## Page 88

1 A. Yeah. See, that belongs with this. These
2  fewer pictures belong with the other part.
3 Q. The packets are mixed up a little bit.
4 A. Yeah.
5 Q. But regardless, you photographed the
6  refrigerator/freezer both before and after
7  the ice dispenser was reinserted?
8 A. Yes.
9 Q. And you've included some of these
10  photographs in your final reports?
11 A. Yes.
12 Q. Have you had any conversations with anybody
13  in this case other than Mr. Tine or Jasmine
14  Bunton or her dad?
15 A. No, sir.
16 Q. When you inspected the refrigerator on the
17  first or the second visit, did you notice
18  any abnormal conditions with the
19  refrigerator or the freezer compartments?
20     MR. TINE: Objection.
21 A. No, sir.
22 Q. Have you actually pulled any standards for
23  your work in this case?
24 A. No.

## Page 89

1 Q. Now, I know you have some what I'm going to
2  call design defect opinions --
3 A. Yes.
4 Q. -- that appear in your report.
5 A. Yeah.
6 Q. Do you have any manufacturing defect
7  opinions in this case?
8 A. I don't believe so. I think they all relate
9  to design.
10 Q. And you do contend that there are some
11  defects in the warnings and instructions --
12 A. Yes.
13 Q. -- that accompanied this model?
14 A. Yes.
15 Q. Other than the question dealing with
16  standards that you may have pulled for this
17  case, have you pulled any literature of any
18  type for your work in this case?
19 A. No. Whatever relates to this case is here.
20 Q. I'm just wondering within your files, is
21  there anything that you consider literature
22  that you pulled for this case?
23 A. Well, other than that Product Safety
24  Newsletter which is already in the pile.

23 (Pages 86 to 89)

Page 90

1  Q. Other than that, that would be the only
2     literature that you pulled?
3  A. Yeah. Well, that European standard with the
4     dimensions of the kiddie probes.
5  Q. Did you actually pull the entire IEC
6     standard or just the dimensions?
7  A. I have that standard because I have a whole
8     notebook of standards that I used for that
9     shredder company.
10 Q. And you just pulled the two probe dimensions
11    for this case?
12 A. And Xerox'd it, yeah.
13 Q. What are the design recommendations you are
14    making for this ice dispenser system in this
15    case?
16 A. Number one, protect against access to the
17    cutter blades by making it a path that will
18    not be accessible to a child, which means
19    you have to have a slightly -- a longer
20    distance, you have to have some angulation
21    so that no matter what the child is they
22    can't reach up and get into the knife
23    blades. That would obviate the need for a
24    guard because you're guarding by location at

Page 91

1     that point.
2  Q. Mm-hmm.
3  A. The other recommendation I would make would
4     be the warning sticker telling parents about
5     the, you know, importance of the locking
6     procedure. And, I mean, I'm not saying that
7     the warning is a substitute for guarding by
8     location because it's not.
9        But they should -- even in the best
10    conditions if it is guarded by location,
11    there should be something that tells the
12    parents to lock it unless they've trained
13    their child how to do it.
14       And there should be a locking
15    mechanism on the panel that would require
16    parents or some more sophisticated level
17    than mere tapping of buttons by a kid.
18 Q. Any other design recommendations you are
19    making in this case?
20 A. I would say those probably would cover
21    everything. But let me just go through
22    the -- oh, the manual should tell people
23    that even though you're not hooking up the
24    ice crusher in the automatic ice maker and

Page 92

1     ice water lines that you still have to lock
2     out that crusher because you're not --
3     you're still -- you could put, as Jasmine
4     did, the ice cubes in the hopper.
5        I think that there probably should
6     be an emergency stop button on the door
7     panel.
8  Q. Isn't there an emergency stop button on
9     there?
10 A. There's a lock button.
11 Q. Right.
12 A. The kid hits the lock button. And she did.
13    She hit the lock button, the blades stopped
14    turning, they were cutting into her, they
15    stopped turning.
16       But if in the attempts by the fire
17    people or others to extricate her, if anyone
18    had pressed -- had somehow hit the unlock
19    key, it would have unlocked just by
20    accident. And so if you have an e-stop
21    button, what an e-stop would do as opposed
22    to the lock button is it cancels everything
23    out and you would have to essentially reboot
24    that little thing, that little control

Page 93

1     panel.
2        In other words, an e-stop
3     couldn't -- a lock, you can unlock it with
4     just one press; but an e-stop you would have
5     to do something else, you'd have to press a
6     reset.
7  Q. Is it your opinion that without an e-stop
8     button this design is defective?
9  A. No. I would say that the e-stop button
10    would help were someone to be trapped in
11    there.
12 Q. But do you think this product needs to have
13    an emergency stop button for it to be
14    reasonably safe?
15       MR. TINE: Objection.
16 A. No. If you took my statement about the lock
17    button having a parental lock with a more
18    complicated locking system, then -- or
19    rather unlock system, then you wouldn't need
20    the e-stop on it.
21 Q. Do you have any other design recommendations
22    or opinions that you believe was necessary
23    to make this product reasonably safe other
24    than what you just told me?

24 (Pages 90 to 93)

Page 98

1    inward, you just reach up and the flap goes
2    in and your hand goes up if you're a child.
3    Q. Mm-hmm.
4    A. To reach in with your fingertips and get the
5    flap and pull it out calls for a little more
6    than just pushing.
7    Q. What did Jasmine Bunton do in this accident
8    scenario with that flap to get her hand up
9    in that chute?
10   A. Now that you mention it, I think she had the
11   ice jammed in there and so she had -- the
12   flap was out. So it would not -- it would
13   not work well. I mean, it's something but
14   it is not as good as making the location
15   guarding.
16   Q. In fact, the microswitch on the flap that
17   you just described probably would have had
18   no impact on this accident. Correct?
19   A. It wouldn't have since she pulled it out.
20   Because there was ice cubes jamming it and
21   the flap was already open when she went in.
22   Q. So if the microswitch on the flap is not a
23   good idea, then you would not --
24   A. Don't even bother with it.

Page 99

1    Q. You're not gonna recommend that in your
2    opinions in this case?
3    A. No.
4    Q. Okay.
5    A. I would drop that one and go for the
6    guarding by location and the warning decal
7    on the control panel.
8    Q. Describe for me how you would design a
9    guarding by location --
10   A. Okay.
11   Q. -- for the subject product.
12   A. Right now, if you look at Figure 14, you can
13   see the knife blades.
14   Q. Mm-hmm.
15   A. When the whole ice crusher mechanism is
16   latched onto the freezer door, it shows it
17   in Figure 13. This end is -- it's the left
18   in Figure 14, it's the right in Figure 13.
19   Q. Mm-hmm.
20   A. Now, the ice is crushed here. It drops into
21   the opening that's -- it drops into this
22   opening and the flap was at the bottom
23   there.
24   Q. Of Figure 9?

Page 100

1    A. Right.
2    Q. Once the ice is crushed, it drops into the
3    opening that is shown in Figure 9?
4    A. Yes.
5    Q. Okay.
6    A. Now, for reference, this metal cylinder with
7    the gearing inside it in Figure 9 is what
8    drives the ice crusher.
9    Q. Mm-hmm.
10   A. So you're driving the ice crusher. And to
11   make it a little more difficult for anyone
12   to get their hand up, you want to have the
13   delivery piece, the delivery opening here
14   that's like a circle. Because the crusher
15   blades go around in a circle, there's like
16   one quadrant, one 90-degree quadrant that's
17   open and is gonna drop the ice out.
18       Put that on the far side so that
19   you're further away from the flap in
20   which -- you know, the chute that's gonna
21   deliver the ice out. Put a longer distance
22   between the front of the door and the top of
23   this -- the top of this door piece onto
24   which the ice crusher is dropped so that

Page 101

1    it's further -- so basically make it further
2    in and up and off to the side.
3    Q. Now, have you tested the potential hazards
4    that that type of design might create that
5    the existing design does not create?
6    A. Not -- I have not built a revised ice
7    crusher mechanism that would have the
8    characteristics I'm talking about.
9    Q. So you have not tested yourself this --
10   A. This alternative design.
11   Q. The alternative design.
12   A. No.
13   Q. Before you actually recommended to a
14   refrigerator manufacturer that they change
15   to this alternative design, would you agree
16   that you would want to test that to see if
17   it would work or not?
18   A. What I'm doing -- what I did is offer you a
19   seat-of-the-pants alternative design. When
20   I say guarding by location, just like when
21   they designed this unit in the first place,
22   the engineers sat down, drew up plans for an
23   ice crusher delivery system. They looked at
24   the dimensions, they decided where the door

26 (Pages 98 to 101)

Page 102

1  height was, how much distance they need.
2       Then they tried it out, and the
3  first time it probably didn't work and the
4  second time they changed it and the third
5  time. So they go through different
6  iterations of design till they get something
7  that works and they're satisfied with and
8  works nicely.
9       And the same thing would go with my
10 alternative design, except now you're going
11 to make it a little further up and a little
12 further over so that it would -- the point
13 of operation, the knives, would not be
14 accessible to a child.
15 Q. But would you agree with me that before you
16    would recommend that a manufacturer put such
17    an alternative design into the
18    marketplace --
19 A. They test it.
20 Q. -- you'd have to test it first?
21 A. You have to test everything before you put
22    it into the marketplace.
23 Q. And you have not tested your alternative
24    design theory in this case?

Page 103

1  A. No.
2  Q. And in the real world if you were hired by
3     Whirlpool or Sears, you would test it before
4     you would give them the opinion, This
5     alternative design is safer?
6  A. Yeah, I would tell them, that, you know,
7     We've gotta get an alternative design and
8     let's try -- you know, Let's start with this
9     and, you know, go through several iterations
10    until we get a design that is both safer and
11    works well.
12 Q. Have you even drawn up on a piece of paper
13    your alternative design that you have for
14    this case, the opinions in this case?
15 A. No, I might have if I had gotten some decent
16    dimensional drawings and some complete
17    dimensional drawings, but I wasn't given
18    them.
19 Q. Are you aware of any manufacturer that has
20    actually implemented an alternative design
21    the same as or similar to the ones you are
22    advocating in this case?
23 A. Without seeing the drawings or taking apart
24    their components, I don't know but that they

Page 104

1  have -- they already have that in there,
2  that it's not as accessible as the one in
3  the Whirlpool. It may be that it's further
4  up, it may be it's further over so that it
5  would already provide the guarding by
6  location.
7  Q. You don't know one way or the other, though,
8     do you?
9  A. No. Without taking apart their units, I
10    wouldn't know.
11 Q. And you haven't done that. Correct?
12 A. No.
13 Q. We might be at a good breaking point, but
14    before we do break, I just want to make sure
15    you have given me your design
16    recommendations.
17 A. Yes, sir.
18 Q. Is there anything else other than what we've
19    talked about the last half an hour that
20    would be part of your design recommendation
21    opinions for this product?
22 A. I think we've covered them. I mean, if I
23    get better drawings, I might be able to say
24    something else but --

Page 105

1  Q. Well, you have received dimensional drawings
2     from Whirlpool, have you not?
3  A. Oh, yeah. I have.
4  Q. Okay.
5  A. What are called dimensional drawings, they
6     have dimensions on them. They're not
7     complete and they show very little that
8     would be of assistance.
9  Q. You have actually seen the exemplar products
10    ice dispenser system now. Correct?
11 A. Yes.
12       MR. FOSTER: Why don't we take a
13 break.
14       MR. TINE: Sure.
15       (Lunch recess taken.)
16 Q. Doctor Richman, what was the name of the
17    company that you said you did some research
18    for where you got Exhibits 1 and 2, the
19    finger probes?
20 A. Security Engineered Machinery.
21 Q. Security Engineered --
22 A. -- Machinery.
23 Q. And did I understand you to say that they
24    manufactured paper shredders?

27 (Pages 102 to 105)

Page 110

1   are not aware of any other incident?
2   A. Right.
3   Q. If you look at your final report, and on
4      page 2 near the bottom --
5   A. Right.
6   Q. -- I think you're actually talking about the
7      subject refrigerator in the second to the
8      last paragraph?
9   A. Yes.
10  Q. And you've given the model number and the
11     serial number. Correct?
12  A. Yes, that's right.
13  Q. And then you state that this label also
14     indicates that the unit has the UL
15     laboratory seal. Do you see that?
16  A. Yes.
17  Q. Where is that label on the product itself?
18  A. Figure 2.
19  Q. So that label identifies the model number,
20     the serial number and a variety of other
21     information, but then it has the UL seal --
22  A. Yeah.
23  Q. -- on Figure 2 of your report?
24  A. Yes.

Page 111

1   Q. What does that UL seal mean to you as an
2      engineer?
3   A. It means it passed a certain UL standard.
4   Q. And what is UL?
5   A. Underwriters Laboratory is an independent
6      laboratory. It was set up years ago. Most
7      of their work was on insulation for
8      electrical wiring, and you could never buy a
9      piece of wiring cord without having a UL
10     sticker on it or a tag right in the middle
11     of the cord.
12        Basically, over the years they have
13     turned into a testing lab where they will
14     develop test programs and they develop
15     protocol for a manufacturer to use and they
16     go out and do spot checks to make sure the
17     manufacturer -- they bring some of the
18     products into their place.
19        They do spot checks to see that the
20     manufacturer is following the procedures.
21     And if the manufacturer isn't, there's a --
22     I don't know the financial arrangements, but
23     I know that there's a fee involved. But if
24     the manufacturer is following it and the

Page 112

1   ones that are tested meet the specs, then
2   they're allowed to put the UL logo on their
3   product.
4   Q. Do you consider UL the foremost independent
5      safety testing organization in the country
6      today?
7   A. No.
8   Q. Who do you consider to be superior to UL
9      when it comes to safety testing and
10     approval?
11  A. Well, UL is better than ANSI. ANSI doesn't
12     do testing, they do standards. But the way
13     in which ANSI develops the standards is by
14     consensus, and the manufacturers have a very
15     large representation on the committees.
16  Q. Mm-hmm.
17  A. I don't think UL works that way. I don't
18     know the ins and outs of their procedure for
19     generating a standard and who pays for it or
20     so forth. I find in the times that I've
21     used or looked at UL standards, I found them
22     lacking in different respects. And they --
23     so I don't consider probably any of these
24     labs very good.

Page 113

1   Q. Well, I can understand you saying that based
2      on this lawsuit.
3   A. No, I'm saying in general. Because I think
4      that it depends on who pays them to develop
5      the standards.
6   Q. My question is more towards not whether you
7      think they're a good testing laboratory, but
8      do you believe they are the foremost
9      independent testing and approval
10     organization in the country?
11  A. I think in certain respects ASME with their
12     boiler code is -- is more prominent and
13     Factory Mutual.
14  Q. Now, what is the difference between ASME and
15     ANSI?
16  A. Well, American Society of Mechanical
17     Engineers, ASME, developed standards before
18     there was ever an ANSI. And they developed
19     standards involving mechanical engineering.
20     One of the prime ones was boiler codes so
21     steam boilers didn't explode. Because, go
22     back 70, 80, 90 years, you had steam boiler
23     explosions all over the place.
24        And so they developed the codes and

1    the standards that are used for all of that
2    application. They developed the codes
3    regarding rotating machinery and nip points
4    and pinch points.
5    Q. Other than just having standards, does ASME
6    have a stamp of approval that they put on a
7    product?
8    A. In boiler codes, yes, they are the ones who
9    certify that a particular welding shop or
10   boiler manufacturer can stamp it as a
11   Class A or a Class B with different
12   capabilities and they put their stamp on a
13   boiler. It's not the same as putting your
14   stamp on an oil tank in a house that only
15   has eight pounds test pressure. Boilers
16   have to take a lot more. So they issue the
17   certification for that.
18        American Welding Society issues
19   certification for welders to go out and be
20   able to do certain types of work. So all of
21   these are more professional type of
22   organizations that represent that particular
23   field of engineering as well as the safety
24   standards in the field. Factory Mutual does

1    it from an insurance perspective.
2    Q. Well, what about consumer products that we
3    consumers have in residential property, what
4    approval and testing organization is
5    superior to UL for those types of consumer
6    products in your opinion, if any?
7    A. I would say that for gas appliances the
8    American Gas Association. The Canadian
9    Standards Association is very good.
10   Q. Superior to --
11   A. I would say so.
12   Q. -- UL?
13   A. Yes.
14   Q. The CSA is superior to UL in your opinion?
15   A. Yes. But, you know, as I say, I am not that
16   familiar with how UL develops the
17   standards. And it's -- if people follow a
18   standard that's already developed, they can
19   follow it to the letter --
20   Q. Mm-hmm.
21   A. -- and it's approved.
22   Q. Mm-hmm.
23   A. But if the standard is deficient, then
24   that's what leads to problems.

1    Q. Are you aware of any UL violations with the
2    subject refrigerator?
3    A. No.
4    Q. The 8-1/4 inches that you measured in your
5    report --
6    A. Right.
7    Q. -- what are the two points between that
8    8-1/4 of an inch measures to?
9    A. The distance from the bottom of that plastic
10   ice guide --
11   Q. The opening --
12   A. The opening --
13   Q. -- to the ice guide --
14   A. -- to the cone at the bottom up to the
15   inside of the -- let's see. Up to here.
16   Q. To the underneath side of the ice crushing
17   machine?
18   A. Yeah, the underneath side of the ice
19   crushing machine is 6-3/4.
20   Q. Oh, 6-3/4.
21   A. And then if I look at the bottom of the ice
22   crushing mechanism, there's an additional
23   1-1/2 inches to the blades.
24   Q. So the 8-1/4 inches is from the opening of

1    the ice chute to the blades?
2    A. Yeah. To the first blade. Because there's
3    several blades.
4    Q. Going down to your report on page 3 under
5    Analysis. We may have touched on this, I
6    just want to make sure I asked you this
7    question. Right under Analysis you state
8    that according to the deposition testimony
9    of Mr. Boughton and the safety audits
10   performed by Whirlpool, a UL articulated
11   probe was used to determine point of
12   operation of the ice crusher blades. Do you
13   see that?
14   A. Yes.
15   Q. Do you have any criticism of Whirlpool
16   utilizing the UL articulated probe when it
17   tested this product during the testing
18   process?
19   A. That's the central point to my argument,
20   that they should have used the one that --
21   that an adult wouldn't get hurt, the probe
22   was for an adult. That if they had used the
23   probe that was designed to represent the
24   child's hand and fingers, it would have

Page 118

1 shown -- it would have proved dangerous and
2 they could have redesigned it.
3 Q. Do I understand your position, it's not that
4 you're critical of Whirlpool using the UL
5 articulated probe which is identified in
6 Exhibit 3, but you believe they should have
7 also used the finger probe?
8 A. Yes, that they should have used both adult
9 and children.
10 Q. And you did not test this product with any
11 probes. Correct?
12 A. That's correct.
13 Q. Is your opinion in your final report the
14 same as your opinion in your preliminary
15 report?
16 A. I have to compare the two.
17 Q. All right.
18      (Witness reviews documents.)
19 A. The first opinion paragraph on the final
20 report is the same as in the preliminary
21 report. The second paragraph talks about
22 the warnings and that's in the preliminary
23 report. The third paragraph about the
24 emergency stop button was not in the

Page 119

1 preliminary report.
2      The fourth about a parental lockout
3 was not expressed as an opinion in the
4 preliminary report. The last one about the
5 parental lockout -- the last one is sort of
6 a summary opinion. That was not summarized
7 the same way in the preliminary report.
8 Q. Is there any opinion that you reached in
9 your final report that is different than or
10 in addition to your preliminary opinions?
11 A. I think the e-stop one which we discussed
12 earlier and the parental lockout, and that's
13 probably it.
14 Q. And do I understand correctly the earlier
15 discussion with the emergency lock that you
16 don't believe that such a lock would be
17 necessary if you had the parental lockout
18 code?
19 A. Right.
20 Q. But you do believe that this product should
21 have had a parental lockout code that made
22 the ice dispenser more child-resistant?
23 A. Yes.
24 Q. And this particular refrigerator is

Page 120

1 defective without having a parental lockout
2 code?
3 A. Yes.
4 Q. Are you aware of any studies that speak to
5 or support in any way your alternative
6 design of guarding by further location?
7 A. Well, the whole concept of guarding by
8 location is spelled out in standards that
9 have existed for years. But I'm not aware
10 of any study about guarding by design for --
11 or guarding by location for an ice
12 dispenser.
13 Q. That's what I was wondering. There is no
14 study about guarding by --
15 A. Location.
16 Q. -- location dealing with an ice dispensing
17 system?
18 A. Not that I know of, no.
19 Q. Have you ever applied for a patent on an
20 electrical appliance?
21 A. No.
22 Q. Have you applied for a patent on any other
23 kind of products?
24 A. Yes.

Page 121

1 Q. What kind of products have you applied --
2 A. It wasn't a product, it was a process.
3 Q. A process?
4 A. Yes.
5 Q. How many patents have you applied for?
6 A. One.
7 Q. And that was on a process?
8 A. Yes.
9 Q. What was the process?
10 A. It was a heat treatment process to
11 heat-treat a certain type of steel. The
12 patent wasn't granted. It was felt to be
13 non -- that it was within the state of the
14 art.
15 Q. Have you ever worked for a company that
16 designed or manufactured electrical
17 appliances?
18 A. No.
19 Q. What professional licenses do you hold?
20 A. I've got a professional engineer's license
21 in Massachusetts, Rhode Island and
22 Connecticut.
23 Q. Any others, licenses, other than a driver's
24 license?

31 (Pages 118 to 121)

Page 122

1  A. I'm a licensed ceramic engineer or licensed
2     chemist. Licensed ceramic engineer. That's
3     about it.
4  Q. Have you subjected your alternative design
5     proposals for this refrigerator to any type
6     of peer review scrutiny?
7  A. No. Because if I had made an alternative
8     design and put it together, that's one
9     thing. But without -- just conceptually,
10    peer review isn't gonna work.
11 Q. Why would peer review not work on a
12    conceptual alternative design plan?
13 A. Without dimensions and the drawings were not
14    sufficient and did not provide sufficient
15    information to do all the dimensional. If I
16    could draw it out, get all the dimensions,
17    then I could subject it to peer review.
18 Q. Have you ever owned a refrigerator that had
19    an automatic ice dispenser?
20 A. No. Not a through-the-door one.
21 Q. I mean through-the-door?
22 A. No. We discussed that earlier.
23 Q. Well, I know you don't right now, but I
24    meant have you ever in the past?

Page 123

1  A. No.
2  Q. When you visited the apartment the second
3     time, how long were you there?
4  A. About an hour. Maybe a little longer.
5  Q. Are those the only two times you have seen
6     the subject refrigerator?
7  A. Yes.
8  Q. So the total time you were in the apartment
9     or house where the subject refrigerator was
10    was about two hours?
11 A. Correct.
12 Q. And we have not marked these notes. What
13    are these notes of?
14 A. Those are the notes that I made after I saw
15    the refrigerator in July.
16 Q. I can't read these very well. So let me
17    just come around here, we'll just kind of
18    walk through this.
19    MR. FOSTER: And we'll mark this as
20    the next exhibit which is going to be 10.
21    (Exhibit 10 marked for
22    identification.)
23 Q. Let me just look over your shoulder, if you
24    don't mind. Just going down these notes,

Page 124

1     did you take these notes when you were at
2     the apartment or when you came home?
3  A. No, these were written -- these were
4     transposed from a piece of scrap paper I had
5     done it on.
6  Q. So what's --
7  A. In re Dossantos.
8  Q. The name of the case. Now, if you'd just
9     kind of read down those lines for me.
10 A. New ice crusher mechanism installed by
11    Sears.
12 Q. What you mean by that was, now the new ice
13    maker crusher mechanism was put into the
14    refrigerator?
15 A. Yes. It hadn't been there when I saw it in
16    March.
17 Q. Okay.
18 A. Fits over built-in shelf when inside of
19    door. That's how this crusher thing fits
20    on. Contains a bin or hopper and crusher
21    blades. Flap opens inward when dispenser
22    pushed in by glass. 2-1/2 inch ID at
23    discharge end, clear plastic chute.
24 Q. What is a 2-1/2 inch ID?

Page 125

1  A. Inside diameter.
2  Q. Inside --
3  A. That's the opening.
4  Q. Would you consider that the minor
5     dimension? Do you know what I'm referring
6     to when I say "minor"?
7  A. It's round so I don't know. If it was oval,
8     I could understand you meant the minor
9     dimension; but that's the circular opening
10    at the bottom.
11 Q. 2-1/2 inches.
12 A. Yeah. At the top of the built-in shelf, you
13    have an opening that looks like the shape
14    that I have in the sketch.
15 Q. Mm-hmm.
16 A. There's a drive linkage to the crusher.
17    That's a circular piece.
18 Q. Right.
19 A. It's almost rectangular. It's 4-1/2 inches
20    on one side, only 3-1/4 on the other because
21    there's sort of an insert there. And it's
22    2-3/4 in and out of the door.
23 Q. Okay.
24 A. Now, the diagonal distance from this Point A

32 (Pages 122 to 125)