UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASMINE D. BUNTON, BY HER LEGAL GUARDIAN, LOURENCO P. DOSSANTOS, and LOURENCO P. DOSSANTOS,<br><br>PLAINTIFFS,<br><br>v.<br><br>SEARS ROEBUCK AND CO., and WHIRLPOOL CORPORATION,<br><br>DEFENDANTS. | CIVIL ACTION NO.: 04-CV-12369-NG |

**MEMORANDUM IN OPPOSITON TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT, DR. MARC RICHMAN**

**I. Statement of Facts and Background**

This action was instituted by Plaintiff after her left hand was severely injured in an ice dispenser unit designed and manufactured by defendant Whirlpool and sold and marketed by defendant Sears Roebuck. The family of the plaintiff purchased a refrigerator, brand "Kenmore", on or about June 29, 2003 in a Sears Roebuck store in Massachusetts. This model is equipped with an integrated ice maker in the door of the freezer compartment. In order to retrieve ice, a lever has to be pushed which sets the cutting tools concealed in the door in motion and ice (either crushed or in cube form) falls through an approximate 8" long chute. The refrigerator was installed by Sears Roebuck representatives at plaintiffs' home. Although a water line was never hooked up to the ice maker, the ice dispenser was functional.

On or about April 16, 2004, then 8 year old plaintiff Jasmine Bunton tried to dispense ice from the ice maker; as no ice would fall out, she reached up into the chute with her left hand in an

1

attempt to free up an ice jam. With her hand placed in the ice dispenser chute, her forearm pressed against the lever, activating the internal mechanism; the hidden ice crusher blades started to rotate and severely lacerated her hand. With her other hand, she was able to push the "lock" button on the display panel, preventing further injury and the likely loss of her fingers. Alerted by her agonized screams, family members called a rescue team that was finally able to free Jasmine. In order to do so, the rescue team had to use a cutting tool to dissemble the ice maker. The process took over two hours during which Jasmine remained trapped in agony, with blades locked into her hand.

After emergency treatment, Jasmine had to undergo additional, complicated surgery including nerve grafting from her leg. The necessity of more surgery is indicated by Defendants' medical expert, Dr. Nalebuff. It is uncontested that, as a result of this accident, Jasmine will be physically impaired for the rest of her life.

Defendants have conceded that children are foreseeable, intended users of the ice maker / refrigerator (see: Boughton Depo. P. 47:8-16), and that ice damns or jams could occur. It is further conceded that plaintiff's attempt to free ice by reaching into the ice chute was not unforeseeable misuse, in other words, was foreseeable use (see: Boughton Depo. P. 41:6-23); defendants' expert witness even recommended this course of action and conceded that he would and has done so himself. However, defendants' expert was obviously not concerned with being injured as he knew his hand was too wide to reach the internal blades (see: Boughton Depo. P. 54:3-11).

Plaintiff retained Dr. Eric Adams, a forensic economist, to testify about the lost earning potential plaintiff has suffered as a result of the accident and the injury.

Also, Plaintiffs retained Dr. Marc Richman, a professional engineer and retired professor from Brown University, to examine the refrigerator. Dr. Richman examined the refrigerator two

2

times, on March 31, 2004 and on June 17, 2004; the first time, he was only able to examine the ice chute as the ice maker had not been replaced by the Sears Roebuck technicians. On his second visit, Dr. Richman partially dissembled the repaired ice maker and took numerous photos and measurements of the dimensions of the ice maker unit and particularly of the ice chute. He also attempted to reach up the ice chute with his own hand. He came to the conclusion that the cutting tools in the ice crusher are located approx. 8 ¼ inches above the chute exit; he further revealed that the chute has a diameter of approx. 2 ½ inches. Although repeatedly requested by Plaintiffs, defendant Whirlpool did not at first produce any dimensioned drawings of the ice maker. Dr. Richman had to rely on his own measurements and empiric field tests to prepare his initial report for filing with this Court. Dr. Richman further studied the safety reports of Whirlpool and Mr. Boughton's deposition transcript. He discovered that the safety test performed by Whirlpool utilizing a so called "articulated UL probe" is not a simulated hand and forearm of a child. This use of an "adult like" probe appeared to be the only safety test performed in order to determine whether the point of operation of the blades was guarded by location from a person's reach.

Specifically, Dr. Richman learned that Whirlpool had not performed <u>any</u> test probes with simulated children's hands, although such probes exist and are in use. Based on his analysis, his two (2) time examination of the ice dispenser, his interviews performed and his studies of the materials given to him, Dr. Richman opined that the ice dispenser was defective in design and/or manufacture and that it was unfit for its intended purpose, as intended users (children) were able to reach the cutting tools of the ice crusher mechanism from the exterior, as this point of operation was not guarded by location. He observed that there was also a warning defect present as there was no warning altogether against the dangers to be encountered by someone who attempts to clear an ice jam with their fingers from the outside. He further opined that the ice

maker should have had a parental lock and an emergency stop button and concluded that the refrigerator was unreasonably dangerous for its intended purpose.

Plaintiffs believe that at least with regard to the causes of action sounding in strict liability, there is no genuine issue of material fact. Plaintiffs therefore filed a motion for partial summary judgment on October 14, 2005. Defendants opposed this motion on November 4, 2005 and filed a Daubert/Rule 702 motion to exclude plaintiffs' expert Dr. Richman and a consequent motion to dismiss the same day. This brief is filed in opposition to defendants' Daubert/Rule 702 motion.

## II. Statement of the Question Presented

The question presented by Defendant's motion to Exclude Plaintiffs' Expert Testimony is whether the expert testimony, including the expert opinion testimony, meets the basic requirements of Rule 702 F.R.E. as delineated by Daubert v. Merell Dow Pharm., Inc., 509 U.S. 579 (1993), and Kumro Tire Company Ltd. v. Carmichael, 526 U.S. 137 (1999).

## III. Argument

Dr. Richman's analysis, investigation and resulting expert engineering testimony, including expert opinion testimony, meets the basic Daubert and Rule 702 F.R.E. requirements for admissibility of expert testimony. Dr. Richman is well qualified as an expert in engineering by knowledge, experience, training and education. His testimony, including his expert opinion, is relevant – it is based upon scientific, technical and specialized knowledge and will assist the trier of fact to understand the evidence and the facts of the case. Further, Dr. Richman's opinion is based upon sufficient facts and data and the product of reliable methods which he reliably applied to the facts of the case, thus making it reliable.

4

**A. Legal Standard**

Expert opinion must be "based upon sufficient facts or data" and be the "product of reliable principles and methods" applied "reliably to the facts of the case" (F.R.E. 702; <u>Carifio v. Benetton Sportsystem USA, Inc.</u>, 2005 WL 1527801 (D. Mass., 2005).

F.R.E. 702 and the <u>Daubert</u> trilogy of cases imposes a "gatekeeping" function on the court to determine the admissibility of an expert's opinion. The court hereby follows a two – prong test in order to determine whether the proffered expert's opinion is admissible.

1. First, the Court determines whether the expert is <u>qualified</u> "by knowledge, skill, experience, training and education" to render his opinion.

2. Second, the court determines whether the opinion itself is <u>reliable</u> pursuant to Rule 702 F.R.E. and the principles set forth in <u>Daubert</u>. For the second step, Rule 702 F.R.E. establishes three (3) requirements to determine if the opinion is reliable: (1) The opinion must be "based upon sufficient facts or data;" (2) the opinions must be "the product of reliable principles and methods" and finally (3), the opinion must apply these "principles reliably to the facts of the case." <u>Daubert</u> further established that the Court must first determine the reliability of the opinion, which requires an assessment of whether the reasoning or the methodology used is scientifically valid and secondly, the Court must decide if the reasoning or methodology was correctly applied to the facts of the case. In order to determine the reliability of the opinion, the <u>Daubert</u> court discussed "general observations" of four factors, which may be considered: (a) whether the theory or technique can be tested; (b) whether the theory or technique was subjected to peer review; (c) whether the method has a known potential rate of error and (d) whether the theory or technique is generally accepted in the scientific community. The Court made it clear

that these factors are by no means "a definitive checklist or test."[1] They are not always pertinent in assessing a particular expert's reliability depending upon the expertise, nature of the case and the subject of the expert's testimony.[2]

If the admissibility of an expert's opinion was challenged with a <u>Daubert</u>/Rule 702 motion, the proponent of the challenged expert's testimony has to prove by a preponderance of the evidence that the testimony is admissible pursuant to the standard of Rule 702 F.R.E. as construed by the <u>Daubert</u> – trilogy. Thus, plaintiffs have to show that:

(a) Expert Dr. Richman is <u>qualified</u> to render engineering testimony and opinion testimony;

(b) That his testimony is <u>relevant</u> (as it will assist the trier of fact); and

(c) That his testimony is <u>reliable</u>, defined as based upon sufficient facts/data, that it is the product of reliable principles/methods and that those were correctly applied to the case.

**B. Analysis**

<u>1. Dr. Richman is evidently qualified to testify as an expert in this case</u>

a) Dr. Richman has been a practicing engineer since 1957. He graduated from Massachusetts Institute of Technology with a Bachelor of Science degree in Metallurgy and holds a PhD in Metallurgy and Material Science from the same school. During his time in the Military, he was in charge of the "Combat Material and Maintenance Inspection Team" for the Second United States Army. He joined the faculty of Brown University in 1963, became a Professor with tenure in 1967, and a full Professor in 1970. He was in charge of the "Materials Engineering Concentration" and was Director of Undergraduate Programs in Engineering. For 18 years, he taught a course in Products Liability *("The Engineer, The Lawyer, and The Consumer")*. Dr. Richman was an Engineer in the Central Technical Division of Bethlehem Steel Shipbuilding, Quincy, MA where he worked on failure analysis, welding, corrosion, and casting. He is a Fellow

---

[1] <u>Daubert</u>, at 593.
[2] <u>Kumro</u> Tire, at 150.

of the Materials Society (U.K.), the National Academy of Forensic Engineers, and the American Institute of Chemists. He is a well sought after forensics expert, having served as court appointed expert to US District Courts and having testified in over 175 trials and depositions since 1981. Dr. Richman also taught classes dealing with warnings on the operation of equipment. He took the status of *Professor Emeritus* in 1998.

b) Defendants contest Dr. Richman's testimony on the basis that he has no previous experience with the design of refrigerators and ice dispensing units (p. 5 of Motion to Exclude), or, as one could frame it, that he is not a licensed, experienced "refrigerator/ice maker design expert," also trained in human engineering. One might reply that, such an expert, if one could be located, would probably be employed by a refrigerator company and hence be unavailable as an expert witness for plaintiffs. Further, the specialized skills of an "ice maker designer," if any exist in terms of skills and specialization, are not needed to analyze the facts presented, given the simple geometric shape and dimensions of the apparatus.

In Estate of Ashton Chapman v. Bernard's Inc., and Mattress Discounters, 167 F.Supp.2d 406 (D. Mass. 2001), this Court had to decide a Daubert/Rule 702 F.R.E. motion to exclude the expert testimony of a professional engineer in a case involving the design defect of a child bed that resulted in the fatal injury to an infant. Although the expert proffered had no experience in the field of "daybeds, crips, baby furniture or even furniture in general", the court denied the motion, observing that "general engineering expertise is sufficient because the design defect at issue turns on the interaction of metal tubes, bolts, springs and various stresses thereon which seems to this court to be the subject of basic engineering expertise."[3]

Further, in Carifio v. Benetton Sportsystem USA, Inc., 2005 WL 1527801 (D. Mass. 2005), this court refused to exclude the testimony of a "general engineer" in a case involving a

---

[3] Ibidem at p. 421; emphasis added.

defectively designed rollerblade brake. Although the proffered expert had no experience in the "design, manufacture, testing and use of in-line skates," this Court held that general engineering expertise is adequate for admissibility, where "the design issues implicated – the interaction of grips and locking mechanisms – are governed by basic principles of physics and engineering."[4]

The case at bar does not involve any complex technical details but instead hinges on such simple questions as whether or not the ice chute in the refrigerator was long enough or narrow enough, and whether or not the chute could have been made longer or the diameter of the chute narrower. It can be concluded that Dr. Richman is obviously qualified, in fact overqualified, to testify in this case, involving the most simple principles of engineering and measurement.

2. Dr. Richman's expert testimony, including his expert opinion testimony, is reliable and relevant

a) Dr. Richman's Testimony is based upon sufficient facts and data

Dr. Richman has examined the refrigerator twice; he partially dissembled the ice maker, took photographs and measurements of the dimensions of the ice maker unit, particularly of the ice chute. Furthermore, he studied every document produced by Whirlpool, including the safety reports and the transcript of Mr. Boughton's deposition. He also interviewed the plaintiff and relevant family members. Dr. Richman did not overlook any data or facts relevant to his analysis.[5]

---

[4] Carifio v. Benetton Sportsystem USA, Inc., 2005 WL 1527801, at 4; emphasis added
[5] Plaintiffs repeatedly requested dimensioned drawings of the ice maker unit; the production by defendants was delayed until after the filing deadline for the expert report had run. Dr. Richman therefore had to rely on his own measurements and empiric field tests for his opinions. His analysis was confirmed by the drawings, produced shortly before his final report.

8

b) Dr. Richman's testimony, including opinion, was the product of reliable principles and methods

Defendants, possibly in an attempt to confuse this Court, misstate the Supreme Court's mandate in the Daubert trilogy of cases. The Supreme Court mandates that the result of the testimony is achieved through scientifically reliable principles, methods or sound reasoning. The Court offers four "general observations" or factors helpful in determining this; these observations that are not meant to be "a definitive checklist or test"[6] and "are not always pertinent in assessing a particular expert's reliability depending on the expertise, the nature of the issue and the subject of the expert's testimony," as "too much depends on the circumstances of the particular case at issue."[7]

i) Design Opinions

Dr. Richman concluded in his testimony that the ice maker unit was designed in such a way that a person with a small forearm (i.e. a child) could reach through the ice chute and reach the cutting tools of the machine. He further concluded that this person would be at risk to severely lacerate his or her hand and possibly even lose fingers. The scientific method employed by Dr. Richman to reach this conclusion was **the taking of dimensional measurements** of the ice maker, particularly of the ice chute's position, its length and diameter, and its position on the refrigerator. It is readily apparent that the **taking of dimensional measurements** will easily pass any of the Supreme Court's four observations in Daubert and Kumho Tire.

Dr. Richman further opined that a refrigerator – a device inherently viewed to be safe by the general public - that allows a foreseeable user to severely maim his or her hand through

---

[6] Daubert, at 593.
[7] Kumho Tire, at 150-151.

9

conduct that admittedly[8] is foreseeable use, is unreasonably dangerous and thus defectively designed. Any lay person may come to this conclusion based on the simplest of principles. Measurements are scientific tests of the simplest form. Defendants do not challenge the accuracy of the measurements or the methodology in taking same. In fact, they admit that taking physical measurements is the easiest and best way to determine a refrigerator's dimensions (see: Boughton Depo. P. 52: 7-24).

Finally, Dr. Richman stated that a safer, alternative design is possible and feasible. He pointed out the possibility of a <u>parental lock</u>, an <u>emergency button</u> and <u>guarding by location</u>, i.e. making the ice chute longer or narrower. Because Dr. Richman has not somehow "tested" these designs, Defendants conclude that his opinion is not reliable. Dr. Richman pointed out the possibility of alternative designs that are either <u>in use</u> by other manufacturers or are <u>so simple in design</u> that, because they are based on the simplest of principles (a slightly longer chute, a chute with a bend, a narrower chute) need not be tested. Defendants do not deny that some of these alternative designs are possible or practiced. They admit that the design alternative of a parental code or lock intended to make the use of the ice dispenser more difficult were <u>not only considered but implemented in other models</u>. Defendants' expert admits this in his deposition taken on June 17, 2005:

> Q: If a child could reach the lock button, the only step in their path to using the ice or water dispenser is to press the unlock button?
> A: That's correct.
> Q: <u>Was there ever any design or safety consideration to put some kind of code or other features to make it more complicated to unlock the ice or water dispenser?</u>
> A: Not in this model, no.
> Q: <u>That consideration, has it ever been implemented in other models?</u>
> A: <u>Yes.</u>

(<u>See</u>: Boughton Depo. P. 51:23 and P.52:1-9)

---

[8] See: Boughton Depo. P. 41:6-23.

10

Besides that, Defendants do not state any particular test that might have been required as a matter of law beyond the testing Dr. Richman has conducted - measuring and empiric attempts to reach through the chute. (See <u>Carifio v. Benetton Sportsystem USA, Inc.</u>, 2005 WL 1527801 (D. Mass. 2005), refusing the argument that testimony was unreliable because there was no "testing" performed where no specific testing that might be required was pointed out by defendants).

ii) Warning Opinions

Dr. Richman also stated that in his opinion, the users of the ice maker should have been warned against the danger of having one's hand cut in the ice maker and that, <u>absent any warning whatsoever</u>, the design of the ice maker suffered from an additional design defect. Defendants conclude that Dr. Richman, who taught classes in dealing with warnings on the operations of equipment in one of America's most prestigious universities for years, is not qualified to make "warning opinions."

They state that other manufacturers do not use a warning on their ice dispenser units and that therefore none are needed on their product (p. 18 of Motion to Exclude Dr. Richman). This statement is as irrelevant as it is incorrect. The possible failure of others will not excuse failures of this defendant. Furthermore, at least two competing manufacturers <u>do include a warning</u> in their manuals against the danger realized in this case. For instance, General Electric Corporation includes a conspicuous statement in their manual for comparable models, warning users never to put <u>"fingers or other objects into the ice crusher discharge opening"</u>. Maytag Corporation includes a similar statement in a conspicuous location, prominently set forth, cautioning users not to put <u>"fingers, hands, or any foreign object into the dispenser opening,"</u> to <u>"avoid personal injury or property damage"</u>.

11

<u>See</u>: Exhibit A and B, Excerpts of refrigerator manuals issued by General Electric and Maytag.

Defendants further reason that because Dr. Richman has, as they put it, "limited" experience with warnings, his opinion should be excluded. They quote a decision by the Supreme Court of New Hampshire involving the difficult question of whether or not the warnings on a complicated construction vehicle were sufficient or not. Dr. Richman's testimony was excluded because in the view of the trial court, he was not experienced enough in the field to determine this intricate question of warnings for a complicated commercial vehicle. The case at bar does not involve a complicated warning for sophisticated commercial machinery nor is it about the adequacy of warnings. It has to be stressed again that <u>no warning at all</u> was given with respect to the dangerous cutting blades. Dr. Richman did not have to opine as to the adequacy of a warning - none existed.

Furthermore, contrary to Defendants' challenge concerning Dr. Richman's experience in designing warnings, it should be noted that he recently developed warning labels for commercially marketed products (see: Dr. Richman Depo. P. 74:1-24 and P.75:1-13). Also, he taught classes dealing with warnings on the operations of equipment at Brown University for many years.

We believe that Dr. Richman is amply qualified to opine that a refrigerator, viewed as a harmless appliance, but capable of severely lacerating a user's limbs should contain a warning against the hidden dangers involved in the use of this utility.

c) Further, Dr. Richman's testimony, including opinion testimony, is relevant as it will assist the trier of fact with the facts and the evidence in the case.

12

## IV. Conclusion

Dr. Richman's expert testimony and expert opinion are straightforward engineering testimony, based upon reliable principles and reliable methods. His testimony does not involve anything new or unique nor any novel scientific principles or theories. Plaintiffs have met their burden of proof to establish that Dr. Richman is qualified, that his opinion is reliable and relevant, in particular, that it is based upon sufficient data and facts, that it is based upon reliable principles and methods and that those were correctly applied to the case. None of Defendants' arguments demonstrate that Dr. Richman's testimony does not meet the Daubert/Rule 702 reliability requirements. Plaintiffs respectfully request that this Court deny Defendants' Motion to Exclude the Testimony of Dr. Richman.

Plaintiffs,
By their attorneys,

Andrew J. Tine (BBO#633639)
Haese, LLC
30 Federal Street
Boston, MA 02110
(617) 428 0266 (Telephone)
(617) 428 0276 (Telefax)
atine@haese.com



www.GEAppliances.com

# *Profile* Side by Side Refrigerators

**Safety Instructions** . . . . . . . . . . .2–4

**Operating Instructions**
Automatic Icemaker . . . . . . . . . . .14
Care and Cleaning . . . . . . . . . .16, 17
Crispers and Pans . . . . . . . . . . . .13
CustomCool™ . . . . . . . . . . . . . .7, 8
Ice and Water Dispenser . . . . . . . .15
Refrigerator Doors . . . . . . . . . . .12
Replacing the Light Bulbs . . . . . . .18
Shelves and Bins . . . . . . . . . . .10, 11
Temperature Controls . . . . . . . . . . .5
TurboCool™ . . . . . . . . . . . . . . . . .6
Water Filter . . . . . . . . . . . . . . . . .9

**Installation Instructions**
Installing the Refrigerator . . . .28–31
Moving the Refrigerator . . . . .24–27
Preparing to Install
the Refrigerator . . . . . . . . . . . . . .23
Trim Kits and Panels . . . . . . . .19–22
Water Line Installation . . . . . .32–34

**Troubleshooting Tips** . . . . . . .36–38
Normal Operating Sounds . . . . . .35

**Consumer Support**
Consumer Support . . . . .Back Cover
Performance Data Sheet . . . . . . . .41
Product Registration . . . . . . . .43, 44
State of California Water
Treatment Device Certificate . . . . .42
Warranty (Canadian) . . . . . . . . . .39
Warranty (U.S.) . . . . . . . . . . . . . .40



Models 23, 25, 26, 27 and 29

*Profile* Côte à Côte
# Réfrigérateurs



La section française commence à la page 46

*Profile* Lado a Lado
# Refrigeradores



La sección en español empieza en la página 88

**Write the model and serial numbers here:**

Model # _____

Serial # _____

Find these numbers on a label inside the refrigerator compartment at the top on the right side.



200D2600P042    49-60350    09-04 JR

**EXHIBIT A**

## *About the ice and water dispenser.* (on some models)

GEAppliances.com


Spill Shelf

### To Use the Dispenser

Select **CUBED ICE**, **CRUSHED ICE** or **WATER**.

Press the glass gently against the top of the dispenser cradle.

The spill shelf is not self-draining. To reduce water spotting, the shelf and its grille should be cleaned regularly.

*If no water is dispensed when the refrigerator is first installed, there may be air in the water line system. Press the dispenser arm for at least two minutes to remove trapped air from the water line and to fill the water system. To flush out impurities in the water line, throw away the first six glassfuls of water.*

**CAUTION:** *Never put fingers or any other objects into the ice crusher discharge opening.*

### Locking the Dispenser



Press the **LOCK CONTROL** pad for 3 seconds to lock the dispenser and control panel. To unlock, press and hold the pad again for 3 seconds.

### Dispenser Light



This pad turns the *night light* in the dispenser on and off. The light also comes on when the dispenser cradle is pressed. If this light burns out, it should be replaced with a 6 watt 12V maximum bulb.

### Quick Ice



When you need ice in a hurry, press this pad to speed up ice production. This will increase ice production for the following 48 hours or until you press the pad again.

### Door Alarm



To set the alarm, press this pad until the indicator light comes on. This alarm will sound if either door is open for more than 3 minutes. The light goes out and the beeping stops when you close the door.

---

### Important Facts About Your Dispenser

- Do not add ice from trays or bags to the storage drawer. It may not crush or dispense well.

- Avoid overfilling glass with ice and use of narrow glasses. Backed-up ice can jam the chute or cause the door in the chute to freeze shut. If ice is blocking the chute, poke it through with a wooden spoon.

- Beverages and foods should not be quick-chilled in the ice storage drawer. Cans, bottles or food packages in the storage drawer may cause the icemaker or auger to jam.

- To keep dispensed ice from missing the glass, put the glass close to, but not touching, the dispenser opening.

- Some crushed ice may be dispensed even though you selected **CUBED ICE**. This happens occasionally when a few cubes accidentally get directed to the crusher.

- After crushed ice is dispensed, some water may drip from the chute.

- Sometimes a small mound of snow will form on the door in the ice chute. This condition is normal and usually occurs when you have dispensed crushed ice repeatedly. The snow will eventually evaporate.

*Safety Instructions · Operating Instructions · Installation Instructions · Troubleshooting Tips · Consumer Support*

**EXHIBIT A**




**Side by Side**



# Refrigerator

Use & Care Guide

| | | | | |
|---|---|---|---|---|
| ⚠ | Important............................ | | Water Filter ......................... 20-22 | |
| | Installation ....................... 3-9 | | Food Storage Tips ............. 23-25 | |
| | Temperature Controls ...... 10-12 | | Care and Cleaning ........... 26-29 | |
| | Fresh Food Features ......... 13-15 | | Operating Sounds ................. 30 | |
| | Freezer Features ................... 16 | ? | Troubleshooting ............... 31-34 | |
| | Ice and Water ................... 17-19 | | Warranty & Service ............... 35 | |
| | | | Guide d'utilisation et d'entretien . 36 | |
| | | | Guía de uso y cuidado ................. 74 | |

Form No. C/11/04   Part No. 12842107   www.maytag.com   Litho U.S.A.

**EXHIBIT B**

# Ice and Water

## Automatic Ice Maker
### (non-dispenser models)

> **Note**
> - Energy rating guides that are posted on the refrigerator at the time of purchase do not include optional ice maker energy usage.

Some models are automatic ice maker ready. The number of the appropriate ice maker kit is IC10S. The kit contains installation instructions and water connection instructions.

Other models have a factory installed ice maker. Connect the ice maker to the water supply as instructed on page 5. **Proper water flow and a level refrigerator are essential for optimal ice maker performance.**

## Operating Instructions

- Confirm ice bin is in place and ice maker arm is down.
- After freezer section reaches between 0° to 2° F (-18° to -17° C), ice maker fills with water and begins operating. You will have a complete harvest of ice approximately every three hours. 
- Allow approximately 24 hours after installation to receive first harvest of ice.
- Discard ice created within first 12 hours of operation to verify system is flushed of impurities.
- Stop ice production by raising ice maker arm until click is heard.
- Ice maker will remain in the OFF position until arm is pushed down.
- The first one or two batches will probably contain undersized and irregular cubes because of air in the supply line.
- When the ice cubes are ejected it is normal for several cubes to be joined together at the ends. They can easily be broken apart. The ice maker will continue to make ice until the supply of ice cubes raises the sensor arm, shutting the ice maker off.
- Certain sounds may accompany the various cycles of the ice maker. The motor may have a slight hum, the cubes will rattle as they fall into an empty storage pan and the water valve may click or "buzz" occasionally.
- If the ice is not used frequently, the ice cubes will become cloudy, shrink, stick together and taste stale. Empty the ice storage bin periodically and wash it in lukewarm water. Be sure to dry the bin thoroughly before replacing it.
- Beverages and foods should not be placed in the ice storage bin for quick chilling. These items can block the sensor arm, causing the ice maker to malfunction.
- Turn off (arm up) the ice maker when the water supply is to be shut off for several hours.

### To Remove the Ice Bin:
- Pull it forward, away from the ice maker. To avoid the ice maker dumping ice while the bin is removed, turn the ice maker off by raising the sensor arm.

### To Install the Ice Bin:
- Reverse the above procedure. Turn the ice maker on by lowering the sensor arm.



⚠ WARNING

**EXHIBIT B**



# Ice and Water

## Dispenser Features
(select models)



Main Dispenser Pad

Removable Tray

### Dispenser Light (select models)

A light activates within the dispenser area at full power when dispensing ice or water with the main dispenser pad.

### Dispenser Pad

The **Dispenser Pad** is located on the back wall of the dispensing area. When the dispenser pad is pressed, the selection chosen on the dispenser control panel will dispense.

### Removable Tray

The **Removable Tray** at the bottom of the dispenser area is designed to collect small spills and may be easily removed for cleaning and emptying purposes.

**IMPORTANT:** Removable tray does not drain. Do not allow tray to overflow. If it does, remove tray and wipe up overflow.

## Water Dispenser Operation



⚠ CAUTION

### Note
- During initial use of water dispenser, there will be a one- to two-minute delay while water tank fills before water dispenses. Discard first 10-14 glasses of water after initially connecting refrigerator to household water supply and after extended periods of nonuse.

### To Use Dispenser Pad:
- Choose water selection from dispenser control panel.
- Press sturdy, wide-mouthed container against dispenser pad. When dispensing crushed ice, hold container as close to chute as possible to reduce spraying.
- Release pressure on dispenser pad to stop water dispensing. A small amount of water may continue to dispense and collect in dispenser tray. Large spills should be wiped dry.

# EXHIBIT B