

**haese**

Attorneys at Law
30 Federal Street, 3rd Floor
Boston, Massachusetts 02110-2508
Telephone 617.428.0266
Facsimile 617.428.0276
Web Site www.haese.com

100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Telephone 860.249.7194
Facsimile 860.249.7195

**Via Certified Mail**

March 6, 2006

Steven M. Key, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Third Floor
Boston, MA 02129

Robert Foster, Esq.
Nelson Mullins
1320 Main Street, 17th Floor
Columbia, SC 29201

Certified Article Number
7160 3901 9844 0443 6058
SENDERS RECORD

Certified Article Number
7160 3901 9844 0443 6065
SENDERS RECORD

Re:   **Bunton v. Sears Roebuck et al.**

Dear Mr. Key and Mr. Foster:

Upon review of the transcript of the oral deposition of Stephen Boughton, defendants' designated expert and 30(b) 6 witness, conducted on January 12, 2006, we came across significant discrepancies to earlier testimonies of Mr. Boughton.

Mr. Boughton stated in his expert report dated September 30, 2005:

"The safety audit and hazard analysis process <u>failed to reveal any incident similar</u> to the Bunton incident, and therefore this incident and injury was not reasonably foreseeable by Whirlpool Corporation".

Further, on or about June 17, 2005 during his first deposition, Mr. Boughton testified that in the many years he has worked for the defendant Whirlpool, Plaintiff's injury was the first of this kind that he encountered and that he had never heard of any similar incident since 1968, the year he was first involved in refrigerator design.

Q. Are you aware of any present or past claims against Whirlpool by anyone claiming to have been injured by putting their hand up the ice dispenser chute?

A. <u>This is the first one I have heard of</u>. I've been involved in refrigerator design since 1968.
(See: Boughton Depo. I, 67:24; 68:1-6).

Attorneys also admitted to practice in
Colorado, Connecticut, Rhode Island
and Germany

**EXHIBIT A**

**haese** Limited Liability Company

Steven M. Key, Esq.
Robert Foster, Esq.
March 6, 2006
Page 2

When Mr. Boughton was asked in more general terms whether he believes that an accident like the one at hand was possible, he replied:

"Obviously in this case, <u>this is the first one that I've ever heard</u> of like this".
Obviously, it is possible..."
(See: Boughton Depo.I, 42:23-24; 43:1-2).

During the ongoing litigation, Defendants have quoted Mr. Boughton's report and his other statements regarding the uniqueness of the accident involving Jasmine Bunton on numerous occasions, both in briefs and oral arguments. They did so to allege that Jasmine's accident was not "foreseeable" and indeed a singular event (see i.e. page 1 and 2 of Defendants' "Statement of Material Facts" of November 4, 2005 with relevant appendices B and C; pages 7 and 8 of Defendants' "Response to Plaintiffs' Motion for Partial Summary Judgment" of the same date, with relevant appendices A and B).

During his second deposition on January 12, 2006, Mr. Boughton was again asked if he had heard about similar accidents. Over the initial objection by Defendants' counsel (see: Boughton Depo. II, pages 49:1-53:2), Mr. Boughton finally conceded that he had indeed been informed about similar accidents involving ice makers of refrigerators (see: Boughton Depo. II, 53:3-55:16).

Mr. Boughton stated that he had knowledge of similar accidents and that he had learned of those sometime after he was notified of the Bunton accident. However, he refused to reveal or claimed to be unable to recall what exact accident or accidents had occurred nor was he willing or able to reveal when he was notified of those similar accidents and by whom (see Boughton Depo. II, 53-55).

According to Rule 26 (e) FRCP, any party is required to supplement at appropriate intervals both information contained in expert reports and information provided through a deposition of an expert if the party learns that in some material respect the information disclosed is incomplete or incorrect.

The fact that, contrary to prior statements both by Defendants' counsel and by Defendants' expert and 30(b)6 designee, Defendants were aware of the fact that similar accidents had occurred, is obviously of great importance for the underlying litigation and should have been disclosed by Defendants without

**EXHIBIT A**

**haese** Limited Liability Company

Steven M. Key, Esq.
Robert Foster, Esq.
March 6, 2006
Page 3

any request made by Plaintiffs.

Therefore, we request that Defendants supplement their expert report and the statements made by their expert/corporate designee and that they immediately disclose the following information:

1. What exact accidents have occurred involving ice makers of Whirlpool or other manufacturers?

2. When exactly did those accidents occur?

3. Who was involved?

4. When did Whirlpool learn or could have learned about them?

5. Were legal actions taken against Whirlpool or other manufacturers and are those legal actions still ongoing?

We would expect you to comply with your obligations under Rule 26 (e) by sending us the requested information by March 20, 2006 at the latest.

Very truly yours,

Glenn H. Haese
GHH/FB

cc: Anthony J. Penry, Esq.

**EXHIBIT A**

# Nelson Mullins

Nelson Mullins Riley & Scarborough LLP
Attorneys and Counselors at Law
1320 Main Street / 17th Floor / Columbia, South Carolina 29201
Tel: 803.799.2000  Fax: 803.256.7500
www.nelsonmullins.com

Robert W. Foster, Jr.
(Admitted in SC & GA)
803.255.9414
robbie.foster@nelsonmullins.com

March 28, 2006

<u>Via Facsimile 617-428-0276</u>

Glenn H. Haese, Esquire
Haese, LLC
70 Franklin Street, 9th Floor
Boston, MA 02110

RE:   Jasmine D. Bunton, by Her Legal Guardian, Lourenco P. Dossantos,
      and Lourenco P. Dossantos v. Sears Roebuck and Co.
      Civil Action No. 04-4374-H
      Whirlpool No. 04-NA-ADC-29072
      Sears No. 2004-005740
      Our File No. 02289/01753

Dear Mr. Haese:

We have reviewed your March 6, 2006, correspondence requesting supplemental information, and we respectfully disagree with your contention that additional information should be provided, or that there are any inconsistencies in the testimony.

First, as to Mr. Boughton's expert report, the "safety audit and hazard analysis" referenced in his report would have been conducted prior to the manufacture of the subject refrigerator in accordance with normal Whirlpool procedures. At the time of manufacture of the subject refrigerator in 2003, Whirlpool engineers were unaware of any incident similar to the Bunton incident. Therefore, there is nothing to supplement regarding the safety audit and hazard analysis for the subject refrigerator. Therefore, the response provided was, and still is correct and complete and there is nothing to supplement regarding the safety audit and hazard analysis for the subject refrigerator.

Second, Mr. Boughton's deposition testimony is completely consistent throughout his two depositions. As you correctly noted in your correspondence, Mr. Boughton testified that the Bunton incident was the "first one I have heard of." Such testimony was, and remains, completely accurate.

**EXHIBIT B**

Glenn H. Haese, Esquire
March 28, 2006
Page 2

    During Mr. Boughton's second deposition, he very clearly stated he was made aware of someone else sticking their hand up an ice chute "sometime after I was notified of this case and now." The Bunton incident was the first time the Whirlpool engineer had heard of such an incident involving someone deliberately sticking their arm up the chute of an ice dispenser.

    Neither Stephen Boughton nor Whirlpool has ever stated anything to the contrary. The Bunton incident was not reasonably foreseeable because this incident was Mr. Boughton's first knowledge that someone would ever try to stick their arm into the ice chute. Consequently, we do not believe that the testimony as given was incorrect and hence there is no requirement that it be changed or supplemented.

                                    Very truly yours,

                                    *Robert W. Foster, Jr.*

                                    Robert W. Foster, Jr.

RWFJR:coc

cc:    Steven M. Key, Esq.

**EXHIBIT B**

**haese** Limited Liability Company

**haese**

Attorneys at Law
30 Federal Street, 3rd Floor
Boston, Massachusetts 02110-2508
Telephone 617.428.0266
Facsimile 617.428.0276
Web Site www.haese.com

100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
Telephone 860.249.7194
Facsimile 860.249.7195

*Via Certified Mail*

April 10, 2006

Steven M. Key, Esq.
Campbell, Campbell, Edwards & Conroy
One Constitution Plaza
Third Floor
Boston, MA 02129

Robert Foster, Esq.
Nelson Mullins
1320 Main Street, 17th Floor
Columbia, SC 29201

Certified Article Number
7160 3901 9844 0443 5730
SENDERS RECORD

Certified Article Number
7160 3901 9844 0443 5716
SENDERS RECORD

Re:   **Bunton v. Sears Roebuck et al.**

Dear Mr. Key and Mr. Foster:

I have received your fax correspondence dated March 28, 2006 in which you take the position that the expert report of Mr. Stephen M. Boughton need not be updated after we found what we believe to be significant discrepancies in his report and in his statement of records have been discovered during his second deposition.

In order to avoid seeking redress at the court, I would like to attempt to resolve this matter in a telephone conference with you and/or Mr. Foster next week or the week after. Please let me know when you are available for a telephone conference.

In addition, we would like to advise you that we request supplementation of response No. 10 of Defendant Sears, Roebuck to Plaintiffs' First Set of Interrogatories of Response No. 7 of Plaintiffs' First Request for Production. Defendants' answers cannot be maintained in the light of the concession made by Mr. Stephen M. Boughton in his second deposition on January 12, 2006.

Yours very truly,

Glenn H. Haese, Esq.

Attorneys also admitted to practice in
Colorado, Connecticut, Rhode Island
and France

**EXHIBIT C**

# STEPHEN G. BOUGHTON

```
 1      A    Yes.
 2      Q    This subject model refrigerator, do you
 3  know if it was delivered to the end user with the
 4  icemaker/dispenser/crusher, all those components
 5  already installed?
 6      A    I believe that they are.
 7      Q    And I think I have already asked this.
 8           The icemaker/dispenser/crusher, all
 9  those units were designed and manufactured by
10  Whirlpool?
11      A    Yes.
12      Q    If you can look at Exhibit No. 13 again,
13  on the third page under the heading Product, it
14  says intermediate safety audit and then in
15  parentheses it says door chill, handles, and gold
16  control.
17           Does this safety audit specifically
18  relate to just those components?
19      A    It looks like there were some other
20  issues identified or at least other parts
21  reviewed at the same time, but it's primarily for
22  those components.
23      Q    And what are those components?
24           Door chill, what does that refer to?
                                                  65
```

```
 1      A    Door chill is a system that directs some
 2  chilled air directly into the shelves on the door
 3  to improve the temperature distribution in the
 4  door area.
 5      Q    And the next item is handles.
 6           Is that referring to the exterior
 7  handles on the freezer and on the refrigerator?
 8      A    Yes.
 9      Q    And gold control, what does that refer
10  to?
11      A    I believe that is an electronic
12  control.
13      Q    So the gold control refers to in your
14  belief electronic controls?
15      A    It may be, but I don't remember for
16  sure.
17      Q    When you're saying that, are you
18  thinking that those are the exterior controls of
19  Exhibit 3 or something else?
20      A    It could be that, or it could be the
21  temperature controls inside the refrigerator.
22           I don't remember for sure.
23      Q    Is there a separate safety audit report
24  that relate to other components or features of
                                                  66
```

```
 1  the refrigerator?
 2      A    There would be on previous models and
 3  for things that didn't change between previous
 4  models and this model. You won't review things
 5  that have already been reviewed.
 6           But I do see some references in here to
 7  a drop-down shelf and to a veggie tray.
 8      Q    So even though the title of this product
 9  review refers to those three categories, you're
10  saying in certain instances testing was performed
11  on other features of the refrigerator as
12  referenced in that document?
13      A    Yes.
14      Q    Are you aware of any other safety
15  audits, documents relating to this refrigerator
16  or subject model refrigerator?
17      A    Not that I'm aware of.
18           There is a reference further back in
19  here to gold control knobs, which would indicate
20  this is not an electrical control. That would be
21  a mechanical control.
22      Q    What Bates page is that on?
23      A    Bates No. 000322.
24      Q    Are you aware of any present or past
                                                  67
```

```
 1  claims against Whirlpool by anyone claiming to
 2  have been injured by putting their hand up the
 3  ice dispenser chute?
 4      A    This is the first one I have heard of.
 5  I've been involved in refrigerator design since
 6  1968.
 7      Q    Could you look at this document,
 8  Bates No. 000001 through 14, and from looking at
 9  the photographs 1 through 9, tell me what part is
10  missing from the interior of the freezer door.
11           And if it's easier to just refer to page
12  numbers and groups of parts, that is sufficient.
13      A    You're talking about what is missing
14  from --
15      Q    From the ice crusher, ice holster
16  assembly that goes inside the freezer door.
17      A    The only thing I can tell that's missing
18  is the part that's in this drawing, in Exhibit
19  No. 11.
20      Q    Exhibit No. 11, that drawing, could you
21  look at the parts listing, which is Bates label
22  No. 1 through 14, and tell me if you see an
23  exploded view or configuration which shows those
24  parts.
                                                  68
```

## STEPHEN G. BOUGHTON

```
 1      Q   And in the safety audit or safety
 2  considerations for this subject model
 3  refrigerator was it considered that someone may
 4  try to free that ice damn or ice jam?
 5      A   Not in terms of a safety hazard, no.
 6      Q   So in Whirlpool's design process did it
 7  ever consider that an ice jam or an ice damn
 8  would occur and an individual would try to free
 9  that jam by sticking their hand up the ice chute?
10      A   Well, that is certainly one way that you
11  could do it.
12      Q   Right.  And in the safety audits which
13  you were involved in was it ever considered that
14  someone would actually do it, would actually put
15  their hand up the ice chute to try to free an ice
16  jam?
17      A   I would not consider that to be a safety
18  hazard.
19      Q   Could you elaborate on that; why you do
20  not believe that to be a safety hazard?
21      A   Well, when I clear an ice jam like that
22  in my refrigerator, I reach up there and I
23  dislodge the cubes and they fall out.
24      Q   Can you can reach up with your hand?
                                                  41
```

```
 1      A   As far as I can.  That opening, of
 2  course, is not very far.  But I can reach up far
 3  enough.
 4          If there are icecubes jammed in there
 5  and if I can free it from underneath, I'll do
 6  that and make the icecubes fall out.
 7          If I can't reach the jam, then I open
 8  the door and reach in from the inside.
 9      Q   And in the refrigerator which you are
10  using at home to free ice jams, are you concerned
11  about reaching too far and reaching any working
12  parts?
13      A   No.
14      Q   Is that a different model refrigerator
15  than the one that is the subject of this
16  litigation?
17      A   No.  The mechanism is basically the same
18  as this one.
19      Q   Is it your opinion that it's impossible
20  for someone to reach up the ice chute and become
21  injured by the working mechanisms of the ice
22  crusher?
23      A   Well, obviously in this case, this is
24  the first one that I've ever heard of like this.
                                                  42
```

```
 1  Obviously, it is possible because it appears to
 2  have happened in this case.
 3      Q   That was going to be my follow-up
 4  question, whether you believe that this happened
 5  or not.
 6      A   Well, I suppose if it hadn't happened,
 7  we wouldn't be here.
 8      Q   What type of safety tests or safety
 9  audit tests were performed to determine whether
10  someone could injure themselves by putting their
11  hand up the ice chute?
12      A   We use a standard underwriter's
13  laboratory test fixture to determine whether it's
14  likely for someone to be able to reach into that
15  particular hazardous part.
16      Q   Could you describe that test fixture for
17  me.
18      A   It's called an articulator probe.
19      Q   Do these comes in different sizes and
20  lengths and configurations?
21      A   No.
22      Q   What does it look like?
23      A   It basically simulates a wrist and a
24  single articulated finger.
                                                  43
```

```
 1      Q   Can you describe for me approximately
 2  the dimensions of this device?
 3      A   It's at the lower two and a half inches
 4  at the wrist area.
 5      Q   Diameter or circumference?
 6      A   It's more like a flattened oval.
 7      Q   About two and a half inches in diameter?
 8      A   It has a major diameter of a little over
 9  two and a half inches.
10      Q   And a minor diameter of --
11      A   I don't know the exact dimension.
12  Probably an inch or so.
13      Q   Okay.
14      A   It's not actually a diameter.  It's a
15  width across a flat area.
16      Q   And also you said that it has some kind
17  of a finger component to it?
18      A   Yes.
19      Q   Could you describe that for me.
20      A   I believe the total length is something
21  like six inches, more or less.
22      Q   Now, in testing -- is it your testimony
23  that in testing this subject model refrigerator
24  that device was placed up the ice chute from the
                                                  44
```

EXHIBIT E    PLNT1888

Page 49:

```
 1    missing?
 2         MR. FOSTER: Object to the form. Go ahead
 3    and tell him what you don't know.
 4  A  Well, I haven't seen her testimony. I haven't
 5    seen any depositions that describe exactly what
 6    she said happened.
 7  Q  You didn't read Jasmine Bunton's deposition
 8    testimony prior to forming your expert opinions?
 9  A  No.
10  Q  Did you read the deposition testimony of anyone
11    prior to forming your expert opinions?
12  A  Not that I can recall.
13  Q  Have you heard of anyone hurting themselves by
14    sticking their hand up an ice chute in a
15    refrigerator?
16         MR. FOSTER: Let me just object to this. A
17    lot of this we went into last time. Prior
18    depositions, prior trials, prior employment, prior
19    injuries? I mean, we --
20         MR. TINE: Well, he's designated as an
21    expert, and as an expert, especially since there's
22    been a time frame since his last deposition, he
23    may have heard of someone sticking their hand up
24    into an ice chute. It is a valid question.
```

Page 50:

```
 1         MR. FOSTER: Thing is he is not a 30(b)(6).
 2    You have had your chance at a 30(b)(6) witness.
 3    He is being produced to you by agreement for his
 4    expert opinions in the case. Now, I don't, I
 5    think it is inappropriate for you to start asking
 6    30(b)(6) witness questions. Discovery is closed.
 7    So I don't think that is appropriate.
 8         MR. TINE: I don't think, by agreement, I
 9    don't think discovery is closed with respect to
10    this expert deposition.
11         MR. FOSTER: It was agreed that you were
12    allowed to take his expert deposition. I did not
13    agree that you could, No. 1, ask the same
14    questions that you asked in the 30(b)(6)
15    deposition or that the 30(b)(6) deposition is
16    continued. Now, these are what you're doing right
17    now. Since his, asking questions since he last
18    gave a deposition is telling me you're going to,
19    you're asking him 30(b)(6) questions.
20         MR. TINE: Well, I think this is a valid
21    question for an expert. If you had someone new
22    whose name is Joe Smith who was the expert, I
23    could ask have you ever heard of anyone hurting
24    themselves, themself by sticking their hand up a
```

Page 51:

```
 1    chute, I could ask that. If I could ask it of a
 2    newly designated expert Joe Smith, I can ask it of
 3    Stephen Boughton.
 4         MR. FOSTER: If it's related to his expert
 5    assessment in this case. I'm going to let him
 6    answer questions, but not in his normal employment
 7    with Whirlpool Corporation. That's a 30(b)(6)
 8    purpose. That is what we've done.
 9         MR. TINE: Well, if the expert has gained
10    their ability to render expert opinions from their
11    work at their employer's place of employment, that
12    is, that doesn't mean that he can't testify with
13    respect to his experiences which are obviously the
14    basis for him forming his opinions. If Joe Smith
15    was your expert who worked for GE, I can ask him
16    about anything he did at GE which may be relied on
17    or used to form his expert opinions. It is not
18    our fault that you've choosen an expert that also
19    works at Whirlpool. Therefore, he can talk about
20    anything, any knowledge acquired at Whirlpool. I
21    have to be able to look into that fact.
22         MR. FOSTER: All I'm talking about is you
23    have asked a series of questions that you have
24    already asked this witness in the prior
```

Page 52:

```
 1    deposition, prior testimony, prior employment, and
 2    you could be getting him to be giving different
 3    answers without me asking him to review his prior
 4    deposition, and then secondly, I do not think it
 5    is appropriate to be going into subject matters
 6    outside of his expert designation in this case.
 7    That's what you said you wanted to depose him for.
 8         MR. TINE: I think this is appropriate. I
 9    will ask him. If you want to tell him not to
10    answer, then I will go to the judge, because I
11    think it's inappropriate.
12         MR. FOSTER: I just want, don't want you to
13    think that we're opening up this 30(b)(6)
14    deposition.
15         MR. TINE: I only have about four more
16    questions, so I don't know how much I could open
17    it up. Some of the questions I do understand were
18    duplicative such as where he lives and such
19    questions.
20         MR. FOSTER: I am not talking about that.
21    I'm talking about the last ten minutes.
22         MR. TINE: I am trying not to cover the same
23    material again. I think this is an appropriate
24    question. I would ask it of any expert. If you
```

EXHIBIT F      N12556

DEPOSITION OF STEPHEN G. BOUGHTON

January 12, 2006

Page 53

```
 1      want to object and instruct him not to answer --
 2          MR. FOSTER: Go ahead.
 3   Q  Have you heard of anyone hurting themself by
 4      sticking their hand up an ice chute of a
 5      refrigerator?
 6   A  Yes.
 7   Q  When did you hear of this?
 8   A  Sometime after I was notified of this case and
 9      now.
10   Q  How did you acquire that knowledge?
11   A  Don't remember specifically.
12   Q  Do you know who you acquired it from?
13   A  No, I don't.
14   Q  And you said after what, after you became involved
15      in this case?
16   A  Yes.
17   Q  As an expert or otherwise?  Let me just rephrase
18      that.  When approximately did you learn that
19      someone was injured by sticking hair hand up an
20      ice chute of a refrigerator?  And I assume it's
21      someone other than the Plaintiff in this case.
22   A  I've already answered that question.  It was
23      sometime after I was notified of this case --
24   Q  When were you notified of this case?
```

Page 54

```
 1   A  -- and now.  I believe it was sometime in 2004.
 2   Q  Did you ever look into the circumstances of that
 3      accident?
 4   A  No.
 5   Q  Was it on a Whirlpool refrigerator?
 6   A  Probably, but I don't know for sure.
 7   Q  Did you hear it from someone at Whirlpool or from
 8      someone outside of Whirlpool?
 9   A  Probably somebody at Whirlpool.
10   Q  Did they tell you the time frame of when that
11      accident happened?
12   A  No.
13   Q  Was it before the Plaintiff was injured in this
14      case?
15   A  I don't believe so.
16   Q  Is Whirlpool being pursued or sued by the person
17      who was injured for sticking their hand up the ice
18      chute?
19   A  I don't know.
20   Q  Have you ever made an inquiry outside of Whirlpool
21      as to whether anyone has ever heard of someone
22      being injured by sticking their hand up an ice
23      chute of a refrigerator?
24   A  No, I haven't.
```

Page 55

```
 1   Q  Were you told what model refrigerator the accident
 2      that you were made aware of involved?
 3   A  No.
 4   Q  I'm talking about the accident other than the one
 5      that is the subject of this litigation.  You
 6      understand that?
 7   A  Yes.
 8   Q  So you were just told by someone that you don't
 9      remember possibly employed by Whirlpool that
10      someone was injured by sticking their hand up an
11      ice chute in a refrigerator, and you don't know
12      anything else about that, didn't look into it at
13      all?
14   A  No.
15   Q  Is that correct what I just stated?
16   A  That's correct.
17
18          MR. TINE: Thank you.  I don't have any more
19      questions.
20          MR. FOSTER: No further questions.
21
22          (Whereupon the deposition was adjourned at
23      9:55 a.m.)
24
```

Page 56

CERTIFICATE

(to be signed by the deponent)

I, _____, on this day, the _____ of _____, 2006, do hereby certify that the foregoing is a true and accurate transcription of my deposition which was held on Thursday, January 12, 2006.

IN RE: JASMINE D. BUNTON, By Her Legal Guardian, Lourenco P. Dossantos and Lourenco P. Dossantos VS SEARS ROEBUCK and COMPANY
DEPOSITION OF: STEPHEN G. BOUGHTON

EXHIBIT F

BUNT2557

**Page 53**

 1    want to object and instruct him not to answer --
 2        MR. FOSTER: Go ahead.
 3  Q   Have you heard of anyone hurting themself by
 4      sticking their hand up an ice chute of a
 5      refrigerator?
 6  A   Yes.
 7  Q   When did you hear of this?
 8  A   Sometime after I was notified of this case and
 9      now.
10  Q   How did you acquire that knowledge?
11  A   Don't remember specifically.
12  Q   Do you know who you acquired it from?
13  A   No, I don't.
14  Q   And you said after what, after you became involved
15      in this case?
16  A   Yes.
17  Q   As an expert or otherwise? Let me just rephrase
18      that. When approximately did you learn that
19      someone was injured by sticking hair hand up an
20      ice chute of a refrigerator? And I assume it's
21      someone other than the Plaintiff in this case.
22  A   I've already answered that question. It was
23      sometime after I was notified of this case --
24  Q   When were you notified of this case?

**Page 54**

 1  A   -- and now. I believe it was sometime in 2004.
 2  Q   Did you ever look into the circumstances of that
 3      accident?
 4  A   No.
 5  Q   Was it on a Whirlpool refrigerator?
 6  A   Probably, but I don't know for sure.
 7  Q   Did you hear it from someone at Whirlpool or from
 8      someone outside of Whirlpool?
 9  A   Probably somebody at Whirlpool.
10  Q   Did they tell you the time frame of when that
11      accident happened?
12  A   No.
13  Q   Was it before the Plaintiff was injured in this
14      case?
15  A   I don't believe so.
16  Q   Is Whirlpool being pursued or sued by the person
17      who was injured for sticking their hand up the ice
18      chute?
19  A   I don't know.
20  Q   Have you ever made an inquiry outside of Whirlpool
21      as to whether anyone has ever heard of someone
22      being injured by sticking their hand up an ice
23      chute of a refrigerator?
24  A   No, I haven't.

**Page 55**

 1  Q   Were you told what model refrigerator the accident
 2      that you were made aware of involved?
 3  A   No.
 4  Q   I'm talking about the accident other than the one
 5      that is the subject of this litigation. You
 6      understand that?
 7  A   Yes.
 8  Q   So you were just told by someone that you don't
 9      remember possibly employed by Whirlpool that
10      someone was injured by sticking their hand up an
11      ice chute in a refrigerator, and you don't know
12      anything else about that, didn't look into it at
13      all?
14  A   No.
15  Q   Is that correct what I just stated?
16  A   That's correct.
17
18        MR. TINE: Thank you. I don't have any more
19  questions.
20        MR. FOSTER: No further questions.
21
22        (Whereupon the deposition was adjourned at
23  9:55 a.m.)
24

**Page 56**

CERTIFICATE

(to be signed by the deponent)

I, _____, on this day,
the _____ of _____, 2006, do hereby
certify that the foregoing is a true and
accurate transcription of my deposition which
was held on Thursday, January 12, 2006.


IN RE:   JASMINE D. BUNTON, By Her Legal
Guardian, Lourenco P. Dossantos and Lourenco P.
Dossantos  VS  SEARS ROEBUCK and COMPANY
DEPOSITION OF:  STEPHEN

**EXHIBIT G**

BUNT2557



Refrigeration Technology

EVANSVILLE, INDIANA 47727 • AREA CODE (812) 426-4000
WRITER'S DIRECT NUMBER (812) 426-4003
FAX (812) 426-4029

September 30, 2005

REPORT OF
STEPHEN G. BOUGHTON

JASMINE BUNTON
04-NA-ADC-29072

**EXHIBIT H**

**ASSIGNMENT:**

Analyze the design of the refrigerator that is the subject of this lawsuit, model number 106.53634300, serial number sp2535958.

**OBSERVATIONS AND CONCLUSIONS:**

1. I have examined the design of the model refrigerator and am familiar with the design of the ice delivery system. I am also involved in the safety audit process for refrigeration products.
2. The ice delivery system used in this refrigerator design was tested according to the UL testing protocol and passed all UL testing procedures. The refrigerator was approved and is listed by UL as passing safety testing requirements.
3. The design of this refrigerator meets all internal Whirlpool product safety requirements, including access to moving parts.
4. The safety audit and hazard analysis process failed to reveal any incident similar to the Bunton incident, and therefore this incident and injury was not reasonably foreseeable by Whirlpool Corporation.

Stephen G. Boughton
September 30, 2005

**EXHIBIT H**

CURRICULUM VITAE
STEPHEN G. BOUGHTON


EDUCATION:

Jefferson High School, Lafayette, Indiana, Diploma 1960
Purdue University, West Lafayette, Indiana, BSEE, 1964
Communications Officer School, US Air Force, 1965
University of Tennessee Nashville, graduate courses 1977 - 1978:
                Economics I
                Economics II
                Accounting I
                Accounting II


CONTINUING EDUCATION / TRAINING:

Statistics of Reliability Measurement, General Electric Co., 1969
Time Share Programming for Engineers, General Electric Co., 1970
Design of Experiments, General Electric Co., 1971
Analysis of Human Transactions, General Electric Co, 1972
Quality Awareness, General Electric Co., 1972
Value Planning, General Electric Co., 1972
Creative Engineering, General Electric Co., 1973
Decision Analysis, General Electric Co., 1974
Professional Engineer Review, General Electric Co., 1974
Assertive Management, Michigan State University, 1983
Product Safety and Liability Prevention, University of Wisconsin, 1984
Statistical Process Control, Employers Association of Grand Rapids, 1984
Essentials of Supervision, Whirlpool Corporation, 1988
Managerial Grid, Scientific Methods, Inc., 1988
Project Management, Whirlpool Corporation, 1990
Training the Engineering Expert Witness, University of Wisconsin, 1990
Technical Fundamentals for the Fire Investigator, University of Wisconsin, 1991
The Successful Defense of the Product Liability Lawsuit, University of Wisconsin, 1994
The Role of Warnings and Instructions, University of Wisconsin, 1996
Advanced Fire, Arson, and Explosion Investigation Science & Technology Program,
       Eastern Kentucky University, 1997
Investigation of Gas & Electric Appliance Fires, Fire Findings Laboratories, 1999


ADDITIONAL STUDY COURSES:

How to Conduct a Fire Investigation, University of Wisconsin, 1991
Electrical Fires; Cause, Prevention, Investigation, University of Wisconsin, 1991

**EXHIBIT H**

**PATENTS:**

Three patents; Refrigerator door gasket, refrigerator door alignment means, and refrigerator temperature control mechanism. Patents assigned to General Electric Co.

**PROFESSIONAL REGISTRATIONS:**

Registered Professional Engineer
Certified Fire & Explosion Investigator

**WORK EXPERIENCE:**

| | |
|---|---|
| 1965 - 1968 | **Communications Officer, US Air Force** |
| | Conducted site surveys and prepared communications plans for relocation of Air Force units between bases within Tactical Air Command. |
| 1968 - 1970 | **Evaluation Engineer, General Electric Co.** |
| | Test engineer for electrical and electromechanical components on household refrigerators and freezers, and supervisor of lab technicians. |
| 1970 - 1972 | **Cost Improvement Engineer, General Electric Co.** |
| | Designed and implemented cost reduction projects for refrigerators and freezers. |
| 1972 - 1974 | **Cabinet Design Engineer, General Electric Co.** |
| | Designed shelves, shelf support systems, door gaskets and other mechanical components for refrigerators and freezers. |
| 1974 - 1975 | **Reliability Engineer, General Electric Co.** |
| | Designed and implemented quality improvement projects for refrigerators and freezers. |
| 1975 - 1978 | **Design Engineer, Samsonite Corp.** |
| | Designed folding furniture, outdoor furniture, reception room furniture and barstools. |
| 1978 - 1985 | **Product Engineering Manager, Attwood Corp.** |
| | Designed hardware and accessories for recreational boats, supervising Engineers, Designers and Drafters. |
| 1985 - 1987 | **Chief Mechanical Engineer, Bennett Pump Co.** |
| | Designed components and products for retail gasoline dispensing equipment, supervising Engineers, Designers and Drafters. |
| 1987 - 1990 | **Lead Engineer, Whirlpool Corp.** |
| | Designed components and systems for household dishwashers, supervising Engineers, Designers and Drafters. |
| 1990 - | **Product Safety Manager, Whirlpool Corp.** |
| | Design consultant for safety concerns. Provide engineering analysis and input to evaluate product liability claims on refrigerators, freezers, ice makers, room air conditioners, dehumidifiers, trash compactors and vacuum cleaners. |



**EXHIBIT H**

9. Please provide the case caption, docket number, state and court of any pending litigation or settled litigation relating to the subject refrigerator, Kenmore Model #10653634300.

**RESPONSE 9:**

Defendant Sears objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding this objection, Defendant Sears is unaware of any pending or settled litigation involving anyone suffering injury by the ice dispenser with Kenmore model no. 106.53634300.

10. Please provide the case caption, docket number, state and court of any pending litigation or settled litigation relating to injuries caused by the use of any Sears or Kenmore door mounted ice dispensers.

**RESPONSE 10:**

Defendant Sears objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding this objection, Defendant Sears has been unable to locate any pending or settled litigation relating to injuries caused by any Sears or Kenmore door mounted ice dispensers.

11. Please identify all documents relating to any recalls of the subject refrigerator, Kenmore Model #10653634300.

**RESPONSE 11:**

None.

**EXHIBIT J**

discovery of admissible evidence. Whirlpool further objects to this request to the extent that it could be construed to seek materials that are proprietary, confidential commercial or business information or materials that are immune from discovery under the work-product doctrine and/or attorney client privilege. Subject to and without waiving the foregoing objections, and subject to the Confidentiality Order, Whirlpool will produce a Product Approval Report, Safety Audits and UL test for the subject refrigerator after the Confidentiality Order is agreed to by the parties.

6. Produce all documents, communications, complaints and lawsuit pleadings that relate to allegations of injury resulting from the use of the dispenser and/or ice maker/crusher on the subject model refrigerator.

RESPONSE: Whirlpool objects to this request on the grounds that it is overly broad. Subject to and without waiving the foregoing objection, Whirlpool states that it has been unable to identify any prior claims or lawsuits alleging injury resulting from the use of the dispenser and/or ice maker/crusher on the subject model refrigerator.

7. Produce all documents, communications, memos, complaints and lawsuit pleadings that relate to allegations of injury resulting from the use of an ice dispenser/crusher on any refrigerator sold under the Sears or Kenmore label that utilizes the same dispenser and/or ice maker/crusher assembly utilized in the subject model refrigerator.

RESPONSE: Whirlpool objects to this request on the grounds that it is overly broad. Subject to and without waiving the foregoing objection, Whirlpool states that it has been unable to identify any prior claims or lawsuits alleging injury resulting from the

**EXHIBIT K**